**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| | § | Case No. 24-12796-LSS |
| AKOUSTIS TECHNOLOGIES, INC.,[1] | § | (Jointly Administered) |
| | § | |
| Debtors. | § | **Proposed Hearing Date: January 8, 2025 at 2:30 p.m. ET** |
| | § | **Proposed Obj. Deadline: January 7, 2025 at 4 p.m. ET** |
| | § | |
| | § | **Re. Bankr. D.I. 14** |

**QORVO, INC.'S MOTION TO STAY THE BIDDING PROCEDURES AND SALE**
**MOTION PENDING THE DISPOSITION**
**OF THE MOTION TO WITHDRAW THE REFERENCE**

Qorvo, Inc. ("Qorvo"), through its undersigned counsel, hereby submits this motion (the "Motion") to the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to Rule 5011(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), staying the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice thereof, and (F) Granting Related Relief; an and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C)*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929), and RFM Integrated Device Inc. (1138). The Debtors' corporate headquarters is located at 9805 Northcross Center Court, Suite A, Huntersville, NC 28078.

*Granting Related Relief* [Bankr. D.I. 14][2] and all issues related thereto (the "Sale Motion," and the bidding procedures attached thereto, the "Bidding Procedures") filed by the above-captioned debtors and debtors in possession (the "Debtors") pending disposition of *Qorvo, Inc.'s Motion to Withdraw The Reference With Respect to the Bidding Procedures and Sale Motion* ("Motion to Withdraw the Reference"), concurrently filed herewith, to be heard by the United States District Court for the District of Delaware (the "District Court").

Qorvo provides the following statement pursuant to Rule 9013-1(f) of the Local Bankruptcy Rules for the Bankruptcy Court: Qorvo has not and does not consent to the Bankruptcy Court's entry of final orders or judgments.

Counsel for Qorvo conducted an oral, telephonic, meet and confer with counsel to Debtors on December 30, 2024 regarding the Motion, the Motion to Withdraw the Reference and a motion to hear the Motion on an expedited timeframe. Counsel for the Debtors informed Qorvo that it would not oppose a motion to hear the Motion on shortened time but would not consent to the Motion or the Motion to Withdraw the Reference. In support of this Motion, Qorvo respectfully states as follows:

## **INTRODUCTORY STATEMENT**

1.       Qorvo respectfully requests that this Court stay the proceedings regarding the Bidding Procedures and Sale Motion, pending a decision by the District Court on Qorvo's Motion to Withdraw the Reference, which is concurrently filed. This Motion is designed to preserve the parties' respective status quo until the District Court – the appropriate forum to adjudicate disputes regarding the PI (as defined below) and the Sale Motion – can consider, and rule on, the Motion to Withdraw the Reference. As set forth herein, these bankruptcy cases are effectively a last gasp

---

[2]       Docket references to the Bankruptcy Court shall be delineated as "[Bankr. D.I. #]" and docket references to District Court shall be delineated as "[D. Del. D.I. #]."

attempt by Debtors to re-litigate the PI, strip the District Court of its jurisdiction, and promulgate a sale of Qorvo's intellectual property rights without Qorvo's consent. To be clear, Qorvo is not trying to torpedo any sale, and rather is in favor of a liquidation sale that maximizes estate assets. However, the process has to be fair to Qorvo, and the process contemplated by the Bidding Procedures is designed to undermine Qorvo's rights. The Debtors have offered no reasonable justification for the impractical need for speed, especially when balanced against the very real, and irreversible, harm to Qorvo. As such, the Motion should be granted to allow the District Court time to rule on the Motion to Withdraw the Reference.

2.     The Bidding Procedures and Sale Motion intentionally undermine the protections, timeline, and procedural safeguards established and imposed by the District Court to protect Qorvo's rights. Debtors' proclamation at the First Day Hearing that it has abided by the PI thus far means virtually nothing because the compliance process is at its very earliest stage. Indeed, despite the Court entering the PI Order (defined below) on October 15, 2024, Debtors waited nearly *two months* (until December 4, 2024) to even *identify* e-discovery vendors Stroz Friedberg, LLC ("Stroz Friedberg") and Technology Concepts and Design, Inc. ("TCDI," and together with Stroz Friedberg, the "E-Vendors") for Qorvo's consideration and approval to assist in removing Qorvo's confidential and trade secret information from the expansive Inspection Materials (as defined below).

3.     Now that the E-Vendors are finally in-place (after Debtors' long delay), the critical process of cleansing Debtor's systems of Qorvo's trade secret information is expected to take several months, not weeks, followed by Qorvo's right to conduct a detailed audit process by a Qorvo Auditor (defined below) to ensure Debtors' compliance with the PI and that Qorvo's trade secrets are not subsequently re-introduced. The Bidding Procedures and Sale Motion are an

attempt to short-circuit an orderly District Court mandated cleansing process and circumvent audit protections for Qorvo contemplated in the PI, as discussed herein.

4.     As this court is aware, a jury found that Debtors Akoustis Technologies, Inc. and Akoustis, Inc. (together, "Akoustis") willfully and maliciously misappropriated 39 of Qorvo's trade secrets and infringed two of Qorvo's patents. Thereafter, the District Court, to protect Qorvo's property rights, issued (i), on October 11, 2024, an *Order Granting in Part and Denying in Part Plaintiff's Motion for Permanent Injunctive Relief* (the "PI Order" [D. Del. D.I. 709], a copy of which is attached as **Exhibit 1** to the Declaration of Leib M. Lerner ("Lerner Declaration"), ¶ 3 and (ii) on October 15, 2024, a *Permanent Injunction* against the Debtors (the "PI" [D. Del. D.I. 710], a copy of which is attached as **Exhibit 2** to the Lerner Declaration, ¶ 4.

5.     Distilled to its essence, the District Court, through its PI established a two-year process (that expands to four years if the Debtors fail to comply in the first two years) whereby the E-Vendors are required to identify and cleanse anywhere Qorvo's confidential and trade secret information might reside, including Debtors' databases, email mailboxes, physical files and document management systems, and Qorvo is granted a yearly audit right to inspect and vet the Debtors' compliance with the PI through its own chosen professionals (the "Qorvo Auditor"). The audit right is critical not only to ensure that Debtors faithfully expunge the huge amount of Qorvo confidential and trade secret information from their systems, but also as a protection that the confidential and trade secret information that Debtors have been relying on is not re-introduced. To be clear, Qorvo's confidential information includes a broad range of highly complex and technical information concerning the design and manufacture of bulk acoustic wave filters. The technical nature of such information makes the identification, cleansing and audit process complex, difficult and time consuming, as it involves identifying and cleansing technical design

and manufacturing information that is derived from Qorvo's misappropriated information. A true and correct copy of the Stroz Friedberg Proposal (as defined below and as redacted before transmission to Qorvo) is attached as **Exhibit 3** to the Lerner Declaration, ¶ 5.  A true and correct copy of the TCDI Proposal (as defined below and as redacted before transmission to Qorvo) is attached as **Exhibit 4** to the Lerner Declaration, ¶ 6.[3]

6.      The District Court maintained jurisdiction to monitor and enforce the PI. In stark contrast, the Bidding Procedures seek to rewrite the PI, and usurp the protections afforded thereby, through, among other things, (i) truncating the District Court's mandated cleansing process into a six to eight week period for the E-Vendors; (ii) converting Qorvo's *annual* audit right into a *single*, unreasonable *14-day period* during which Qorvo is expected to vet, audit and object to, the Debtors' compliance, and (iii) impermissibly and improperly stripping the District Court of its jurisdiction to enforce its PI. Simply put, the Debtors are trying to use the Bankruptcy Court and the 363 process to re-write the fundamental nature of the PI, and in the process strip Qorvo of vital protections for its trade secrets while supplanting the District Court's ruling and order with the Debtors' business judgment on what the injunction should have required.

7.      The Bidding Procedures and Sale Motion (i) directly conflict with the PI, undermining the vetting and cleansing process and timeline established thereunder to protect Qorvo's trade secrets, and (ii) falsely assume that Qorvo's trade secrets can be properly cleansed from Akoustis' entire business on a timeline that conflicts with the expectations in the PI and that is unrealistic, unattainable and impractical.

8.      In addition, the Bidding Procedures do not adequately maximize the value for any potentially cleansed assets by providing for only a two-week period for Debtors to market the

---

[3]      Debtors have consented to **Exhibit 3** and **Exhibit 4** being filed on the public docket, and the parties have stipulated to their authenticity.

prospectively cleansed property.  *See* Sale Motion at p. 17 (proposing March 7, 2025 as Qorvo Trade Secret Objection Hearing and March 21, 2025 at 4:00 p.m. ET as Bid Deadline). Instead, the Bidding Procedures and Sale Motion wed Debtors to a Stalking Horse Bid by Gordon Brothers Commercial & Industrial, LLC (the "Stalking Horse Bidder") that commits Debtors to a timeline that conflicts directly with the PI.  Moreover, the Stalking Horse Bid itself contemplates the Stalking Horse Bidder quickly liquidating any purchased assets, which neither justifies nor warrants (i) any bid protections or (ii) the expedited timeline insisted upon by Debtors and the Stalking Horse Bidder. It also does not justify the Debtors' attempt to brush aside the process and rights of the PI and cram down an ineffective and rushed process for protecting Qorvo's trade secrets.  In contrast to the Debtors' desperate plea to the Court at the First Day Hearing to set a quick sale procedures hearing, supposedly at the demand and behest of the Stalking Horse Bidder, both the Debtors and Stalking Horse Bidder then employed all types of tricks and delay tactics to impede Qorvo's immediate discovery efforts.  Regardless, the evidence that will be introduced at the hearing – and that is submitted with this Objection – supports granting the Motion to Withdraw the Reference and denial of the Sale Motion.

9.     Qorvo believes that the proposed sale process is a sham designed by Debtors to impermissibly strip Qorvo of its property rights, while clearing the deck for a going concern transaction to a potential company insider (which exacerbates the risk of re-introducing Qorvo's trade secrets).  That can be the only explanation for why the Debtors are insistent on a truncated process for the E-Vendors to complete their work and why they believe a competing buyer would be comfortable with just a two-week process to vet and evaluate purchasing supposedly cleansed assets.  It also explains instances where unusual language is included in the Stalking Horse Bidder's proposed asset purchase agreement, which Qorvo suspects the Debtors have included in

advance to pivot to an insider transaction.[4] Qorvo is entitled to have these issues properly adjudicated in the appropriate forum – the District Court. The Bankruptcy Court does not currently have jurisdiction of the PI and, practically speaking, is not equipped to deal with the complex and highly-technical trade secret, patent law and related issues implicated by these disputes or interpret and enforce the PI. Accordingly, stay relief is warranted, and necessary, to preserve the status quo until the District Court can properly decide the Motion to Withdraw the Reference.

## APPLICABLE BACKGROUND

10.     After a two-week jury trial and post-trial briefing in that case styled *Qorvo, Inc. v. Akoustis Technologies, Inc., et al*., Case No. 21-1417 (JPM), the District Court issued the PI Order on October 11, 2024, and, entered the PI on October 15.

11.     The PI Order found that:

> Given the ***remarkable scale*** of trade secret misappropriation in this case, and because Akoustis' ***willful and malicious misappropriation*** of Qorvo's trade secrets ***was unmitigated and led to the incorporation of Qorvo trade secrets into Akoustis documents, processes, and systems, irreparable injury uncompensable by monetary damages is imminent without injunctive relief***.

Lerner Decl., Ex. 1 (PI Order), p. 4 (emphasis added).  Despite having only limited access to the Akoustis computer systems, over 500,000 Qorvo files, plus 279 GB of additional data, were found on the devices and systems of Akoustis employees. Lerner Decl., Ex 1 (PI Order), p. 2. Throughout its business operations, including at the executive level, Akoustis treated Qorvo's trade secrets indistinguishably from non-trade secrets and public access material and incorporated Qorvo's trade secrets into their own material and technology, including relabeling Qorvo information as

---

[4]     The *Resolutions of the Board of Directors of Akoustis Technologies, Inc.*, attached as Exhibit A to the Debtors' bankruptcy petition [Bankr. D.I. 1], states that "[i]t is hereby disclosed or made known to the Board that each of Kamram Cheeman, a director and officer of the Corporation, and Kenneth Boller, an officer of the corporation, has expressed interest in pursuing a strategic transaction with the Corporation and has recused himself from the consideration and approval of pursuing a bankruptcy proceeding under the provisions of chapter 11 of Title 11 of the United States code ….".

"industry standard" and replacing Qorvo logos and confidentiality legends with Akoustis logos and legends. *Id.* at 3.

12.     The District Court further found that Qorvo was irreparably harmed due to the Debtors' theft of Qorvo's trade secrets and infringement of Qorvo's patents.  As a result, the District Court entered the PI, which enjoins Akoustis and its Related Parties[5] from (i) possessing, accessing, reviewing, using, or disclosing Qorvo Trade Secret Information (as defined in the PI), (ii) offering to sell, selling, or otherwise distributing anywhere in the world any product made using Qorvo Trade Secret Information, (iii) advertising, promoting, offering to sell, or otherwise providing services that use Qorvo Trade Secret Information; and (iv) making, using, selling, or offering to sell in the United States, or importing into the United States, the products infringing Qorvo's patents (the foregoing relief, the "Injunctive Relief").  As used in the PI, "Qorvo Trade Secret Information" is specifically defined by reference to the content of numerous documents presented under seal at trial as reflecting the trade secrets.  The Qorvo Trade Secret Information includes information that is incredibly complex and subject-matter specific, drawing upon countless sub-parts to many of the trade secrets and requiring subject-matter expertise to understand the entire scope, nuance and implication of the misappropriated trade secrets. Moreover, all of the misappropriated trade secrets are under seal and available only to a small cadre of individuals.

13.     The PI sets forth a process and procedure for the removal and quarantine of all Qorvo confidential information from Akoustis' computer systems, including the Qorvo Trade Secret Information but also extending to "[a]ll other documents that contain confidential Qorvo

---

5       As used herein, "Related Parties" means its officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the PI by personal service or otherwise.

information" that were "received without Qorvo's authorization or in violation of any obligation to maintain the confidentiality of that information (such relief and process, the "<u>Removal and Quarantine Relief</u>"). As reflected above, the Removal and Quarantine Relief is expected to encompass a massive and wide-ranging cleansing effort given that hundreds of thousands of confidential Qorvo materials were identified in only the small subset of employee-devices previously subject to discovery. The PI thus reflects the following requirements associated with the Removal and Quarantine Relief.

- **<u>Procurement of E-Discovery Vendor</u>**: Akoustis was required, at its own expense, to engage an e-discovery vendor that is approved by Qorvo to assist with the identification, collection and removal of any Qorvo confidential information. After repeated follow-ups by Qorvo since the PI was entered in October, on December 4, 2024, Debtors finally identified the proposed E-Vendors. Qorvo consented to the selection of the E-Vendors on December 8, 2024. The E-Vendors projected the aggregate completion date of the entirety of the project to be approximately 8-12 months.

- **<u>Scope of Materials Inspected</u>**: Akoustis and Related Parties are required to inspect (i) any database, document management system, or other shared storage in use at Akoustis; (ii) mailboxes contained in Akoustis' corporate email serves for all Akoustis employees, as well as personal email accounts (in certain instances with probable cause), Akoustis computers, laptops, hard drives and other storage media (including USB drives and network-based storage drives) belonging to all Akoustis employees; and (iii) paper files belonging to Akoustis employees and kept on Akoustis property or related to the employees' work at Akoustis (the foregoing, the "<u>Inspection Materials</u>"). Currently, Qorvo has no insight or transparency into the actual volume of Inspection Materials, but expects

the volume will be very large.

- **Removal and Quarantine**: Akoustis and Related Parties must remove and quarantine (i) Qorvo Trade Secret Information and (ii) all other documents that contain confidential Qorvo information (either indicated as Qorvo-confidential by the information itself or otherwise known to be Qorvo-confidential by Akoustis) obtained or received without Qorvo's authorization or in violation of any obligation to maintain the confidentiality of same. So, in addition to cleansing Qorvo Trade Secrets Information and confidential Qorvo information internally, Debtors will need to ensure that the products and information provided to any distributors or resellers is also cleansed.

14. To monitor compliance with the PI, the District Court granted Qorvo audit rights. These rights include that, for a period of 2 years (which becomes 4 years if Debtors' violate the PI), Qorvo has the right to conduct a once-a-year audit of Akoustis and Related Parties. Such audit is to be conducted by an independent third party chosen by Qorvo (the "Qorvo Auditor") and cover (i) the Inspection Materials, and (ii) any other data sources reasonably necessary to determine wither Akoustis is in compliance with the PI. If the Qorvo Auditor finds a violation by Akoustis of the PI, the Qorvo Auditor must provide written notice and a copy of his findings to Akoustis and one of Qorvo's in-house attorneys to permit Qorvo to understand the reason(s) and extent of the noncompliance. In the event an audit shows a violation of the PI, the cost of the audit is borne exclusively by Akoustis.[6] The District Court explicitly "retains jurisdiction to enforce [the] Permanent Injunction." PI, p. 12.

15. Qorvo has not yet retained the Qorvo Auditor. Such retention is premature given that the E-Vendors were first identified on December 4 and have barely begun their work (if at

---

[6] Debtor has provided assurances in writing that Debtors' monetary obligations for the E-Vendor and Qorvo Auditor are properly accounted for, and reflected in, the Debtors' cash collateral budget.

all). Moreover, a threshold item in selecting the appropriate Qorvo Auditor, with the proper specialization and expertise, is understanding the scope and complexity of the Inspection Materials – of which Qorvo currently has no transparency.

16. In connection with the E-Vendor's retention, Stroz Friedberg and TCDI both submitted proposals to the Debtors (respectively, the "<u>Stroz Friedberg Proposal</u>" and "<u>TCDI Proposal</u>"), which set forth, among other things, particulars of their proposed processes and timelines for completing their respective tasks in compliance with the PI. The Stroz Friedberg Proposal, **<u>Exhibit 3</u>**, lists five separate stages:

1) First, Stroz Friedberg will "develop a detailed plan that lays out a pragmatic approach for preserving all relevant data sources." Stroz Friedberg Proposal, p. 3. Once this plan is developed, Stroz Friedberg proposes to "preserve all relevant data sources that have been previously identified and newly identified data sources [sic]." *Id*.

2) Second, it "will conduct a targeted forensic analysis of computers to determine if any additional data sources should be preserved and analyzed for trade secrets." *Id*., p. 4.

3) Third, it will partner with TCDI "to identify all potential trade secrets to develop a remediation library". *Id*.

4) Fourth, it will "work closely with TCDI to assemble a remediation library of data that potentially contains trade secrets, with the goal of permanently deleting that data and therefore removing it from Akoustis' possession." *Id*. It will then "develop a plan to efficiently and permanently delete the data from Akoustis' systems, based on the most effective means available. These means may include custom scripts,

commercial tools, and manual deletion of data and will be identified once Stroz Friedberg understands the volume and type of data to be deleted." *Id*.

5) Fifth, Stroz Friedberg will "prepare a report detailing all preservation, identification of trade secrets, analysis, and remediation." *Id*., p. 5.

17. The TCDI Proposal sheds additional light on the timing of both its own and Stroz Friedberg's services:

> **To maximize efficiencies, we [*i.e.*, TCDI] propose the majority of the efforts should be completed over a four-month period (approx. December 2024 through March 2025) with an additional two-month period (approx. April 2025 through May 2025) for clean-up, final validation, and documentation, etc. This would target a project completion date of approx. May 2025 and allow Stroz Friedberg the time to complete the project within their 8-12 month timeline.**

TCDI Proposal, **Exhibit 4**, p. 2 (emphasis added).

18. Debtors have not yet provided Qorvo with any of the plans referenced by the E-Vendor in the above cited provisions of the respective proposals. Moreover, there is no timeline or transparency as to when Stroz Friedberg will "prepare a report detailing all preservation, identification of trade secrets, analysis, and remediation" but the provided proposals suggest that such a report will take at least 8-12 months. Qorvo would expect that the data that must be cleansed will include highly technical file types, as well as computer code. The foregoing further highlights the procedural and technical difficulties of attempting to truncate the proscribed District Court cleansing process into an arbitrarily short period with only two weeks for Qorvo to complete a several months long process when it took Debtors nearly two months simply to propose the E-Vendor.

19.     Immediately after the First Day Hearing, Qorvo began preparing for the hearing set for January 8 pertaining to the Bidding Procedures and the Sale Motion.  On December 19, Qorvo contacted Debtors to arrange for depositions of the Stalking Horse Bidder and E-Vendors, and to discuss other related items.  Video conference meet and confer sessions were held on December 20 with both counsel for the Debtors (who were fronting for the E-Vendors) and counsel for the Stalking Horse Bidder, with Debtors' counsel attending.  Qorvo proposed 2 hour Zoom depositions for all parties, first on December 26 or 27, and then, when that was denied by the deponent parties, for December 30, a date initially suggested by counsel for Debtors.  Ultimately, Qorvo served 30(b)(6) subpoenas with a short list of topics for December 30.  The Stalking Horse Bidder responded that it would be filing a motion to quash (which was ultimately filed in the late afternoon on Friday, December 27, 2024).  The Debtors responded that the E-Vendors could only appear on Friday, January 3.  Qorvo believes that the lack of cooperation by the Debtors and Stalking Horse Bidder is not coincidental, and indicative of their attempt to force through approval of the Bidding Procedures regardless of the Preliminary Injunction.  A true and correct copy of the email exchanges between counsel for Qorvo and Debtors regarding proposed depositions of the E-Vendors is attached as **<u>Exhibit 5</u>** to the Lerner Declaration, ¶ 7.  A true and correct copy of the email exchanges between counsel for Qorvo, Debtors and the Stalking Horse Bidder regarding proposed deposition of the Stalking Horse Bidder is attached as **<u>Exhibit 6</u>** to the Lerner Declaration, ¶ 8.  Counsel for Qorvo conducted an oral, telephonic, meet and confer with counsel to Debtors on December 30, 2024 regarding the Motion to Withdraw the Reference, this Stay Motion and a motion to hear the Stay Motion on an expedited basis.  Counsel for Debtors informed Qorvo that it would not oppose a motion to hear the Stay Motion on an expedited basis, but was not consenting to the Motion to Withdraw the Reference or the Stay Motion.

<u>**ARGUMENT**</u>

20.      Bankruptcy Rule 5011(c) provides, in relevant part, that "[t]he filing of a motion for withdrawal of a case or proceeding . . . shall not stay the administration of the case or any proceeding therein before the bankruptcy judge ***except*** that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending the disposition of the motion." <u>Fed. R. Bankr. P. 5011(c)</u> (emphasis added).

21.      In determining whether to grant a stay pending the disposition of a motion to withdraw the reference, courts consider the following four factors: (1) the likelihood that the movant will prevail on the merits of the motion to withdraw the reference; (2) the likelihood that the movant will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay.  *See In re Summit Global Logistics, Inc.*, Adv. Pro. No. 08-01241-DHS, <u>2008 WL 5953690</u>, at *2 (Bankr. D.N.J. Dec. 1, 2008); *Miller v. Vigilant Ins. Co. (In re Eagle Enters.)*, <u>259 B.R. 83</u>, <u>86–87</u> (Bankr. E.D. Pa. 2001); 9 *Collier on Bankruptcy* ¶ 5011.04 (16th 2024).  Each of the factors weighs decidedly in favor of granting Qorvo's Motion.

**A.      Qorvo is Likely to Succeed on the Merits of the Motion to Withdraw the Reference**

22.      Qorvo is likely to succeed on the merits of the Motion to Withdraw the Reference, because the Bidding Procedures and Sale Motion are subject to mandatory withdrawal and, in the alternative, merit discretionary withdrawal by the District Court for cause.

23.      The District Court is required to withdraw a proceeding from the Bankruptcy Court "if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  <u>28 U.S.C. § 157(d)</u>.  Accordingly, withdrawal of the reference is mandatory if resolution of a proceeding "requires substantial and material consideration of non-Bankruptcy

Code laws regulating interstate commerce." *Hatzel & Buehler, Inc. v. Orange & Rockland Util.*, 107 B.R. 34, 38 (D. Del. 1989); *see also In re CM Holdings, Inc.*, 221 B.R. 715, 721 (D. Del. 1998). "[T]he issue for the Court is not whether the Bankruptcy Court *can* capably interpret [the non-Bankruptcy Code] law, but rather whether the Bankruptcy Court will be *required* to interpret [the non-Bankruptcy Code] law." U.S. v. *Delfasco, Inc.*, 409 B.R. 704, 708 (D. Dist. 2009) (emphasis in original); *see also In re Johns-Manville Corp.*, 63 B.R. 600, 602 (S.D.N.Y. 1986) (noting that withdrawal is mandatory in cases presenting "issues requiring significant interpretation of federal laws that Congress would have intended to have decided by a district judge rather than a bankruptcy judge," rather than the "straightforward application of a [non-bankruptcy] federal statute to a particular set of facts.").

24.     To be clear, **the PI remains subject to the jurisdiction of the District Court**. Courts generally recognize that an issuing court has exclusive jurisdiction to redress contempt of a prior injunction order. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re SelectBuild Ill., LLC*, 2015 Bankr. LEXIS 1790, at *18 (Bankr. D. Del. May 28, 2015) ("[T]he court that issued the injunctive order alone possesses the power to enforce compliance with and punish contempt of that order."); *Beck v. Gold Key Lease, Inc. (In re Beck)*, 283 B.R. 163, 166 (Bankr. E.D. Pa. 2002) ("As a general principle of law, only the court which issues an injunction has the authority to enforce it.").

25.     The Bankruptcy Court cannot enter a sale order that would extinguish the PI in whole or part. *See In re Sugarloaf Holdings, LLC*, 640 B.R. 270, 282, 284 (Bankr. D. Utah 2022) (holding that a § 363(f) free and clear sale could not sever a non-monetary interest protected by a prepetition preliminary injunction issued in state court because the creditors' interest could not be satisfied by "a money judgment, an equitable remedy, or any other relief that could be satisfied

through the payment of money from the [debtor's] sale proceeds."); *see also Carnival Corp. v. DeCurtis Holdings LLC (In re DeCurtis Holdings LLC),* Nos. 23-10548 (JKS), 23-50413 (JKS), 2023 Bankr. LEXIS 1973, at *54 (Bankr. D. Del. Aug. 9, 2023) (holding that debtors were not allowed to sell certain assets free and clear under section 363 when debtors were permanently enjoined from using certain intellectual property which was commingled into those assets). Here, Debtors have neither taken affirmative steps nor established a legal basis for why there should be any exception to the rule. Debtors are attempting to use the Section 363 sale process to impermissibly strip the District Court of its jurisdiction and rob Qorvo of its rights and protections under the PI. The Bidding Procedures proposed by Debtors truncates the entirety of the contemplated PI process into a couple of months – which even the Debtors' E-Vendor thinks is impractical and impossible (given that their proposal contemplated a substantially longer process). The reference must therefore be withdrawn.

26. Even assuming that that the Bankruptcy Court has jurisdiction (which it does not), the Sale Motion is a paradigm for mandatory withdrawal, as the Sale Motion (i) requires substantial and material consideration of non-Bankruptcy Code laws – namely whether the Debtors' assets continue to infringe on Qorvo's trade secrets and patents (they do and will unless and until Debtors' assets are cleansed), and (ii) determines the extent to which the Debtors' assets may be sold to a purchaser, which principally involves interstate commerce. In addition to the factual record developed in the District Court, the merits of whether the Debtors have ceased violating Debtors' intellectual property rights hinge on the District Court enforcing its own PI and continuing to interpret the federal Defend Trade Secrets Act ("DTSA"), North Carolina Trade Secrets Protection Act ("NCTSPA"), and U.S. Patent Nos. 7,522,018 (the "'018 Patent") and 9,735,755 (the "'755 Patent"). Indeed, proceedings concerning intellectual property are often mandatorily withdrawn

under section 157(d) because they typically involve complex issues of federal non-bankruptcy law. *In re Singer Co., N.V.,* No. 01 Civ. 0165 (WHP), 2002 WL 243779 (S.D.N.Y. Feb. 20, 2002) (dispute over sewing needle patent); *In re Nat'l Gypsum Co.,* 145 B.R. 539 (N.D. Tex. 1992) (dispute over patent on "lightweight joint compound"); *see also Weiss ex rel. Fibercore, Inc. v. OFS Fitel, LLC,* 361 B.R. 315, 317 (D. Mass. 2007) ("the predominance of federal law in the pending patent infringement action … strongly implicates non-core federal bankruptcy law, which the district court is best equipped to apply").

27.     When withdrawal of the reference is mandatory, the distinction between core and noncore proceedings is irrelevant. *See City of New York v. Exxon Corp.,* 932 F.2d 1020, 1026 (2d Cir. 1991) ("[M]atters within this 'core' jurisdiction, upon timely motion, must be withdrawn under § 157(d) if they require the bankruptcy court to substantially interpret federal statutes which affect interstate commerce."). Indeed, "Section 157(d) does not mention the core/noncore distinction, and withdrawal of reference is not dependent on the classification of a claim." *Burger King Corp. v. B-K of Kansas, Inc.,* 64 B.R. 728, 73 (D. Kan. 1986).  Because the core/non-core distinction is irrelevant under Section l57(d), the degree to which the Sale Motion as a whole is a core proceeding does not come into play.  Accordingly, withdrawal of the reference to the District Court to decide the Debtors' sale motion is necessary.

28.     Even where withdrawal is not mandatory, "[t]he district court may withdraw, in whole or in part, any case or proceeding … for cause shown." 28 U.S.C. § 157(d). This is known as "permissive withdrawal" and the Third Circuit has directed courts to examine various considerations that speak to whether a case would be more efficiently handled by an Article III court or a bankruptcy court. *See In re Pruitt*, 910 F.2d at 1168. The Pruitt factors are: "(1) whether retention of the proceeding promotes the uniformity of bankruptcy administration; (2) whether

retention of the proceeding reduces forum shopping and confusion; (3) whether retention of the proceeding fosters the economical use of debtor/creditor resources; (4) whether retention of the proceeding would expedite the bankruptcy process; and (5) whether the request for withdrawal was timely." *In re Elk Petroleum*, Inc., 2022 WL 4355285, at *3.

29.     Before considering the Pruitt factors, courts may "first evaluate whether the claims are core or non-core, since it is upon this issue that questions of efficiency and uniformity will turn." *In re AgFeed USA, LLC*, 565 B.R. 556 (D. Del. 2016) (citing *In re Orion Pictures Corp.,* 4 F.3d 1095, 1101 (2d Cir. 1993)). Because the Bankruptcy Court can only submit proposed findings of fact and conclusions of law to the District Court in a non-core proceeding, *see* 28 U.S.C. § 157(c)(1), it is more efficient to entirely conduct a non-core proceeding in the district court. *In re Orion,* 4 F.3d at 1101 ("[U]nnecessary costs could be avoided by a single proceeding in the district court").

30.     A core proceeding is one that could only arise in a bankruptcy case. *See In re Leco Ent., Inc.,* 144 B.R. 244, 249 (S.D.N.Y. 1992) (quoting *In re Wood,* 825 F.2d 90, 97 (5th Cir. 1987) ("If the proceeding does not invoke a substantive right created by the federal bankruptcy law and is one that could exist outside of bankruptcy it is not a core proceeding.")) "To be a core proceeding, an action must have as its foundation the creation, recognition, or adjudication of rights which would not exist independent of a bankruptcy environment although of necessity there may be a peripheral state law involvement." *Acolyte Elec. Corp. v. City of New York,* 69 B.R. 155, 173 (Bankr. E.D.N.Y. 1986). Claims that "are independent of bankruptcy and involve facts wholly antecedent to the bankruptcy" are not core claims. *In re Fairfield Sentry Ltd. Litig.,* 458 B.R. 665, 685 (S.D.N.Y. 2011). Where a debtor "could have pursued the same claims … and continued about [its] ordinary business without ever having filed for bankruptcy," its claims are not core. *Id.*

Similarly, "pre-petition common law actions for a claim requiring adjudication of factual disputes unrelated to the bankruptcy are not core claims." *Id.* at 688.

31.     An action filed prior to bankruptcy does not become "core" simply because a win for the Debtor might increase the funds available to the estate or improve the Debtor's chances of successfully reorganizing. *Acolyte Elec.,* 69 B.R. at 175; *see also In re McCrory Corp.,* 160 B.R. 502, 506 (S.D.N.Y. 1993) (trademark dispute that "goes to the heart of the debtor's reorganization plans" was not core proceeding because "the dispute would exist independent of a bankruptcy environment"). "An action involving a debtor and a non-creditor in which 'the only relationship … to the bankruptcy proceeding [is] that determination of the action would affect the ultimate size of the estate' is not a core proceeding." *Little Rest Twelve, Inc. v. Visan,* 458 B.R. 44, 55 (S.D.N.Y. 2011) (quoting *In re Best Prods. Co.,* 68 F.3d 26, 32 (2d Cir. 1995)).

32.     The Sale Motion, to the extent grounded in Section 363 of the Bankruptcy Code, may at first blush appear to fall within the enumerated instances of core proceedings, 28 U.S.C. § 157(b)(2)(N)-(O) ("orders approving the sale of property" and "other proceedings affecting the liquidation of the assets of the estate."). However, the Sale Motion and Bidding Procedures inextricably link themselves to the PI and by seeking to sell all of Debtors' property including its intellectual property, on a schedule that violates the PI, renders those proceedings non-core or, at the very least, provides cause for withdrawal of the reference. *See, e.g., Fairfield Sentry,* 458 B.R. at 685 (claims that "are independent of bankruptcy and involve facts wholly antecedent to the bankruptcy" are not core). Debtors' compliance with the PI, its enforcement, the prospective cleansing and Qorvo's audit rights are all inherently for the District Court to oversee, not the Bankruptcy Court.

33.     Filing for chapter 11 and proposing a quick sale to contravene the PI does not thrust

"core" status on the PI or the Sale Motion. *See McCrory, supra,* 160 B.R. at 506 ("While McCrory obviously seeks to prevail in the adversary proceeding in order to reorganize, it also seeks to cancel [defendant's] trademarks and enjoin defendant from protecting its registered marks. As a result, the proceeding is not one which could arise only in the context of a bankruptcy case."); *Little Rest Twelve, supra,* 458 B.R. at 55 (action between debtor and non-creditor is non-core where sole connection to bankruptcy is that "determination of the action would affect the ultimate size of the estate."); *In re Best Prods. Co., supra,* 68 F.3d at 32 (contrasting dispute over "priority rights of creditors who have filed claims against the estate" with "a proceeding that simply seeks to augment the estate").

34.     Consistent with this reasoning, it is black letter law that the automatic stay does not stay the PI. *See, e.g.*, *Larami Ltd. v. Yes! Entm't Corp.*, 244 B.R. 56, 60 (D.N.J. 2000) (concluding that the automatic stay "protects interests in a debtor's property, not tortious uses of that property by the debtor;" and finding the automatic stay does not permit "bankrupt businesses which operated post-petition [to] violate patent rights with impunity"); *Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 917 (E.D.N.Y. 1988) ("The Bankruptcy Act was intended to protect and rehabilitate debtors. It should not be used as a shield behind which a debtor may sustain the misappropriation of a trade name to which he is not rightfully entitled. Nor will this Court permit it to be used as an instrument by which the damages to an innocent party may be increased unnecessarily."); *In re Roman Cath. Church of the Archdiocese of New Orleans*, 653 B.R. 524, 535 (E.D. La. 2023) ("Federal courts around the country have concluded that suits based on allegedly tortious or unlawful post-petition conduct are not subject to the automatic stay provisions of § 362(a).") (collecting cases); *Equate Media, Inc. v. Suthar*, No. 2:21-cv-00314-RGK-AGR, 2024 U.S. Dist. LEXIS 23478, at *2 (C.D. Cal. Feb. 6, 2024) (same).

35.     The *Pruitt* factors are easily met here.  The District Court, which has lived with this complex trade secret and patent case for over three years, culminating in its presiding over a two week jury trial and extensive briefing and argument on the proposed injunction and scope and parameters of same.  The District Court issued both the PI and Injunction Order after hearing arguments from both sides.  Moreover, the District Court also issued a protective order to guard the secrecy of the parties' intertwined intellectual property in Akoustis' possession.  Specifically with respect to the *Pruitt* factors, and as further detailed in the Motion to Withdraw the Reference and its accompanying brief: first, enforcing the PI and determining whether Debtors' assets are no longer infringing on Qorvo's intellectual property will require no analysis of substantive or procedural bankruptcy law, and is unrelated to any issue of uniform bankruptcy administration.  Indeed, nothing could be more uniform than a single court—the District Court—handling the sale process from day one to ensure that no property is sold that impacts the PI or Qorvo's property rights. *See*, *e.g.*, *Appleseed's*, 2011 WL 6293251, at *3 (withdrawal of reference granted "[t]o avoid confusion and future collateral attacks" to judgment issued by the bankruptcy court). Second, the only forum shopping is by Debtors, who are attempting to undercut the PI by asking the Bankruptcy Court to rewrite it.  Qorvo asks, by this Motion, that the District Court—within the same judicial district and applying the same law—fully and finally resolve the Sale Motion that attempts to violate, and relitigate the scope of, the PI.  Third, determining the Sale Motion before the District Court is plainly the more economical and expeditious option.  The PI was entered by the District Court only after a jury trial, post-trial briefing, deliberation and argument.  The Bankruptcy Court would need to start from scratch on developing an understanding of the scope and breadth of the PI, all while the Debtor is trying to run an operating chapter 11. The fourth factor is whether retention or withdrawal would expedite the bankruptcy process.  Only the District

Court, which dealt with the two-week trial, over three years of litigation, and imposition of the PI will be in any position to expedite the process. Fifth, and finally, Qorvo's request is timely, and being brought at the first available instance, just three weeks after Debtors' filing. "A §157(d) motion is timely if it is filed at the first reasonable opportunity after the movant has notice of the grounds for removal, taking into consideration the circumstances of the proceeding." *In re Schlein*, 188 B.R. 13, 14 (E.D. Pa. 1995).

36.     Whether the District Court finds withdrawal of the Sale Motion is mandatory or instead finds cause for permissive withdrawal, Qorvo is likely to succeed on the merits of the Motion to Withdraw the Reference, and this factor weighs in favor of the Bankruptcy Court staying the Sale Motion and Bidding Procedures pending the disposition of the Motion to Withdraw the Reference.

**B.      Qorvo Will be Irreparably Harmed Absent a Stay of the Sale Motion**

37.     Qorvo will be irreparably harmed if the Motion to Stay is denied and the Sale Motion moves forward with the imposition of Bidding Procedures. Without the enforcement of the PI, which can only be done by the District Court, Qorvo is at risk of having its intellectual property continued to be infringed upon by the Debtors (or subsequently re-introduced), and Qorvo's confidential and trade secret information exposed to third parties and potential competitors.  Without a stay, the Bankruptcy Court, having no prior involvement in the District Court case, will be forced to rule on whether the Debtors' assets are cleansed of Qorvo's intellectual property, and consider approval of any sales of the Debtors' assets, prior to the issuance of the District Court's ruling on the Motion to Withdraw the Reference.  This factor strongly weighs in favor of staying any ruling on the Bidding Procedures or Sale Motion pending disposition of the Motion to Withdraw the Reference by the District Court.

**C.      Debtors Will Not Be Harmed if the Sale Motion is Stayed**

38.     Debtors will not be harmed if the hearing on Bidding Procedures and the timeline for the Sale Motion is stayed.  The bankruptcy proceeding is in its infancy, and the Debtors have not set forth any plausible reason for the entire sale process (including intellectual property) to be on an expedited basis.  The Stalking Horse Bidder is purchasing equipment at a liquidation value. Neither the Debtors nor the Stalking Horse Bidder have provided justification for why a liquidation bid (where Stalking Horse Bidder will be reselling the purchased assets) should trump Qorvo's rights to a fair process and the protections afforded the PI. In fact, Debtors will ***benefit*** from having the Bidding Procedures and Sale Motion stayed and heard by the District Court, so that the Debtors and any purchasers of the assets will gain certainty over what is being offered for sale, and have time to consider whether or not to purchase those assets.   Another liquidator (or the current Stalking Horse Bidder) will presumably be around to get rid of the equipment for roughly the same price, or more, if the District Court determines that the Debtors cannot satisfactorily cleanse their intellectual property from the assets they stole from Qorvo.

**D.     The Public Interest Weighs in Favor of Staying the Sale Motion**

39.     The Bidding Procedures and Sale Motion is an illegal attempt to strip Qorvo of its rights and protections under the PI, which was entered by the District Court after a jury awarded Qorvo $38,595,023.00 for damages (which amount, together with District Court ordered fees and interest now exceeds $57 million) and found that Akoustis willfully and maliciously misappropriated 39 of Qorvo's trade secrets and infringed two of Qorvo's patents.   The determination of whether Debtors can weaponize the Section 363 sale process to undermine, undercut and circumvent the District Court's PI is of vital importance to the public's interest in preserving intellectual property rights and ensure court orders are justly enforced.  The public interest can only be protected by staying these proceedings.

## CONCLUSION

For the reasons stated above, Qorvo respectfully requests that the Court grant the Motion and

enter the Proposed Order.

Dated: December 31, 2024
       Wilmington, Delaware

Respectfully submitted,

**PASHMAN STEIN WALDER HAYDEN, P.C**

By: /s/ *David B. Stratton*
David B. Stratton (Del. I.D. No. 960)
John W. Weiss (Del. I.D. No. 4160)
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 592-6496
Email: dstratton@pashmanstein.com
      jweiss@pashmanstein.com
-and-

Leib M. Lerner (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
350 South Grand Avenue, 51st Floor
Los Angeles, California 90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100
Email: leib.lerner@alston.com

and

Stephen M. Blank (admitted *pro hac vice*)
**ALSTON & BIRD LLP**
90 Park Avenue
New York, NY 10016-1387
Telephone: (212) 210-9400
Facsimile: (212) 210-9444
Email: Stephen.blank@alston.com

*Attorneys for Qorvo, Inc.*

**<u>EXHIBIT A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| | § | |
| AKOUSTIS TECHNOLOGIES, INC.,[1] | § | Case No. 24-12796-LSS |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | |

**ORDER GRANTING QORVO, INC.'S MOTION TO STAY THE BIDDING
PROCEDURES AND SALE MOTION PENDING THE DISPOSITION OF THE MOTION
TO WITHDRAW THE REFERENCE**

Upon the *Qorvo, Inc.'s Motion to Stay the Bidding Procedures and Sale Motion Pending
the Disposition of the Motion to Withdraw the Reference* ("Motion"); and this Court having
reviewed the Motion, having found that notice of the Motion is adequate and no other or further
notice need be given, and having determined that the legal and factual basis set forth in the Motion
establish just cause for the relief granted herein, and after due deliberation and sufficient cause
appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is **GRANTED**.

2.      Effective immediately, the *Motion of the Debtors for Entry of Orders (I)(A)
Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B)
Authorizing the Debtors to Enter into the Stalking Horse Agreement and to Provide Bidding
Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of
Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929),
and RFM Integrated Device Inc. (1138). The Debtors' corporate headquarters is located at 9805 Northcross Center
Court, Suite A, Huntersville, NC 28078.

*Hearing and Approving the Form and Manner of Notice thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Bankr. D.I. 14],[2] and all related hearings, motions, and briefing shall be stayed pending the issuance of the United States District Court for the District of Delaware's (the "District Court") disposition of *Qorvo, Inc.'s Motion to Withdraw The Reference With Respect to the Bidding Procedures and Sale Motion* ("Motion to Withdraw the Reference").

3.      The stay in the preceding paragraph may be lifted or terminated prior to the issuance of the District Court's opinion on the Motion to Withdraw the Reference only upon written agreement by and between the Qorvo and the Debtors, or pursuant to further court order.

4.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

---

[2]      Docket references to the Bankruptcy Court shall be delineated as "[Bankr. D.I. #]."

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| | § | |
| AKOUSTIS TECHNOLOGIES, INC.,[1] | § | Case No. 24-12796-LSS |
| | § | (Jointly Administered) |
| Debtors. | § | |
| | § | **Re. Bankr. D.I. 14** |
| | § | |

### DECLARATION OF LEIB M. LERNER IN SUPPORT OF QORVO, INC.'S MOTION TO STAY THE BIDDING PROCEDURES AND SALE MOTION PENDING THE DISPOSITION OF THE MOTION TO WITHDRAW THE REFERENCE

I, Leib M. Lerner, declare and state the following under penalty of perjury:

1.     I am a partner with the law firm of Alston & Bird LLP, attorneys for Qorvo, Inc. ("Qorvo"), and admitted *pro hac vice* to appear and participate in this action.

2.     I make this declaration based on my personal knowledge and in support of *Qorvo Inc.'s Motion to Stay the Bidding Procedures and Sale Motion Pending the Disposition of the Motion to Withdraw the Reference* filed contemporaneously herewith, except for those facts stated on information and belief, which I believe to be true.

3.     Attached hereto as **Exhibit 1** is a true and correct copy of the *Order Granting in Part and Denying in Part Qorvo's Motion for Permanent Injunctive Relief* entered in that case styled as *Qorvo, Inc. v. Akoustis Technologies, Inc., et al.*, Case No. 21-1417 (JPM) ("District Court Action"), dated October 11, 2024 [D. Del. D.I. 709][2] ("Permanent Injunction Order").

4.     Attached hereto as **Exhibit 2** is a true and correct copy of the *Permanent Injunction* entered in the District Court Action, dated October 15, 2024 [D. Del. D.I. 710] ("Permanent Injunction").

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929), and RFM Integrated Device Inc. (1138). The Debtors' corporate headquarters is located at 9805 Northcross Center Court, Suite A, Huntersville, NC 28078.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of Stroz Friedberg, LLC's submitted proposal (the "Stroz Friedberg Proposal") which I am informed and believe was provided to Qorvo on or about December 4, 2024.  Debtors have stipulated to the authenticity but not admissibility of this document for purposes of the hearing on the Bidding Procedures and Sale Motion.

6.      Attached hereto as **Exhibit 4** is a true and correct copy of TCDI's submitted proposal (the "TCDI Proposal") which I am informed and believe was provided to Qorvo on or about December 4, 2024.  Debtors have stipulated to the authenticity but not admissibility of this document for purposes of the hearing on the Bidding Procedures and Sale Motion.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of email correspondence between counsel for the Debtors and Qorvo relating to the hearing on the Bidding Procedures and Sale Motion.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of email correspondence between counsel for Gordon Brothers Commercial & Industrial, LLC ("Stalking Horse Bidder") and Qorvo relating to the hearing on the Bidding Procedures and Sale Motion.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of December, 2024.

/s/ Leib M. Lerner
Leib M. Lerner

---

2      Docket references to the Bankruptcy Court shall be delineated as "[Bankr. D.I. #]" and docket references to District Court shall be delineated as "[D. Del. D.I. #]."

## EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| QORVO, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )    Case No. 1:21-cv-01417-JPM |
| v. | ) |
| | ) |
| AKOUSTIS TECHNOLOGIES, INC., and | ) |
| AKOUSTIS, INC., | ) |
| | ) |
| Defendants. | ) |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PERMANENT INJUNCTIVE RELIEF

Before the Court are Plaintiff Qorvo, Inc's ("Qorvo's" or "Plaintiff's") Motion for Permanent Injunctive Relief and Opening Brief in Support, Defendants Akoustis Technologies, Inc., and Akoustis, Inc.'s (collectively, "Akoustis'" or "Defendants'") Response in Opposition, and Plaintiff's Reply. (ECF Nos. 608–09, 626, 636.) For the reasons discussed below, Plaintiff's Motion is **GRANTED IN PART AND DENIED IN PART**.

### I.    BACKGROUND

On May 17, 2024, a jury in the District of Delaware found Defendants liable for trade secret misappropriation under the federal Defend Trade Secrets Act ("DTSA") and North Carolina Trade Secrets Protection Act ("NCTSPA"). (ECF No. 601.) The jury found that the misappropriation was willful and malicious and awarded $31,315,214 in unjust enrichment damages and $7,000,000 in punitive damages. (Id.) The jury also found Defendants liable for infringing two claims of United States Patent No. 7,522,018 ("the '018 Patent") and two claims of United States Patent No. 9,735,755 ("the '755 Patent") (collectively, "Patents at Issue"). (Id.) The jury found that Akoustis

did not violate the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA").  (Id.)
Plaintiff filed the instant Motion on June 17, 2024, Defendants responded on July 25, 2024, and
Plaintiff replied on August 8, 2024.  (ECF Nos. 608–09, 626, 636.)  The Court held a hearing on
August 29, 2024.

II.    **TRIAL RECORD**

The jury determined that Akoustis was liable for the misappropriation of trade secrets, and
that Akoustis' products infringed Qorvo's patents.  (ECF No. 601.)  The record showed that
Akoustis and Qorvo compete in the market for bulk acoustic wave ("BAW") filters.  (Trial Tr.
449:24-450:4 (Cross-examination of Dr. Robert Aigner) ("[W]e compete for the same slots [as
Broadcomm, Akoustis, and other manufacturers], sometimes we win, sometimes we lose. We
perform in the very same markets with the very same performance.").)  The record shows that
Qorvo spends "a four[-] to five-year time frame" and "in excess of $1 billion" to develop each new
BAW filter product.  (Trial Tr. 375:6–15.)  "Trade secrets play a big role [in BAW development]
because not everything [Qorvo] do[es] can be reverse engineered or can be patented."  (Id. at
375:22–23.)

After misappropriating trade secrets and confidential information from Qorvo, former
Qorvo employee and Chief Product Officer at Akoustis Rohan Houlden and others circulated
Qorvo materials to others at Akoustis.  (See, e.g., id. at 671:6–8; 845:16–846:12; 1098:3–1100:17;
1240:20–1245:15.)  Those documents were referenced in the development of Akoustis processes
and incorporated into Akoustis materials.  (See, e.g., id.)  While Qorvo's expert had limited access
to the devices of Akoustis employees, over 9,000 Qorvo documents and 500,000 Qorvo emails
were found on the devices and systems of Akoustis custodians.  (Id. at 849:21–24, 852:4–7; 850:5–
7.)  8,600 of these documents were found in the custody of Houlden and Rama Vetury, another

2

Akoustis custodian, and at least 700 Qorvo documents were found on the devices of thirty-eight other Akoustis employees. (Id. at 848:12–849:20, 1361:23–1362:15.) Akoustis treated the Qorvo trade secrets misappropriated by Mr. Houlden indistinguishably from non-trade secrets and public access material, and Mr. Houlden was not initially disciplined by Akoustis for circulating Qorvo materials. (Id. at 1016:10–15 ("Rohan was having—Mr. Houlden was having multiple discussions with multiple people within Qorvo. And so anything that he would send me, I don't know exactly where he got it, you know, if it was through, obviously, you know, right channels or incorrect channels. So I just didn't raise, you know, any visibility to me on that being a concern.").) Akoustis also incorporated Qorvo trade secrets into their own material, including relabeling Qorvo information as "industry standard." (See Tr. Exs. 213, 220.)

Akoustis employees used personal emails to share Qorvo material that had been designated as confidential. (See, e.g., Trial Tr. 1092:10–1093:7.) While Mr. Houlden was eventually terminated from Akoustis, it had "absolutely nothing" to do with his circulation of Qorvo confidential-marked materials. (Id. at 1018:24–1019:1.) Indeed, at the time of trial, Akoustis' then-CEO, Jeff Shealy, testified that no employee had been disciplined for misappropriating or circulating Qorvo's information. (Id. at 1157:3–15.) Shealy also testified that while guidelines prohibited misappropriation of trade secrets and other confidential information, Akoustis had no way to police or enforce these guidelines, and did not do so. (Id. at 1188:14–1189:6.)

## III.    LEGAL STANDARD

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must . . . demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

warranted; and (4) that the public interest would not be disserved by a permanent injunction." S&P Glob. Inc. v. S&P Data LLC, 619 F.Supp.3d 445, 472 (D. Del. 2022) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

"[R]egardless of any irreparable harm [p]laintiffs have previously incurred, a permanent injunction will not issue unless there is reason to believe that future injury would constitute irreparable harm." Bone v. Univ. of N.C. Health Care Sys., 378 F.Supp.3d 660, 688 (M.D.N.C. 2023) (collecting cases). "At the same time, 'past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury,' . . . and thus current compliance with the law does not necessarily preclude the entry of a permanent injunction." Id. (citing O'Shea v. Littleton, 414 U.S. 488, 496 (1974); United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)).

IV.    **ANALYSIS**

a.    *Trade Secrets*

"The purpose of an injunction in a trade secret case is to protect the secrecy of the misappropriated information, eliminate the unfair advantage obtained by the wrongdoer and reinforce the public policy of commercial morality." Gen. Elec. Co. v. Sung, 843 F.Supp. 776, 778 (D. Mass. 1994) (citing Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 481 (1974)). Given the remarkable scale of trade secret misappropriation in this case, and because Akoustis' willful and malicious misappropriation of Qorvo's trade secrets was unmitigated and led to the incorporation of Qorvo trade secrets into Akoustis documents, processes, and systems, irreparable injury uncompensable by monetary damages is imminent without injunctive relief. The balance of equities weighs in favor of relief which is narrowly tailored to the extent that it includes purging Qorvo information from Akoustis' systems and prohibition of future use of Qorvo's trade secrets.

See Barr-Mullin, Inc. v. Browning, 424 S.E.2d 226, 230 (N.C. Ct. App. 1993); WeRide Corp. v.
Kun Huang, 379 F.Supp.3d 834, 853–54 (N.D. Cal. 2019).

                i.   *Irreparable Injury*

Plaintiff argues that it will face irreparable injury without an injunction.  (ECF No. 609.)
Plaintiff argues that irreparable injury should be presumed for misappropriation under North
Carolina law, that "continuing use of a trade secret is a 'recurrent violation' that gives rise to
irreparable harm," and that a variety of other factors suggest irreparable harm is imminent without
a permanent injunction.  (Id. at PageID 28862–66.)

Defendants argue that the record is "devoid of any trial evidence to establish any direct or
irreparable injury" because "Akoustis no longer has access to, possession of, or use of the
information contained in Qorvo Trade Secret Groups 2-7" given their voluntary sequestration and
deletion efforts.  (ECF No. 626 at PageID 30664–66.)  Defendants argue that the Akoustis board
of directors authorized a "Document Replacement Project" which will "sequester and permanently
remove from its computers and information systems any documents identified by Qorvo to contain
trade secrets and/or confidential information purportedly belonging to Qorvo."  (Id. at PageID
30664.)

Defendants' remediation effort used a keyword search as a proxy for Qorvo trade secret or
confidential information.  (See ECF No. 630 ¶ 9.)  The keywords do not appear to be linked
topically or substantively to the trade secrets alleged, but rather use Qorvo product names and the
email addresses of key circulators as proxies for the alleged trade secrets.  (Id.)  Given the
incorporation of Qorvo's trade secrets into unrelated documents, the unmitigated spread of
Qorvo's trade secret information across Akoustis, and that Qorvo identifiers were removed from
Qorvo-related documents, it is clear that use of Qorvo-related keywords as a proxy for trade secret

information would be insufficient to cleanse Akoustis' system of Qorvo's trade secrets. Indeed, even after remediation efforts, it is likely that Qorvo's trade secrets will remain in Akoustis documents, and will remain incorporated into Akoustis products, given the breadth of misappropriation. See supra Section II. Accordingly, the threat of future harm has not "dissipated" through remediation efforts. Cf. Adler v. Duval Cnty. Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997) ("When the threat of future harm dissipates, the plaintiff's claims for equitable relief become moot because the plaintiff no longer needs protection from future injury.")

Under North Carolina law, those liable for "actual . . . misappropriation of a trade secret . . . shall be permanently enjoined upon judgment finding misappropriation. . .." N.C. Gen. Stat. § 66-154(a). Federal courts interpreting North Carolina law note that this statutory language "creat[es] a presumption of irreparable injury and irreparable harm absent an injunction." Legacy Data Access, LLC v. MediQuant, Inc., No. 3:15-cv-00584-FDW-DSC, 2017 WL 6001637, at *21 (citing BridgeTree, Inc. v. Red F Marketing LLC, No. 3:10-cv-00228-FDW-DSC, 2013 WL 443698, at *22 (W.D.N.C. Feb. 5, 2013)). While Defendants argue that Legacy Data Access establishes that this presumption should be rebutted in this case, that case involved a jury's verdict finding only a single agent of the defendant "possessed or used plaintiff's trade secrets" and therefore "[i]t follows that upon the termination of [the agent] as an employee, Defendant loses control" over the trade secrets. Id. at *22; see also ActiveVideo Networks v. Verizon Commc'ns, Inc., 694 F.3d 1312, 1338 n.6 (Fed. Cir. 2012) ("Every injunctive case must be considered according to its unique facts"). Here, even if all forty of the custodians of Qorvo information at Akoustis were terminated, the evidence suggests that Qorvo's trade secrets were incorporated into Akoustis processes, documents, and products, and likely spread beyond the initial pool. Accordingly, Akoustis has not rebutted the presumption of irreparable harm.

6

ii.  *Adequacy of Monetary Remedies*

Defendant argues that the $31,315,215 in compensatory damages and $7 million in exemplary damages awarded by the jury is "more than adequate to compensate [Qorvo] for the alleged misappropriation of trade secrets."  (ECF No. 626 at PageID 30669.)  This argument is unavailing—the theory of damages pursued by Qorvo is based on Akoustis' unjust enrichment through their misappropriation of trade secrets.  Compensation disgorging Akoustis' ill-gotten past gains does not adequately compensate Qorvo for the future use or proliferation of their trade secrets.  This is especially true because trade secrets cannot be "unshared" once revealed: were Akoustis to inadvertently or purposely share Qorvo's trade secrets, Qorvo would suffer irreparable harm not only from Akoustis' use of that secret, but also its spread to other competitors in the field.  Cf. CPG Prod. Corp. v. Mego Corp., No. C-1-79-582, 1981 WL 59413, at *9 (S.D. Ohio Jan. 12, 1981) ("The Court finds that exportation of the technology for making [the plaintiff's] stretchable toy figure is likely to place such information in the public domain, and that such an occurrence would cause plaintiff irreparable harm.")

iii.  *Balance of Hardships and Public Interest*

The balance of hardships favors granting a permanent injunction.  Akoustis asserts that they have voluntarily begun the remediation process, and that they will not use the misappropriated trade secrets.  (ECF No. 626 at PageID 30663–66.)  Defendant do not argue that they will face hardship if a permanent injunction is entered, rather asserting that "Qorvo . . . has no evidence of any other direct harm which could support [Qorvo's] claim of hardship."  (Id. at PageID 30670.)  Any interest Defendants have in retaining the trade secrets would not establish hardship, as there is "no cognizable hardship" in prohibiting a defendant from engaging in continued wrongdoing.

See BTL Indus., Inc. v. Advanced Regenerative Med., LLC, No. CV 23-359-WCB, 2024 WL 455218 (D. Del. Feb. 6, 2024).

The public interest favors granting a permanent injunction. Defendants do not argue otherwise, describing the proposition that "there is a public interest in 'upholding the inviolability of trade secrets'" as "unremarkable[.]" (ECF No. 626 at PageID 30670; see also Bimbo Bakeries, USA, Inc. v. Botticella, 613 F.3d 102, 119 (3d Cir. 2010) ("As noted by the District Court, there is a generalized public interest in 'upholding the involability of trade secrets and enforceability of confidentiality agreements'").[1] Instead, Akoustis argues that "no public interest supports granting . . . injunctive relief absent showings of irreparable harm and that money damages cannot provide an adequate remedy" and that "no public interest supports enjoining Akoustis from accessing and/or using trade secrets that it no longer has." (ECF No. 626 at PageID 30670.) As discussed above, Qorvo established at trial that its trade secrets have spread through Akoustis' systems without mitigation, Akoustis' remediation efforts are insufficient to prevent irreparable harm, and money damages cannot provide an adequate remedy for future misappropriation of trade secrets by and through Akoustis. Accordingly, Akoustis' arguments are unavailing and the public interest favors injunctive relief.

b. *Patents*

Plaintiff has demonstrated that it is entitled to injunctive relief as to its patents. To award permanent injunctive relief for patent infringement, a plaintiff must demonstrate the same four factors in equity: (1) irreparable injury; (2) inadequate remedies at law; (3) the balance of hardships

---

[1] Defendants argue that this quotation is an "untethered caselaw 'sound bite.'" (ECF No. 626 at PageID 30670.) The Court disagrees—the Third Circuit in Bimbo Bakeries not only agreed that a public interest in protecting trade secrets exists, but that it outweighed competing public interests in "employers being free to hire whom they please and in employees being free to work for whom they please" and favored injunctive relief. 313 F.3d 102 at 119.

weighs in its favor; and (4) the public interest would not be disserved by a permanent injunction. eBay, 547 U.S. at 391. Each factor is addressed in turn.

> i. *Irreparable Injury*

Plaintiff has demonstrated irreparable injury, as "the direct competition between Qorvo and Akoustis gives rise to irreparable harm." (ECF No. 609 at PageID 28869.) "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions." Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1345 (Fed. Cir. 2013).

Qorvo and Akoustis are in competition with one another in a market with a small number of competitors. (See ECF No. 609 at PageID 28870; Trial Tr. 449:24–450:4.) Qorvo spent significant time and capital to develop its technology via the Patents at Issue, while Akoustis infringed on those patents. (Trial Tr. at 375:6–15; ECF No. 601.) Further, Akoustis used Qorvo's patents to develop its own technology and compete for the same customers. (See, e.g. Exh. 127.) Because Akoustis' sales "will come at the expense of Qorvo," (ECF No. 609 at PageID 28870), Qorvo has demonstrated irreparable injury "in light of evidence of the parties' direct competition and loss in access to potential customers resulting from Akoustis' introduction of infringing technology." Robert Bosch LLC v. Pylon Mfg. Corp., 659 F.3d 1142, 1151 (Fed. Cir. 2011) (cleaned up).

Further, Qorvo has demonstrated a "causal nexus" between its harm and Akoustis' infringement, which is "part of the irreparable harm calculus." Apple Inc. v. Samsung Elecs. Co., 735 F.3d 1352, 1361 (Fed. Cir. 2013) (quoting Apple Inc. v. Samsung Elecs. Co., 695 F.3d 1370, 1375 (Fed. Cir. 2012)). A causal nexus is found "[w]hen a patentee alleges it suffered irreparable harm stemming from lost sales solely due to a competitor's infringement, [and there is] a finding

that the competitor's infringing features drive consumer demand for its products."  Apple Inc. v. Samsung Elecs. Co., 809 F.3d 633, 641 (Fed. Cir. 2015).  Here, the Patents at Issue "are directed to improving the most basic performance aspects of BAW filters" and "Akoustic promotes these very performance improvements . . . in its data sheets for the infringing BAW filters."  (ECF No. 609 at PageID 28871 (citing Trial Tr. at 1378:17–1379:6; 1387:22–1373:19; 1609:15–1611:8; 1612:20–1613:8; Exhs. 240–257).)  Because these performance aspects of the filters are "an important consideration . . . for customers" and drive demand, Qorvo has satisfied the causal nexus requirement.  See Apple, 809 F.3d at 641.

Akoustis argues that there is no irreparable harm because it "ceased manufacturing and offering for sale the accused products found to infringe the [Patents at Issue]" and has "evidence of [its] redesign of its products to not infringe the [Patents at Issue.]"  (ECF No. 626 at PageID 30671.)  "However, a redesign is not a valid reason for denying an injunction to prevent future infringement, 'unless the evidence is very persuasive that further infringement will not take place.'"  GeigTech E. Bay LLC v. Lutron Elecs. Co., No. 18 CIV. 5290 (CM), 2024 WL 3595413, at *26 (S.D.N.Y. July 30, 2024) (quoting W.L. Gore & Assocs., Inc. v. Garlock, Inc., 842 F.2d 1275, 1281–82 (Fed. Cir. 1988), abrogated on other grounds by eBay, 547 U.S. at 126).

Akoustis does not provide any information as to the specifics of its redesign.  (See ECF No. 626 at PageID 30671–72.)  Instead, Akoustis supports its argument with a citation to XpertUniverse, Inc. v. Cisco Sys., Inc.  No. CV 09-157-RGA, 2013 WL 6118447, at *12 (D. Del. Nov. 20, 2013), aff'd, 597 F. App'x 630 (Fed. Cir. 2015). However, XpertUniverse is easily distinguished, as the court there found that the plaintiff "[made] no allegations of prospective lost customers or harms that are truly irreparable unless the court issues a permanent injunction."  Id. Here, however, Qorvo has made allegations of prospective lost customers, and has shown that

Akoustis is projected to grow dramatically in the future. (See Exh. 127; Trial Tr. at 1712:20–1713:11.)

Because Akoustis has not provided "very persuasive" evidence as to its redesign, its argument as to irreparable harm fails. See GeigTech E. Bay, 2024 WL 3595413, at *26.

### ii. *Adequacy of Monetary Remedies*

Plaintiff has demonstrated that monetary remedies are inadequate, satisfying the second eBay factor. See 547 U.S. at 391.

Looking forward, it is clear that "[m]onetary damages [will] be an inadequate remedy for harm caused by patent infringement [because] the harm, including harm from lost sales, is difficult to quantify." Wonderland Switzerland AG v. Evenflo Co., Inc., No. 1:20-CV-00727-JPM, 2023 WL 4098571, at *5 (D. Del. June 7, 2023) (citing Apple, 809 F.3d at 644–45). In a small market where "relationships with customers often last for years," (ECF No. 609 at PageID 28870–71), "[i]t is difficult to determine how many sales [Qorvo] will lose as a result of competition from [Akoustis'] Accused Products versus how many sales will be gained or lost as a result of other factors such as [Qorvo's] pricing model, differences in advertising, general market fluctuations, or a host of other factors." Wonderland, 2023 WL 4098571, at *6. Because of this difficulty in quantifying a monetary remedy, Qorvo has demonstrated that the second eBay factor favors issuing the permanent injunction. See Apple, 809 F.3d at 645.

Akoustis argues that an injunction would be a duplicative remedy, as the jury has already awarded damages. (See ECF No. 626 at PageID 30672–73.) This argument is unavailing. The jury awarded unjust enrichment damages, which compensated for infringement prior to the judgment, not for future infringement. (See supra Section III.a.ii; see also ECF No. 601.)

### iii. *Balance of Hardships*

Plaintiff has demonstrated that the balance of hardships weighs in its favor. "This factor 'assesses the relative effect of granting or denying an injunction on the parties.'" Apple, 809 F.3d at 645 (quoting i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 862 (Fed. Cir. 2010), aff'd, 564 U.S. 91 (2011)). In its analysis, the Court considers several factors, including "the parties' sizes, products, and revenue sources." i4i, 598 F.3d at 862.

Here, the hardship to Qorvo is great. As in i4i, Qorvo's BAW filters are "central to [its] business." See id. at 683; Trial Tr. 449:24–450:4. Further, "requiring [Qorvo] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [Qorvo]." See Robert Bosch, 659 F.3d at 1156.

In contrast, the hardship to Akoustis is lower. Akoustis states it has redesigned its products. See CH2O, Inc. v. Meras Eng'g, Inc., No. LACV1308418JAKGJSX, 2017 WL 1700844, at *3 (C.D. Cal. May 2, 2017) (finding no significant hardship for a defendant where it "no longer use[d] the patented method"). Indeed, there is no cognizable hardship in prohibiting Akoustis from engaging in continued wrongdoing. (See supra Section IV.a.iii.) Further, "[t]he fact that the enjoined portion of [Akoustis'] business was built on infringing products also weighs against the hardship [it] will suffer by being enjoined." Wonderland, 2023 WL 4098571, at *8. Finally, even though Akoustis is a smaller company, it "cannot escape an injunction simply because it is smaller than the patentee." Robert Bosch, 659 F.3d at 1156.

Thus, Plaintiff has demonstrated that the third eBay factor weighs in favor of granting a permanent injunction. See 547 U.S. at 391.

iv.  *Public Interest*

Plaintiff has demonstrated that the public interest factor supports injunctive relief. "[T]he touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a

12

workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects." i4i, 598 F.3d at 863.

Here, the injunction strikes this "workable balance." Id. On the side of protecting the patentee's rights, "the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." Apple, 809 F.3d at 647. Here, Qorvo practices its patents. (See ECF No. 609 at PageID 28870.) On the other side, the injunctive relief requested is tailored enough to protect the public from any adverse effects. While the public benefits from competition, there is no benefit "when that competition comes at the expense of a patentee's investment-backed property right." Apple, 809 F.3d at 647. Further, the Court has narrowed the injunctive relief requested such that the "quarterly compliance process" requested is not included. See infra Section IV.c.

Thus, Plaintiff has demonstrated that the fourth eBay factor weighs in favor of granting a permanent injunction. See 547 U.S. at 391.

    c. *Tailoring of Remedies*

While Qorvo is entitled to injunctive relief, its proposed remedy is overbroad in several respects. First, Section II(3)(c) of the proposed permanent injunction requires the removal of "all other information that is derived from Qorvo's Trade Secret Information and/or other documents that contain confidential Qorvo information." (ECF No. 608-1 at PageID 28846.) This clause is overbroad, especially in comparison to the prior clauses, which require deletion of all "Qorvo Trade Secret Information" and documents which are "indicated as Qorvo-confidential by the information itself or otherwise known to be Qorvo-confidential by Akoustis[.]" (Id. at PageID 28846.) Indeed, not everything in a Qorvo confidential document is protected or trade secret. Subclause (c) does not differentiate between the non-protected information in Qorvo-confidential

13

materials incorporated into Akoustis' system and the wrongfully obtained, protected information. (Id. at PageID 28845–46.)  The deletion of all "Qorvo Trade Secret Information," in conjunction with the use of Qorvo's trade secret information in Part I is sufficient to prevent irreparable harm through continued misappropriation of Qorvo's trade secrets. Subclause (c) also presents enforceability problems. Given the breadth of trade secrets and confidential information alleged and the vague use of "derived from," nearly any information on Akoustis' system could fall under this subclause, including documents which incorporate templates from properly-obtained but confidential-marked Qorvo materials. Accordingly, clause II(3)(c) will not be included in the Permanent Injunction.

Similarly, Qorvo's proposed Audit Rights seeking to audit "personal email accounts of Akoustis employees who have used his/her email accounts for business" is overbroad.  (Id. at PageID 38846.)  As written, it would subject any employee who sent a single work-related email or used their Gmail calendar to record meetings to invasive audits of all their email accounts.  Some ability to audit some personal email accounts, however, is necessary, given the use of personal email accounts by Akoustis employees to avoid detection of their trade secret misappropriation. Accordingly, Section III(1)(b) of the permanent injunction is modified to read: "The mailboxes contained in Akoustis' corporate email servers for all Akoustis employees and, upon documented and disclosed probable cause to believe that employees' personal email accounts were used to transmit, download, or upload Qorvo trade secrets, those email accounts."  Similarly, because "Paper files belonging to all Akoustis employees" could be read to include personal paper files, Section III(1)(d) is modified to read "paper files belonging to Akoustis employees and kept on Akoustis property, or related to the employees' work at Akoustis."

Section III(3) is further modified to read: "The findings of such audits will be available only to Qorvo's outside attorneys, the independent third-party auditor, the Court, and Akoustis and its attorneys. Notwithstanding the foregoing, Qorvo's outside attorneys may be permitted to provide a summary of the finding of such audits to Qorvo's in-house attorneys. Any summary must comply with the terms of the Protective Order entered in this case."

The five-year audit period described in Section III is overly burdensome. The suggested provision provides for a five-year period during which Qorvo has the right to subject Akoustis to an extensive auditing process "a maximum of twice per calendar year" on five business days' notice. (Id. at PageID 28846–47.) Accordingly, the audit period is modified to occur for a maximum of four years, at most once per calendar year. If no violations are found in the first two years of the four year period, the audit period will presumptively expire after those first two years.

In its proposed patent injunction, Qorvo proposes a quarterly compliance process, requiring Akoustis to provide documentary evidence that any redesigned product is non-infringing, including cross-sectional electron microscopy analyses demonstrating the non-infringement of the product. Qorvo cites no precedent for this remedy and made strategic decisions to not pursue many of the redesigned products during this case. (See ECF No. 609.) Qorvo may pursue sanctions should purportedly redesigned products infringe and may pursue new actions against other infringing products. However, Qorvo's proposed compliance process would place the burden of proof on Akoustis to establish their products were non-infringing. The balance of equities weighs against this burden-shifting, as does the public's interest in promoting innovation and a competitive marketplace between non-infringing products. Accordingly, the quarterly compliance process is not narrowly tailored, and those provisions will not be included in the final permanent injunction.

## V.    CONCLUSION

For the reasons discussed above, Plaintiff's Motion for Permanent Injunctive Relief is **GRANTED IN PART AND DENIED IN PART**.

The following permanent injunctive relief is **ORDERED**:

1.  Permanent Injunction on Use of Qorvo Trade Secret Information

    a.  Akoustis, its officers, agents, servants, employees, distributors and resellers of any type, and all those persons in active concert or participation with any of them who receive actual notice of this order by personal service or otherwise, are permanently enjoined from performing any of the following actions:

        i.   Possessing, accessing, reviewing, using, or disclosing Qorvo Trade Secret Information, in whole or in part, anywhere in the world;

        ii.  Offering to sell, selling, or otherwise distributing anywhere in the world any product made using Qorvo Trade Secret Information;

        iii. Advertising, promoting, offering to sell, or otherwise providing services anywhere in the world that use Qorvo Trade Secret Information.

2.  Removal and Quarantine of Confidential Qorvo Information

    a.  Akoustis, its officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, shall undertake the following steps to remove from their possession and quarantine any confidential Qorvo information (as set forth in Part 2.a.iii), as follows:

16

i.  Akoustis will, at its own expense, engage an e-discovery vendor that is approved in advance in writing by Qorvo, to assist with the identification, collection, and removal of any Qorvo confidential information;

ii. Akoustis will inspect the following data sources in its possession:

1.  Any database, document management system, or other shared storage in use at Akoustis;

2.  The mailboxes contained in Akoustis' corporate email servers for all Akoustis employees, and, upon documented and disclosed probable cause to believe that employees' personal email accounts were used to transmit, download, or upload Qorvo trade secrets, those email accounts;

3.  Akoustis computers, laptops, hard drives, and other storage media (including USB drives and network-based storage drives) belonging to all Akoustis employees; and

4.  Paper files belonging to Akoustis employees and kept on Akoustis property or related to the employees' work at Akoustis.

iii. Akoustis will remove from its possession and quarantine the following:

1.  Qorvo Trade Secret Information

2.  All other documents that contain confidential Qorvo information (either indicated as Qorvo-confidential by the information itself or otherwise known to be Qorvo-confidential by Akoustis) obtained or received without Qorvo's authorization or in

17

violation of any obligation to maintain the confidentiality of that information.

3. Qorvo Audit Rights

   a. In order to monitor compliance with Parts 1 and 2 of this Permanent Injunction Order, Qorvo shall, for a period of four years from the issuance of this Order, have the right to conduct audits of Akoustis, its officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, as follows:

      i. Qorvo may audit, through audits conducted by an independent third party chosen by Qorvo, and in compliance the Protective Order in this case, the following data sources in Akoustis' possession;

         1. Any database, document management system, or other shared storage in use at Akoustis;

         2. The mailboxes contained in Akoustis' corporate email servers for all Akoustis employees, and, upon documented and disclosed probable cause to believe that employees' personal email accounts were used to transmit, download, or upload Qorvo trade secrets, those email accounts;

         3. Akoustis computers, laptops, hard drives, and other storage media (including USB drives and network-based storage drives) belonging to all Akoustis employees; and

18

4. Paper files belonging to Akoustis employees and kept on Akoustis property, or related to the employees' work at Akoustis.

ii. Upon request, the auditor shall be given access to any other data sources reasonably necessary to determine whether Akoustis is in compliance with Parts 1 and 2 of this Permanent Injunction, including data sources sufficient to show how Akoustis is performing trimming and reliability testing with respect to BAW filters.

iii. The findings of such audits will be available only to Qorvo's outside attorneys, the independent third-party auditor, the Court, and Akoustis and its attorneys. Notwithstanding the foregoing, Qorvo's outside attorneys may be permitted to provide a summary of the finding of such audits to Qorvo's in-house attorneys. Any summary must comply with the terms of the Protective Order entered in this case.

iv. If the auditor finds that Akoustis may not be in compliance with the terms of this Order, the auditor shall provide written notice and a copy of his findings to Akoustis and one of Qorvo's in-house attorneys to permit Qorvo to understand the reason(s) and extent of Akoustis' noncompliance.

v. The audits may be conducted a maximum of one per calendar year, during the course of normal business hours, and upon electronic or written notice of at least five business days to Akoustis. The parties will use good faith efforts to conduct the audit in a manner least disruptive

to Akoustis' normal business activities. The cost of any audit shall be born equally by Akoustis (50%) and Qorvo (50%). In the event an audit shows a violation of this Permanent Injunction Order, the cost of the audit shall be borne exclusively by Akoustis.

    b.  If no violations are found after 2 years, Qorvo's audit rights will presumptively expire after 2 years.

4.  Permanent Injunction on Infringement of the '018 and '755 Patents

    a.  Akoustis and any of its officers, agents, servants, directors, employees, attorneys, subsidiaries, successors in interest, and all those persons in active concert or participation with such persons who receive actual notice of this Order by personal service or otherwise, are permanently enjoined and restrained from making, using, selling, or offering for sale within the United States, or importing into the United States:

        i.  The '018 Patent Enjoined Products or any products not more than colorably different from the '018 Patent Enjoined Products from the Effective Date (which is fourteen (14) days from the date of this signed Permanent Injunction) through the expiration of the '018 Patent;

        ii.  The '755 Patent Enjoined Products or any products not more than colorably different from the '755 Patent Enjoined Products from the Effective Date through the expiration of the '755 Patent.

5.  For the purposes of this injunction, the term "'018 Patent Enjoined Products" means the following Akoustis BAW filter products the jury found to infringe the '018 patent: A10149, A10154, A10155, A10156, A10158, A10160, A10165, A10166, A10235,

A10238, A10249, A10252, A10256, A10266, A10335, AKF-1256, AKF-1256, AKF-1336, AKF-1938.

6. For the purposes of this injunction, the term "'755 Patent Enjoined Products" means the following Akoustis BAW filter products the jury found to infringe the '755 Patent: A10149, A10154, A10155, A10156, A10160, A10165, A10166, A10235, A10238, A10249, A10256, A10266, A10335, AKF-1252, AKF-1256, AKF-1336, AKF-1938.

7. For the purpose of this injunction, the term "Qorvo Trade Secret Information" means any confidential information copied or derived from, in whole or in part, the following trade secrets that the jury found Akoustis to have misappropriated (identified here by trade secret number and citation to trial exhibit):

    a. **Group 2: Qorvo BAW filter and resonator designs**

        i. Trade Secret 2.1

            1. Trial Ex. 8 (PTX-0078) at page 4

            2. Trial Ex. 46 (PTX-0007) at page 2

        ii. Trade Secret 2.2

            1. Trial Ex. 9 (PTX-0149) at page 3

            2. Trial Ex. 44 (PTX-0005) at page 3

            3. Trial Ex. 45 (PTX-0006) at page 2

        iii. Trade Secret 2.3

            1. Trial Ex. 9 (PTX-0149) at pages 14–16

            2. Trial Ex. 44 (PTX-0005) at pages 14–16

            3. Trial Ex. 45 (PTX-0006) at pages 3–5

        iv. Trade Secret 2.4

      1.  Trial Ex. 9 (PTX-0149) at page 17

      2.  Trial Ex. 44 (PTX-0005) at page 17

      3.  Trial Ex. 45 (PTX-0006) at page 6

  v.  Trade Secret 2.5

      1.  Trial Ex. 9 (PTX-0149) at page 19

      2.  Trial Ex. 44 (PTX-0005) at page 19

  vi.  Trade Secret 2.6

      1.  Trial Ex. 9 (PTX-0149) at page 24

      2.  Trial Ex. 44 (PTX-0005) at page 24

  vii.  Trade Secret 2.7

      1.  Trial Ex. 9 (PTX-0149) at page 11

      2.  Trial Ex. 44 (PTX-0005) at page 11

      3.  Trial Ex. 45 (PTX-0006) at pages 12

  viii.  Trade Secret 2.8

      1.  Trial Ex. 10 (PTX-0720) at page 4

  ix.  Trade Secret 2.9

      1.  Trial Ex. 10 (PTX-0720) at page 8

  x.  Trade Secret 2.10

      1.  Trial Ex. 10 (PTX-0720) at page 10

  xi.  Trade Secret 2.11

      1.  Trial Ex. 10 (PTX-0720) at page 15

  xii.  Trade Secret 2.12

      1.  Trial Ex. 10 (PTX-0720) at page 23

xiii.  Trade Secret 2.13

1.  Trial Ex. 10 (PTX-0720) at page 24

xiv.  Trade Secret 2.14

1.  Trial Ex. 10 (PTX-0720) at page 29

xv.  Trade Secret 2.15

1.  Trial Ex. 10 (PTX-0720) at page 36

xvi.  Trade Secret 2.16

1.  Trial Ex. 10 (PTX-0720) at page 37

b.  Group 3: Qorvo's trimming method and procedures

i.  Trade Secret 3.1

1.  Trial Ex. 11 (PTX-1141) at page 16

2.  Trial Ex. 12 (PTX-0453) at page 2

3.  Trial Ex. 209 (PTX-0421) at page 2

4.  Trial Ex. 213 (PTX-0438) at page 11

5.  Trial Ex. 217 (PTX-0662) at pages 10

6.  Trial Ex. 220 (PTX-0721) at page 11

ii.  Trade Secret 3.2

1.  Trial Ex. 11 (PTX-1141) at page 17

2.  Trial Ex. 12 (PTX-0453) at page 3

3.  Trial Ex. 209 (PTX-0421) at page 3

4.  Trial Ex. 213 (PTX-0438) at pages 4 and 12

5.  Trial Ex. 217 (PTX-0662) at pages 8 and 11

6.  Trial Ex. 220 (PTX-0721) at pages 9 and 12

   iii. Trade Secret 3.3

     1. Trial Ex. 11 (PTX-1141) at page 18

     2. Trial Ex. 12 (PTX-0453) at page 4

     3. Trial Ex. 209 (PTX-0421) at page 4

 c. Group 4: Qorvo's evaluation board design rules and schematics

   i. Trade Secret 4.1

     1. Trial Ex. 13 (PTX-1142) at page 1

 d. Group 5: Qorvo's product development process and testing procedures

   i. Trade Secret 5.4

     1. Trial Ex. 33 (PTX-0111) at overview, specification, and production test tabs

     2. Trial Ex. 34 (PTX-0114) at overview and specification tabs

     3. Trial Ex. 76 (PTX-0112) at overview and specification tabs

     4. Trial Ex. 79 (PTX-0116) at overview and specification tabs

     5. Trial Ex. 80 (PTX-0117) at overview and specification tabs

     6. Trial Ex. 83 (PTX-0120) at overview and specification tabs

   ii. Trade Secret 5.5

     1. Trial Ex. 7 (PTX-1089) at pages 1–2

     2. Trial Ex. 33 (PTX-0111) at overview, specification, and production test tabs

     3. Trial Ex. 34 (PTX-0114) at overview and specification tabs

     4. Trial Ex. 35 (PTX-0088) at specification tab (with guard band file), test specification, and conditions tab

     5.   Trial Ex. 61 (PTX-0089) at page 2

     6.   Trial Ex. 76 (PTX-0112) at overview and specification tabs

     7.   Trial Ex. 79 (PTX-0116) at overview and specification tabs

     8.   Trial Ex. 80 (PTX-0117) at overview and specification tabs

     9.   Trial Ex. 83 (PTX-0120) at overview and specification tabs

e.   Group 6: Qorvo's systems at processes, and procedures for testing reliability and mean-time-to-failure of parts

   i.   Trade Secret 6.1

     1.   Trial Ex. 14 (PTX-0099) at pages 6 and 24

     2.   Trial Ex. 68 (PTX-0101) at pages 6 and 24

     3.   Trial Ex. 70 (PTX-0103) at pages 6 and 24

     4.   Trial Ex. 73 (PTX-0107) at pages 6 and 24

     5.   Trial Ex. 110 (PTX-0105) at pages 6 and 24

   ii.   Trade Secret 6.3

     1.   Trial Ex. 14 (PTX-0099) at pages 15–17

     2.   Trial Ex. 68 (PTX-0101) at pages 15–17

     3.   Trial Ex. 70 (PTX-0103) at pages 15–17

     4.   Trial Ex. 73 (PTX-0107) at pages 15–17

     5.   Trial Ex. 110 (PTX-0105) at pages 15–17

   iii.   Trade Secret 6.4

     1.   Trial Ex. 14 (PTX-0099) at pages 15–17

     2.   Trial Ex. 68 (PTX-0101) at pages 15–17

     3.   Trial Ex. 70 (PTX-0103) at pages 15–17

    4.   Trial Ex. 73 (PTX-0107) at pages 15–17

    5.   Trial Ex. 110 (PTX-0105) at pages 15–17

  iv.  Trade Secret 6.5

    1.   Trial Ex. 14 (PTX-0099) at pages 15–17

    2.   Trial Ex. 68 (PTX-0101) at pages 15–17

    3.   Trial Ex. 70 (PTX-0103) at pages 15–17

    4.   Trial Ex. 73 (PTX-0107) at pages 15–17

    5.   Trial Ex. 110 (PTX-0105) at pages 15–17

  v.  Trade Secret 6.6

    1.   Trial Ex. 14 (PTX-0099) at page 23

    2.   Trial Ex. 68 (PTX-0101) at page 23

    3.   Trial Ex. 70 (PTX-0103) at page 23

    4.   Trial Ex. 73 (PTX-0107) at page 23

    5.   Trial Ex. 110 (PTX-0105) at page 23

f.  Group 7: Qorvo's manufacturing and assembly procedures

  i.  Trade Secret 7.2

    1.   Trial Ex. 37 (PTX-0751) at pages 7 and 9

**IT IS SO ORDERED**, this 11th day of October, 2024.

                /s/ Jon P. McCalla
                JON P. McCALLA
                UNITED STATES DISTRICT JUDGE

**<u>EXHIBIT 2</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| QORVO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Case No. 1:21-cv-01417-JPM |
| v. | ) | |
| | ) | |
| AKOUSTIS TECHNOLOGIES, INC., and | ) | |
| AKOUSTIS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**PERMANENT INJUNCTION**

For the reasons set out in the Court's Order Granting In Part and Denying In Part Plaintiff's Motion for Permanent Injunctive Relief (ECF No. 709), the following injunctive relief is granted:

1.  Permanent Injunction on Use of Qorvo Trade Secret Information

    a.  Akoustis, its officers, agents, servants, employees, distributors and resellers of any type, and all those persons in active concert or participation with any of them who receive actual notice of this order by personal service or otherwise, are permanently enjoined from performing any of the following actions:

        i.  Possessing, accessing, reviewing, using, or disclosing Qorvo Trade Secret Information, in whole or in part, anywhere in the world;

        ii. Offering to sell, selling, or otherwise distributing anywhere in the world any product made using Qorvo Trade Secret Information;

  iii. Advertising, promoting, offering to sell, or otherwise providing services anywhere in the world that use Qorvo Trade Secret Information.

2. Removal and Quarantine of Confidential Qorvo Information

 a. Akoustis, its officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, shall undertake the following steps to remove from their possession and quarantine any confidential Qorvo information (as set forth in Part 2.a.iii), as follows:

  i. Akoustis will, at its own expense, engage an e-discovery vendor that is approved in advance in writing by Qorvo, to assist with the identification, collection, and removal of any Qorvo confidential information;

  ii. Akoustis will inspect the following data sources in its possession:

   1. Any database, document management system, or other shared storage in use at Akoustis;

   2. The mailboxes contained in Akoustis' corporate email servers for all Akoustis employees, and, upon documented and disclosed probable cause to believe that employees' personal email accounts were used to transmit, download, or upload Qorvo trade secrets, those email accounts;

3. Akoustis computers, laptops, hard drives, and other storage media (including USB drives and network-based storage drives) belonging to all Akoustis employees; and

4. Paper files belonging to Akoustis employees and kept on Akoustis property or related to the employees' work at Akoustis.

iii. Akoustis will remove from its possession and quarantine the following:

1. Qorvo Trade Secret Information

2. All other documents that contain confidential Qorvo information (either indicated as Qorvo-confidential by the information itself or otherwise known to be Qorvo-confidential by Akoustis) obtained or received without Qorvo's authorization or in violation of any obligation to maintain the confidentiality of that information.

3. Qorvo Audit Rights

a. In order to monitor compliance with Parts 1 and 2 of this Permanent Injunction Order, Qorvo shall, for a period of four years from the issuance of this Order, have the right to conduct audits of Akoustis, its officers, agents, servants, employees, distributors and resellers of any type, and attorneys, and all those persons in active concert or participation with any of them who receive actual notice of the order by personal service or otherwise, as follows:

   i. Qorvo may audit, through audits conducted by an independent third party chosen by Qorvo, and in compliance the Protective Order in this case, the following data sources in Akoustis' possession;

      1. Any database, document management system, or other shared storage in use at Akoustis;

      2. The mailboxes contained in Akoustis' corporate email servers for all Akoustis employees, and, upon documented and disclosed probable cause to believe that employees' personal email accounts were used to transmit, download, or upload Qorvo trade secrets, those email accounts;

      3. Akoustis computers, laptops, hard drives, and other storage media (including USB drives and network-based storage drives) belonging to all Akoustis employees; and

      4. Paper files belonging to Akoustis employees and kept on Akoustis property, or related to the employees' work at Akoustis.

   ii. Upon request, the auditor shall be given access to any other data sources reasonably necessary to determine whether Akoustis is in compliance with Parts 1 and 2 of this Permanent Injunction, including data sources sufficient to show how Akoustis is performing trimming and reliability testing with respect to BAW filters.

   iii. The findings of such audits will be available only to Qorvo's outside attorneys, the independent third-party auditor, the Court, and Akoustis

and its attorneys. Notwithstanding the foregoing, Qorvo's outside
attorneys may be permitted to provide a summary of the finding of
such audits to Qorvo's in-house attorneys. Any summary must comply
with the terms of the Protective Order entered in this case.

iv. If the auditor finds that Akoustis may not be in compliance with the
terms of this Order, the auditor shall provide written notice and a copy
of his findings to Akoustis and one of Qorvo's in-house attorneys to
permit Qorvo to understand the reason(s) and extent of Akoustis'
noncompliance.

v. The audits may be conducted a maximum of one per calendar year,
during the course of normal business hours, and upon electronic or
written notice of at least five business days to Akoustis. The parties
will use good faith efforts to conduct the audit in a manner least
disruptive to Akoustis' normal business activities. The cost of any
audit shall be born equally by Akoustis (50%) and Qorvo (50%).  In
the event an audit shows a violation of this Permanent Injunction
Order, the cost of the audit shall be borne exclusively by Akoustis.

b. If no violations are found after 2 years, Qorvo's audit rights will
presumptively expire after 2 years.

4. Permanent Injunction on Infringement of the '018 and '755 Patents

a. Akoustis and any of its officers, agents, servants, directors, employees,
attorneys, subsidiaries, successors in interest, and all those persons in active
concert or participation with such persons who receive actual notice of this

5

Order by personal service or otherwise, are permanently enjoined and restrained from making, using, selling, or offering for sale within the United States, or importing into the United States:

   i.  The '018 Patent Enjoined Products or any products not more than colorably different from the '018 Patent Enjoined Products from the Effective Date (which is fourteen (14) days from the date of this signed Permanent Injunction) through the expiration of the '018 Patent;

   ii. The '755 Patent Enjoined Products or any products not more than colorably different from the '755 Patent Enjoined Products from the Effective Date through the expiration of the '755 Patent.

5. For the purposes of this injunction, the term "'018 Patent Enjoined Products" means the following Akoustis BAW filter products the jury found to infringe the '018 patent: A10149, A10154, A10155, A10156, A10158, A10160, A10165, A10166, A10235, A10238, A10249, A10252, A10256, A10266, A10335, AKF-1256, AKF-1256, AKF-1336, AKF-1938.

6. For the purposes of this injunction, the term "'755 Patent Enjoined Products" means the following Akoustis BAW filter products the jury found to infringe the '755 Patent: A10149, A10154, A10155, A10156, A10160, A10165, A10166, A10235, A10238, A10249, A10256, A10266, A10335, AKF-1252, AKF-1256, AKF-1336, AKF-1938.

7. For the purpose of this injunction, the term "Qorvo Trade Secret Information" means any confidential information copied or derived from, in whole or in part, the

following trade secrets that the jury found Akoustis to have misappropriated (identified here by trade secret number and citation to trial exhibit):

   a.  **Group 2: Qorvo BAW filter and resonator designs**

       i.  Trade Secret 2.1

          1.  Trial Ex. 8 (PTX-0078) at page 4

          2.  Trial Ex. 46 (PTX-0007) at page 2

      ii.  Trade Secret 2.2

          1.  Trial Ex. 9 (PTX-0149) at page 3

          2.  Trial Ex. 44 (PTX-0005) at page 3

          3.  Trial Ex. 45 (PTX-0006) at page 2

     iii.  Trade Secret 2.3

          1.  Trial Ex. 9 (PTX-0149) at pages 14–16

          2.  Trial Ex. 44 (PTX-0005) at pages 14–16

          3.  Trial Ex. 45 (PTX-0006) at pages 3–5

     iv.  Trade Secret 2.4

          1.  Trial Ex. 9 (PTX-0149) at page 17

          2.  Trial Ex. 44 (PTX-0005) at page 17

          3.  Trial Ex. 45 (PTX-0006) at page 6

      v.  Trade Secret 2.5

          1.  Trial Ex. 9 (PTX-0149) at page 19

          2.  Trial Ex. 44 (PTX-0005) at page 19

      vi.  Trade Secret 2.6

          1.  Trial Ex. 9 (PTX-0149) at page 24

      2.  Trial Ex. 44 (PTX-0005) at page 24

  vii.  Trade Secret 2.7

      1.  Trial Ex. 9 (PTX-0149) at page 11

      2.  Trial Ex. 44 (PTX-0005) at page 11

      3.  Trial Ex. 45 (PTX-0006) at pages 12

  viii.  Trade Secret 2.8

      1.  Trial Ex. 10 (PTX-0720) at page 4

  ix.  Trade Secret 2.9

      1.  Trial Ex. 10 (PTX-0720) at page 8

  x.  Trade Secret 2.10

      1.  Trial Ex. 10 (PTX-0720) at page 10

  xi.  Trade Secret 2.11

      1.  Trial Ex. 10 (PTX-0720) at page 15

  xii.  Trade Secret 2.12

      1.  Trial Ex. 10 (PTX-0720) at page 23

  xiii.  Trade Secret 2.13

      1.  Trial Ex. 10 (PTX-0720) at page 24

  xiv.  Trade Secret 2.14

      1.  Trial Ex. 10 (PTX-0720) at page 29

  xv.  Trade Secret 2.15

      1.  Trial Ex. 10 (PTX-0720) at page 36

  xvi.  Trade Secret 2.16

      1.  Trial Ex. 10 (PTX-0720) at page 37

    b.  Group 3: Qorvo's trimming method and procedures

        i.  Trade Secret 3.1

            1.  Trial Ex. 11 (PTX-1141) at page 16

            2.  Trial Ex. 12 (PTX-0453) at page 2

            3.  Trial Ex. 209 (PTX-0421) at page 2

            4.  Trial Ex. 213 (PTX-0438) at page 11

            5.  Trial Ex. 217 (PTX-0662) at pages 10

            6.  Trial Ex. 220 (PTX-0721) at page 11

        ii.  Trade Secret 3.2

            1.  Trial Ex. 11 (PTX-1141) at page 17

            2.  Trial Ex. 12 (PTX-0453) at page 3

            3.  Trial Ex. 209 (PTX-0421) at page 3

            4.  Trial Ex. 213 (PTX-0438) at pages 4 and 12

            5.  Trial Ex. 217 (PTX-0662) at pages 8 and 11

            6.  Trial Ex. 220 (PTX-0721) at pages 9 and 12

       iii.  Trade Secret 3.3

            1.  Trial Ex. 11 (PTX-1141) at page 18

            2.  Trial Ex. 12 (PTX-0453) at page 4

            3.  Trial Ex. 209 (PTX-0421) at page 4

    c.  Group 4: Qorvo's evaluation board design rules and schematics

        i.  Trade Secret 4.1

            1.  Trial Ex. 13 (PTX-1142) at page 1

    d.  Group 5: Qorvo's product development process and testing procedures

    i.  Trade Secret 5.4

       1.  Trial Ex. 33 (PTX-0111) at overview, specification, and production test tabs

       2.  Trial Ex. 34 (PTX-0114) at overview and specification tabs

       3.  Trial Ex. 76 (PTX-0112) at overview and specification tabs

       4.  Trial Ex. 79 (PTX-0116) at overview and specification tabs

       5.  Trial Ex. 80 (PTX-0117) at overview and specification tabs

       6.  Trial Ex. 83 (PTX-0120) at overview and specification tabs

    ii.  Trade Secret 5.5

       1.  Trial Ex. 7 (PTX-1089) at pages 1–2

       2.  Trial Ex. 33 (PTX-0111) at overview, specification, and production test tabs

       3.  Trial Ex. 34 (PTX-0114) at overview and specification tabs

       4.  Trial Ex. 35 (PTX-0088) at specification tab (with guard band file), test specification, and conditions tab

       5.  Trial Ex. 61 (PTX-0089) at page 2

       6.  Trial Ex. 76 (PTX-0112) at overview and specification tabs

       7.  Trial Ex. 79 (PTX-0116) at overview and specification tabs

       8.  Trial Ex. 80 (PTX-0117) at overview and specification tabs

       9.  Trial Ex. 83 (PTX-0120) at overview and specification tabs

e.  Group 6: Qorvo's systems at processes, and procedures for testing reliability and mean-time-to-failure of parts

    i.  Trade Secret 6.1

      1.  Trial Ex. 14 (PTX-0099) at pages 6 and 24

      2.  Trial Ex. 68 (PTX-0101) at pages 6 and 24

      3.  Trial Ex. 70 (PTX-0103) at pages 6 and 24

      4.  Trial Ex. 73 (PTX-0107) at pages 6 and 24

      5.  Trial Ex. 110 (PTX-0105) at pages 6 and 24

ii.  Trade Secret 6.3

      1.  Trial Ex. 14 (PTX-0099) at pages 15–17

      2.  Trial Ex. 68 (PTX-0101) at pages 15–17

      3.  Trial Ex. 70 (PTX-0103) at pages 15–17

      4.  Trial Ex. 73 (PTX-0107) at pages 15–17

      5.  Trial Ex. 110 (PTX-0105) at pages 15–17

iii.  Trade Secret 6.4

      1.  Trial Ex. 14 (PTX-0099) at pages 15–17

      2.  Trial Ex. 68 (PTX-0101) at pages 15–17

      3.  Trial Ex. 70 (PTX-0103) at pages 15–17

      4.  Trial Ex. 73 (PTX-0107) at pages 15–17

      5.  Trial Ex. 110 (PTX-0105) at pages 15–17

iv.  Trade Secret 6.5

      1.  Trial Ex. 14 (PTX-0099) at pages 15–17

      2.  Trial Ex. 68 (PTX-0101) at pages 15–17

      3.  Trial Ex. 70 (PTX-0103) at pages 15–17

      4.  Trial Ex. 73 (PTX-0107) at pages 15–17

      5.  Trial Ex. 110 (PTX-0105) at pages 15–17

       v.  Trade Secret 6.6

          1.  Trial Ex. 14 (PTX-0099) at page 23

          2.  Trial Ex. 68 (PTX-0101) at page 23

          3.  Trial Ex. 70 (PTX-0103) at page 23

          4.  Trial Ex. 73 (PTX-0107) at page 23

          5.  Trial Ex. 110 (PTX-0105) at page 23

    f.  Group 7: Qorvo's manufacturing and assembly procedures

       i.  Trade Secret 7.2

          1.  Trial Ex. 37 (PTX-0751) at pages 7 and 9

The Court retains jurisdiction to enforce this Permanent Injunction.

**IT IS SO ORDERED**, this 15th day of October, 2024.

               /s/ Jon P. McCalla
               JON P. McCALLA
               UNITED STATES DISTRICT JUDGE

**EXHIBIT 3**



# K&L Gates: Akoustis Technologies Inc.

*Privileged and Confidential | Prepared at the Direction of Counsel*

November 7, 2024

Updated November 30, 2024

# Introduction

Stroz Friedberg, LLC ("Stroz Friedberg") is pleased to provide this proposal to assist Akoustis Technologies, Inc. ("Akoustis") in complying with the court's injunction Order (DI 709). Stroz Friedberg will assist with the identification, collection, and removal of:

a. "Qorvo Trade Secret Information" (as defined in trial exhibits cited by the court), and

b. "All other documents that contain confidential Qorvo information (either indicated as [i] Qorvo-confidential by the information itself or [ii] otherwise known to be Qorvo-confidential by Akoustis) obtained or received without Qorvo's authorization or in violation of any obligation to maintain the confidentiality of that information".

Stroz Friedberg is uniquely suited to serve in this role because our practice combines significant expertise in forensics, expert witness work, and litigation. Our team consists of a deep bench of forensic experts, network specialists, and former practicing attorneys who combine deep technical knowledge, expert witness experience, and strong litigation awareness, with an ability to communicate sophisticated technical principles to a wide range of audiences.

This proposal outlines, at a high level, how Stroz Friedberg would approach assisting Akoustis in this matter, a preliminary proposed budget for each phase, and Stroz Friedberg's relevant qualifications and experience.

# About Stroz Friedberg

Stroz Friedberg is a global risk management firm and recognized leader in cybersecurity, digital forensics, and investigations with over 500 employees across multiple offices in North America, Europe, and Asia.

Our team of specialized professionals includes digital forensic examiners, cybersecurity analysts and consultants, and former government prosecutors and special agents. We have a particular focus on cybersecurity risk services and have extensive experience designing and implementing technical and procedural protocols to address both U.S. government and state-level enforcement and regulatory directives. Our technical expertise derives from both the education and experience of our consultants and engagement managers, who have graduated from leading technical programs and have often provided technical analysis in the adversarial context of litigation. Our engagement managers, many of whom have experience as federal prosecutors, draw upon their legal training to guide our technical teams. Our technical analysis has had to withstand the scrutiny of

adverse parties with enormous incentives to uncover mistakes, and over many years we have established a reputation that our work withstands that heavily motivated scrutiny.

- Stroz Friedberg maintains an unquestionable reputation for neutrality, independence, and ethical conduct, and the Parties can be assured that Stroz Friedberg possesses the necessary technical and analytical skills to perform the work described herein. Stroz Friedberg is built around seeking truth, providing assurance to all parties, maintaining neutrality, and adhering to the highest standards of business ethics. Now into its third decade in business, Stroz Friedberg has worked for public and private companies and other entities, as well as for multiple government agencies.

# Preservation Approach and Proposed Budget

Stroz Friedberg will assist Akoustis in preserving all relevant data sources, locating any potential trade secrets, and permanently removing them from Akoustis' possession. Stroz Friedberg will take a practical but prudent approach to this work and would begin by gaining a detailed understanding of all the data sources to be preserved. We understand the relevant data sources to include:

1. Any database, document management system, or other shared storage in use at Akoustis;

2. The mailboxes contained in Akoustis' corporate email servers for all Akoustis employees, and—upon documented and disclosed probable cause to believe that employees' personal email accounts were used to transmit, download, or upload Qorvo trade secrets—those email accounts; and

3. Akoustis computers, laptops, hard drives, and other storage media (including USB drives and network-based storage drives) belonging to all Akoustis employees.

Stroz Friedberg would use this understanding of Akoustis' data sources to develop a detailed plan that lays out a pragmatic approach for preserving all relevant data sources. This plan will define the relevant requirements and outline our proposed approach for preservation with each data source. Stroz Friedberg's preservation plan will include a mix of remote and on-site preservation to provide the most efficient means possible to preserve the relevant data.

Stroz Friedberg anticipates fees of approximately ████████████████ to preserve all relevant data sources that have been previously identified and newly identified data sources.

# Analysis Approach and Proposed Budget

Stroz Friedberg will conduct a targeted forensic analysis of computers to determine if any additional data sources should be preserved and analyzed for trade secrets. This analysis will be conducted to determine if any external storage devices were used by Akoustis that have not been produced for inspection. A list of any external storage devices found to have been used will be provided to Akoustis and the devices requested for inspection. Stroz Friedberg will utilize its custom and proprietary triage and analysis tool for this analysis.

Stroz Friedberg anticipates fees of approximately ███████████████ to analyze specific data sources for potential additional sources of trade secrets.

# Identification of Trade Secrets Approach and Proposed Budget

Stroz Friedberg divested its e-Discovery group in 2022 to Technology Concepts and Design Inc. ("TCDI"). Stroz Friedberg continues to partner with TCDI when e-Discovery work is necessary and proposes partnering with TCDI to locate all trade secrets in the data sources collected.

Stroz Friedberg anticipates TCDI fees of approximately ██████████████████ to identify all potential trade secrets to develop a remediation library. See attached TCDI proposal for details on the detailed approach and proposed budget.

# Remediation Approach and Proposed Budget

Stroz Friedberg will work closely with TCDI to assemble a remediation library of data that potentially contains trade secrets, with the goal of permanently deleting that data and therefore removing it from Akoustis' possession.

Once a remediation library is established, Stroz Friedberg will develop a plan to efficiently and permanently delete the data from Akoustis' systems, based on the most effective means available. These means may include custom scripts, commercial tools, and manual deletion of data and will be identified once Stroz Friedberg understands the volume and type of data to be deleted.

Based on the limited information available to it today and past experiences, Stroz Friedberg anticipates fees of approximately ██████████████ to remediate all potential trade secrets identified. This estimate may increase or decrease based on the volume of files contained within the remediation library and the number of data sources on which those files reside.

# Preparation of Report and Proposed Budget

Stroz Friedberg will prepare a report detailing all preservation, identification of trade secrets, analysis, and remediation. Stroz Friedberg anticipates fees of approximately ██████████████ to prepare this report.

# Select Relevant Experience

Stroz Friedberg has been engaged in numerous contested matters to serve as a forensic expert, neutral, or special master. Stroz Friedberg has provided a variety of services, including drafting protocols related to the preservation, collection, review, and product of key documents; forensically preserving and harvesting data on workstations, laptops, serves, home computers, USB drives, and other media; testing and running keyword searches to harvest the most complete and critical set of data relevant to the litigation; reviewing and analyzing key data; and providing assurance to all parties and the Court that sensitive data will be handled discreetly and appropriately. Select engagements include:

- Stroz Friedberg recently concluded a large-scale remediation effort. This remediation effort included laptops, mobile phones, cloud file storage, email, and backups for over 30 users, both current and former with the goal of accomplishing permanent, unrecoverable deletion of targeted documents while maintaining business functionality for the client. Stroz Friedberg leveraged a combination of proprietary and open-source tooling, and manual processes where applicable to most efficiently and effectively conduct the deletion effort. Depending on the data source being remediated from, Stroz Friedberg leveraged their expertise, research and testing, and even escalating to third-party support where necessary to ensure complete, accurate, and expeditious deletion.

- Stroz Friedberg was recently retained to serve as a forensic expert in connection with a motion for a preliminary injunction and temporary restraining order in a matter alleging theft of trade secrets and violations of restrictive covenants. Stroz Friedberg conducted forensic analysis of multiple devices and cloud-storage repositories, authored two declarations, and testified at a preliminary injunction hearing, in which our client prevailed.

- Stroz Friedberg has been retained to serve as a forensic expert in numerous other matters involving contest intellectual property and trade secrets, and these matters have included data preservation, identification, and deletion, drafting of expert reports, and oral testimony in deposition, evidentiary hearings, and trial.

Stroz Friedberg is also routinely asked to undertake sensitive data-related investigations outside of the litigation context. Some highlights of other work related to data investigation and remediation include:

- Stroz Friedberg was retained to conduct an independent investigation into the alleged theft of trade secrets by certain former employees of Google who joined Uber and an entity it acquired. Stroz Friedberg forensically preserved and analyzed data from over two dozen devices and cloud-storage repositories, interviewed multiple employees, and drafted a detailed report for use in litigation.

- Stroz Friedberg has served as a Third-Party Monitor and Third-Party Cybersecurity & Network Auditor in connection with National Security Agreements issued by the Committee on Foreign Investment in the United States, with a focus on monitoring Chinese access to U.S. protected data.

Stroz Friedberg served as an independent, neutral consultant providing digital forensic work for the Depart of Justice's Deepwater Horizon Task Force in connection with the investigation into the Deepwater Horizon disaster. In 2011, the Task Force requested that British Petroleum ("BP") produce various computers and electronic devices as part of the Task Force's investigation. Stroz Friedberg was selected to serve as the independent forensic consultant under an agreement whereby BP selected an independent firm to search and analyze data on computers and electronic devices that might be subject to BP's attorney-client privilege. Drawing upon our expertise in digital forensics, we were able to recover many deleted text messages and metadata that proved crucial as evidence. Although engaged and paid by BP, Stroz Friedberg operated as an independent, neutral consultant sitting between BP and the Government.

## Stroz Friedberg Team

The matter would be led by Brian Lichter, a former practicing attorney and federal prosecutor, and Mike Perry, an experienced forensic expert witness. Stroz Friedberg will supplement its team with other forensic examiners and consultants as appropriate.

Brian Lichter is Vice President in the Washington, D.C. office of Stroz Friedberg. His practice focuses on advising clients on high-impact incident response matters, complex regulatory investigation, executive and Board-level advisory work, and litigation consulting. Mr. Lichter has led investigations into cyber attacks by nation-state actors, hacktivists, and ransomware groups, and has significant experience investigating thefts of intellectual property. Mr. Lichter also regularly leads litigation-related engagements and has testified as an expert witness in multiple arbitration matters related to data breaches. He co-leads Stroz Friedberg's CFIUS

practice and is currently serving as the Third-Party Cybersecurity & Network Auditor under a National Security Agreement.

Before joining Stroz Friedberg, Mr. Lichter served as Cybersecurity Counsel and Senior Director for Global Investigations at Cognizant Technology Solutions, an attorney in the White-Collar Defense & Investigations and Complex Commercial Litigation practices at Latham & Watkins LLP, and as a federal corruption prosecutor with the Public Integrity Section of the U.S. Department of Justice,. Mr. Lichter began his legal career as a law clerk to the Chief Judge Diane S. Sykes of the U.S. Court of Appeals for the Seventh Circuit. He received his J.D. from Northwestern University Pritzker School of Law, and his undergraduate degree *magna cum laude* from Washington University in St. Louis.

Michael Perry is a Vice President in Stroz Friedberg's Boston office, where he leads and supports complex digital forensic and incident response engagements involving intellectual property and data theft, business email compromise, internal employee misconduct, and digital data preservation with anticipation of litigation. Mr. Perry has testified dozens of times as an expert in trials, depositions, and hearings.

Prior to joining Stroz Friedberg, Mr. Perry was a Deputy Sheriff and Digital Evidence Forensic Examiner for the Plymouth County Sheriff's Department's Bureau of Criminal Investigation (BCI), where he preserved and analyzed data and conducted investigations in criminal matters. Mr. Perry holds a B.A. in Information Technology from Boston College. He holds the industry certificates GIAC Certified Forensic Analyst (GCFA) and GIAC Advanced Smartphone Forensics Certification (GASF).

**EXHIBIT 4**



# eDiscovery Services
# PROPOSAL

Prepared For:



Prepared By:
Greg Michalek, J.D., CIPP/US
Senior Director
336-232-5826
g_michalek@tcdi.com



## Qorvo v Akoustis Trade Secret Identification & Analysis- Overview of Technology Solutions and Budget

PREPARED AT THE DIRECTION OF MIKE PERRY, VICE PRESIDENT AT STROZ FRIEDBERG

The following provides an overview of technology solutions, processes, and document review services that TCDI could provide to support Stroz Friedberg's identification obligations. Please note this is our best effort to identify the technology and service options and associated budget estimates for the project. This is not intended to be a final project design/workflow plan – those details would continue to be refined in close collaboration with Stroz Friedberg, the client, and its counsel via a project design-build process.

The technology solutions proposed below are suggested because, in our experience, they are well-suited to identify the excludable content, will utilize automated or semi-autonomous processes where possible, integrate well with other tools, and can be refined to meet evolving needs and requirements.

### Base Assumptions

- The previous work performed by FTI will not be re-used, but details on the work done and work product utilized will be needed, including all search terms and parameters.
- Every document that can safely be identified, en masse, as being incredibly unlikely to contain trade secrets or confidential business material will be immediately set aside from identification processes. (If new information impacts those assumptions, such documents can easily be returned to the workflow queues.)
- We will leverage duplicate analysis to identify documents where effectively the same document has already received a designation for trade secret or business confidential and use propagation to reduce overall volumes in Review (items will appear on final deletion log)
- We will design and leverage new trade secret and business confidential search term strings and domain analyses after learning more about the product(s) at issue and case at large.
- Gen AI tools and analytics will be used to the fullest extent possible where such tools can be validated to deliver timely, high-quality results at efficient pricing.

### General Project Approach and Timeline

TCDI proposes to utilize a small team of our top technology and professional service experts that would pair with client/counsel to ensure efficiency and avoid any duplication of efforts.

To maximize efficiencies, we propose the majority of the efforts should be completed over a four-month period (approx. December 2024 through March 2025) with an additional two-month period (approx. April 2025 through May 2025) for clean-up, final validation, and documentation, etc. This would target a project completion date of approx. May 2025 and allow Stroz Friedberg the time to complete the project within their 8-12 month timeline.

Based on experience with similar projects, meeting project objectives and deadlines while maintaining cost efficiencies are dependent on a variety of factors including:

- the nature of the data to be analyzed (consistency of data across custodians and sources, variety of sources and file types, presence of encryption, amenability to search, etc.)



- maintaining timely and collaborative communication pathways to ensure continuous alignment on direction and strategy;
- Flexibility regarding workflows and technologies so that those strategies and technologies that generate efficient, high-quality results are utilized, while other data sets may require iterative strategies before settling on the appropriate tech and workflow; and
- Minimal changes to scope of search after project initiation – significant mid-project directional changes to the scope and nature of the search that necessitate re-work against the same data sets can have a significant impact on the timing and efficiency of the overall project delivery.

## Strategy

- Identification of Trade Secret and Business Confidential using Reveal's Brainspace tool [https://www.revealdata.com/] to design, deploy, and evaluate specialized active learning classifiers based on inputs from client/counsel
- This process would also leverage domain analysis tools and traditional search term queries wherever it would be advantageous.
- We would create a list of trade secret and business confidential terms and suggested additional concepts by Brainspace
- Managed Document Review via TCDI MSMR Document Review Team [https://www.tcdi.com/legal-services/managed-document-review/military-spouse-program/]
- MSMR document review services in support of tool and process validation, support for search term development, etc.
- We would use Relativity for review, validation, and counsel queries - -this serves as the validation and feedback loop to ensure accurate coding
- We would use Relativity Analytics to reduce noise and prioritize for review
- Identify small and large files for manual validation
- Identify non-reviewable file types
- Streamline known Trade secret files (already discovered or known senders/receivers)
- Extract all text
- Send Review population to Altumatim for Gen AI processing or utilize Air for Review
- MSMR prompt creation with client/counsel to identify trade secret and business confidential documents
- MSMR to analyze small sample of results and update prompt criteria accordingly (iterate to best results) - -this serves as the validation and feedback loop to ensure accurate coding
- Run prompts across batches of documents (depending on total size) and MSMR team validate results
- MSMR team to use search terms and analytics to find more documents containing trade secret or confidential business material

**Analysis and Review of Data Not Processed**

TCDI will perform data cleanup steps across data populations not sent through analytics processes and utilize additional tools and methodologies, as needed. These steps may include:
- Analysis of file size and removal of small byte or large files
- Analysis of file types and removal of non-reviewable files
- Identification of Foreign Language documents
- Identification of image-based files and use of Gen AI tools, such as TackleAI to aid in the potential identification and review of files not successful in text-based processes


## Final Deliverables

- Summary Report documenting processes used (please note that this would not rise to the level of description and detail found in a traditional litigation testifying expert report, but such a report could be prepared on request)
- Narrative of overall process
- Tools and services used and any accompanying detailed outcomes data
- Search terms/Concepts/TAR/prompts employed against data
- Data reduction/document removal techniques and outcomes data
- Log of files to be deleted
- Log of Exceptions/Issues
- Final Daily Status report
- Final Query Log (aggregation of all)

# Pricing Estimates

## Processing and Data Analytics Estimate

Brainspace analytics: used to find various types of trade secret documents through search terms, suggested concept terms, concept wheel analysis, communication analysis, TAR Modeling and other analytics. This will result in large populations of documents that will be over-inclusive and need to be pared down through review.

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Data Processing (Blended Rate) | | | | | | | | | | |
| Brainspace Analytics | | | | | | | | | | |

## AI For Data Reduction & Identification

AI For Data Reduction and Identification will run Brainspace selected populations through an LLM model and this phase will involve MSMR team members creating prompts, validating results, re-engineering prompts, re-validating results until precision and recall numbers show good results in finding the required trade secret documents. The model will then be run across all selected documents and the MSMR team will validate results and remediate issues (over and under inclusive coding).

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Altumatim - SAR | | | | | | | | | | |
| TackleAI – Image Based AI | | | | | | | | | | |



## Data Hosting

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| User Fees (User/Month) | | | | | | | | | | |
| Review Hosting (OUT) (GB) (EMAIL/SERVER) | | | | | | | | | | |
| IN Hosting (GB) | | | | | | | | | | |

## AI Exclusion Document Review

AI Exclusion Review phase is for the work done in Brainspace as well as review of non-AI accessible docs (images, schematics, photos, large files, etc) to find trade secret documents.

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Review (Outside SAR) | | | | | | | | | | |
| Review Management | | | | | | | | | | |
| Review Consultant | | | | | | | | | | |

## Professional Services

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Project Management | | | | | | | | | | |
| TAR/AI Consulting | | | | | | | | | | |
| Technical Time | | | | | | | | | | |
| Expert Consulting | | | | | | | | | | |

## Overall Estimate

| Phase | Low Total | High Total |
|---|---|---|
| Processing and Data Analytics | | |
| AI For Data Reduction & Identification | | |
| Data Hosting | | |
| AI Exclusion Review | | |
| Professional Services | | |
| **Total** | | |
| **Monthly Estimate** | | |

*Project estimates are an approximation based on information and requirements provided and are not guaranteed. Actual costs and terms may change once the project starts and we will notify you as soon as we can of any substantial changes. Data Processing and AI for Data Reduction & Identification are one-time fees.*

# **EXHIBIT 5**

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Thursday, December 19, 2024 10:04 AM |
| **To:** | Kucera, Jeffrey T.; Westbrook, Margaret |
| **Cc:** | Blank, Stephen |
| **Subject:** | Akoustis Sale Procedures Motion |

Jeff and Margaret,

In advance of the hearing on January 8 and the quickly approaching January 3 objection deadline, can you please respond with answers to the following either later today or first thing tomorrow?

- **Cash Collateral Budget**: Please confirm that the cash collateral budget currently contemplates the Debtors' financial obligations under the Permanent Injunction with respect to (i) paying for Stroz Freidberg/TCDI (the "**E-Vendors**") and (ii) paying 50% of the cost for Qorvo's audit compliance with the permanent injunction (pursuant to paragraph 3 of the PI, as well as a reserve for the full amount). If the budget does so contemplate, please identify the line item(s) and amount.

- **Depositions**: We would like to take the depositions of the two E-Vendors, as well as the stalking horse bidder, over the next week. We would of course work around the holiday, and assume each deposition to be approximately 2 hours with appearances via zoom. We would like to coordinate these depositions with you and the deponents on a consensual basis.

- **E-Vendor Materials**: Please confirm whether the Debtor will consent to a copy of the Stroz Friedberg and TCDI redacted proposals that were provided to Sheppard Mullin being filed on the bankruptcy docket.

- **Cheeman and Boller Recusal from Resolutions**: There is a disclosure in the corporate resolutions that Cheeman and Boller are exploring an insider transaction. Please let us know whether the Debtor is willing to voluntarily provide any written proposal that was presented to the company/board, or if instead we need to take discovery on that on an expedited basis as well.

If a call would be helpful to talk through these items, we are available any time tomorrow between 830-930 am ET, or after 1030am ET until about 5pm ET.

We look forward to hearing from you,

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

| | |
|---|---|
| **From:** | Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com> |
| **Sent:** | Friday, December 20, 2024 6:46 AM |
| **To:** | Lerner, Leib; Westbrook, Margaret |
| **Cc:** | Blank, Stephen |
| **Subject:** | RE: Akoustis Sale Procedures Motion |

**EXTERNAL SENDER – Proceed with caution**

Leib, please see our responses below.

Regards,

Jeff Kucera
305-539-3322

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Thursday, December 19, 2024 1:04 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** Akoustis Sale Procedures Motion

Jeff and Margaret,

In advance of the hearing on January 8 and the quickly approaching January 3 objection deadline, can you please respond with answers to the following either later today or first thing tomorrow?

- **Cash Collateral Budget**: Please confirm that the cash collateral budget currently contemplates the Debtors' financial obligations under the Permanent Injunction with respect to (i) paying for Stroz Freidberg/TCDI (the "**E-Vendors**") and (ii) paying 50% of the cost for Qorvo's audit compliance with the permanent injunction (pursuant to paragraph 3 of the PI, as well as a reserve for the full amount). If the budget does so contemplate, please identify the line item(s) and amount.

[Kucera, Jeffrey T.] Confirmed. It is in the line labeled "professional fees, non-restructuring."

- **Depositions**: We would like to take the depositions of the two E-Vendors, as well as the stalking horse bidder, over the next week. We would of course work around the holiday, and assume each deposition to be approximately 2 hours with appearances via zoom. We would like to coordinate these depositions with you and the deponents on a consensual basis.

[Kucera, Jeffrey T.] We are coordinating dates for the e-vendors and will get back to you shortly. As for Gordon Brothers, please contact Paige Tinkham at Blank Rome:

**Paige Barr Tinkham** | BLANKROME
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2514 (*forwarded to cellphone*) | F: 312.264.2443 | paige.tinkham@blankrome.com

- **E-Vendor Materials**: Please confirm whether the Debtor will consent to a copy of the Stroz Friedberg and TCDI redacted proposals that were provided to Sheppard Mullin being filed on the bankruptcy docket.

[Kucera, Jeffrey T.] We have passed this request along to the e-vendors; we were hoping to have a response this morning but have not heard from them yet. We will advise when we have a response.

- **Cheeman and Boller Recusal from Resolutions**: There is a disclosure in the corporate resolutions that Cheeman and Boller are exploring an insider transaction. Please let us know whether the Debtor is willing to voluntarily provide any written proposal that was presented to the company/board, or if instead we need to take discovery on that on an expedited basis as well.

[Kucera, Jeffrey T.] We are discussing this with our team, but suggest we have a call; we can be available at 10:30 or 4:00 EST. Please let us know what works for you.

If a call would be helpful to talk through these items, we are available any time tomorrow between 830-930 am ET, or after 1030am ET until about 5pm ET.

We look forward to hearing from you,

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

**Lerner, Leib**

| | |
|---|---|
| **From:** | Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com> |
| **Sent:** | Friday, December 20, 2024 6:46 AM |
| **To:** | Lerner, Leib; Westbrook, Margaret |
| **Cc:** | Blank, Stephen |
| **Subject:** | RE: Akoustis Sale Procedures Motion |

**EXTERNAL SENDER – Proceed with caution**

Leib, please see our responses below.

Regards,

Jeff Kucera
305-539-3322

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Thursday, December 19, 2024 1:04 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** Akoustis Sale Procedures Motion

Jeff and Margaret,

In advance of the hearing on January 8 and the quickly approaching January 3 objection deadline, can you please respond with answers to the following either later today or first thing tomorrow?

- **Cash Collateral Budget**: Please confirm that the cash collateral budget currently contemplates the Debtors' financial obligations under the Permanent Injunction with respect to (i) paying for Stroz Freidberg/TCDI (the "E-Vendors") and (ii) paying 50% of the cost for Qorvo's audit compliance with the permanent injunction (pursuant to paragraph 3 of the PI, as well as a reserve for the full amount). If the budget does so contemplate, please identify the line item(s) and amount.
[Kucera, Jeffrey T.] Confirmed. It is in the line labeled "professional fees, non-restructuring."

- **Depositions**: We would like to take the depositions of the two E-Vendors, as well as the stalking horse bidder, over the next week. We would of course work around the holiday, and assume each deposition to be approximately 2 hours with appearances via zoom. We would like to coordinate these depositions with you and the deponents on a consensual basis.
[Kucera, Jeffrey T.] We are coordinating dates for the e-vendors and will get back to you shortly. As for Gordon Brothers, please contact Paige Tinkham at Blank Rome:
**Paige Barr Tinkham** | BLANKROME
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2514 (*forwarded to cellphone*) | F: 312.264.2443 | paige.tinkham@blankrome.com

- **E-Vendor Materials**: Please confirm whether the Debtor will consent to a copy of the Stroz Friedberg and TCDI redacted proposals that were provided to Sheppard Mullin being filed on the bankruptcy docket.

[Kucera, Jeffrey T.] We have passed this request along to the e-vendors; we were hoping to have a response this morning but have not heard from them yet. We will advise when we have a response.

- **Cheeman and Boller Recusal from Resolutions**: There is a disclosure in the corporate resolutions that Cheeman and Boller are exploring an insider transaction. Please let us know whether the Debtor is willing to voluntarily provide any written proposal that was presented to the company/board, or if instead we need to take discovery on that on an expedited basis as well.

[Kucera, Jeffrey T.] We are discussing this with our team, but suggest we have a call; we can be available at 10:30 or 4:00 EST. Please let us know what works for you.


If a call would be helpful to talk through these items, we are available any time tomorrow between 830-930 am ET, or after 1030am ET until about 5pm ET.


We look forward to hearing from you,


Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Sunday, December 22, 2024 1:17 PM |
| **To:** | Kucera, Jeffrey T.; Westbrook, Margaret; Tinkham, Paige B. |
| **Cc:** | Blank, Stephen |
| **Subject:** | RE: Akoustis - Qorvo Depositions |

All,

We appreciate Jeff's email. Can you (or Paige) further confirm whether Gordon Brothers is committing that its bid will not change to later include IP or any additional assets other than the equipment on the exhibit attached to the currently filed APA.

In addition, while we certainly appreciate the clarification, isolating the intellectual property from the Gordon Brothers bid still does not resolve the questions and concerns that we discussed and were listed as topics on the draft subpoena that we sent on Friday. As Jeff argued at the hearing, the expedited timing is being driven by Gordon Brothers, which is also seeking stalking horse protections. As such, Qorvo needs to understand the reason for the proposed speed of the transaction. Further, Qorvo is entitled to understand the proposed value of the stalking horse bid and bid protections, which is relevant to the 1/8 hearing when those procedures are proposed for approval. We imagine that any soon-to-be-appointed Committee will have similar questions.

The bottom line is that we think that it remains appropriate to take Gordon Brothers' deposition, as well as the depositions of both e-vendors. We would like to confirm all three for the 30th (if at all possible) so that we can ensure that a transcript is then available for Qorvo's objection to be filed on 1/3. We look forward to your response.

Leib

---

**From:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Sent:** Sunday, December 22, 2024 9:01 AM
**To:** Lerner, Leib <Leib.Lerner@alston.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** RE: Akoustis - Qorvo Depositions

**EXTERNAL SENDER – Proceed with caution**

---

Leib,

We have spoken with Gordon Brothers. The parties have agreed to add "Intellectual Property" to the list of Excluded Assets in the APA. The debtors and Gordon Brothers believe this should satisfy Qorvo's questions about what assets are included in the APA. We will file the amended APA with the court (if not today, then tomorrow). We do not believe that any of Qorvo's remaining issues regarding the Gordon Brothers bid present factual questions that are relevant for a hearing on bid procedures, and therefore we do not believe that a deposition of Gordon Brothers is necessary.

As for the e-vendors, we are still working to confirm dates. We understand that neither the 26th or the 27th work, but are trying to coordinate times for the 30th and, if needed, the 31st.

Regards,

Jeff Kucera
305-539-3322

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Sunday, December 22, 2024 9:21 AM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** Akoustis - Qorvo Depositions

Jeff and Margaret,
We never heard back from you as to whether the parties can consensually facilitate the e-vendor depositions for this week via Zoom. We are trying once more today by reaching out to you again. We also note that Gordon Brothers has not responded to us either after our Friday call. You can call my cell today at 323-683-6644 to discuss.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

**Lerner, Leib**

---

| | |
|---|---|
| **From:** | Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com> |
| **Sent:** | Monday, December 23, 2024 1:26 PM |
| **To:** | Tinkham, Paige B.; Lerner, Leib; Westbrook, Margaret |
| **Cc:** | Blank, Stephen |
| **Subject:** | RE: Akoustis - Qorvo Depositions |

**EXTERNAL SENDER – Proceed with caution**

---

The Debtors agree with Gordon Brothers. It is not customary for stalking horse bidders—or other bidders, for that matter—to get deposed like this. We are concerned that a deposition will not only potentially disrupt the stalking horse bid, but will also be a disruption to the entire marketing and bidding process. Other bidders could see that Qorvo is adding unnecessary turbulence to the process and simply decide to pass on the deal, to the detriment of all stakeholders.

Regards,

Jeff Kucera
305-539-3322

---

**From:** Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Sent:** Monday, December 23, 2024 12:03 PM
**To:** Lerner, Leib <Leib.Lerner@alston.com>; Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** RE: Akoustis - Qorvo Depositions

Leib,

I confirm that Gordon Brothers is not buying the IP and has no intention of doing so.

I disagree that there are any bases for a deposition of Gordon Brothers. If you have caselaw you are relying on, please share it.

Paige

**Paige Barr Tinkham** | BLANK**ROME**
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2514 (*forwarded to cellphone*) | F: 312.264.2443 | paige.tinkham@blankrome.com

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Sunday, December 22, 2024 3:17 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>;

Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** RE: Akoustis - Qorvo Depositions

All,

We appreciate Jeff's email. Can you (or Paige) further confirm whether Gordon Brothers is committing that its bid will not change to later include IP or any additional assets other than the equipment on the exhibit attached to the currently filed APA.

In addition, while we certainly appreciate the clarification, isolating the intellectual property from the Gordon Brothers bid still does not resolve the questions and concerns that we discussed and were listed as topics on the draft subpoena that we sent on Friday. As Jeff argued at the hearing, the expedited timing is being driven by Gordon Brothers, which is also seeking stalking horse protections. As such, Qorvo needs to understand the reason for the proposed speed of the transaction. Further, Qorvo is entitled to understand the proposed value of the stalking horse bid and bid protections, which is relevant to the 1/8 hearing when those procedures are proposed for approval. We imagine that any soon-to-be-appointed Committee will have similar questions.

The bottom line is that we think that it remains appropriate to take Gordon Brothers' deposition, as well as the depositions of both e-vendors. We would like to confirm all three for the 30th (if at all possible) so that we can ensure that a transcript is then available for Qorvo's objection to be filed on 1/3. We look forward to your response.

Leib

**From:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Sent:** Sunday, December 22, 2024 9:01 AM
**To:** Lerner, Leib <Leib.Lerner@alston.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** RE: Akoustis - Qorvo Depositions

**EXTERNAL SENDER – Proceed with caution**

Leib,

We have spoken with Gordon Brothers. The parties have agreed to add "Intellectual Property" to the list of Excluded Assets in the APA. The debtors and Gordon Brothers believe this should satisfy Qorvo's questions about what assets are included in the APA. We will file the amended APA with the court (if not today, then tomorrow). We do not believe that any of Qorvo's remaining issues regarding the Gordon Brothers bid present factual questions that are relevant for a hearing on bid procedures, and therefore we do not believe that a deposition of Gordon Brothers is necessary.

As for the e-vendors, we are still working to confirm dates. We understand that neither the 26th or the 27th work, but are trying to coordinate times for the 30th and, if needed, the 31st.

Regards,

Jeff Kucera
305-539-3322

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Sunday, December 22, 2024 9:21 AM

**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** Akoustis - Qorvo Depositions

Jeff and Margaret,
We never heard back from you as to whether the parties can consensually facilitate the e-vendor depositions for this week via Zoom. We are trying once more today by reaching out to you again. We also note that Gordon Brothers has not responded to us either after our Friday call. You can call my cell today at 323-683-6644 to discuss.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

*************************************************************************************************
******

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

*************************************************************************************************
******

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Monday, December 23, 2024 2:23 PM |
| **To:** | Kucera, Jeffrey T.; Westbrook, Margaret |
| **Cc:** | Blank, Stephen; Hernandez, Leslie |
| **Subject:** | Akoustis Sale Procedures Depositions (Stroz and TCDI) |
| **Attachments:** | 2024.12.23 - Subpoena - Stroz (Final).pdf; 2024.12.23 - Subpoena - TCDI (Final).pdf |

Jeff and Margaret,

Attached are two Subpoenas, one each for Stroz and TCDI, with depositions set for next Monday at 10am ET and 1pm ET, respectively. We set them for within 100 miles of each of their locations, but as discussed, would strongly prefer to organize the depositions to be taken over Zoom.  Please let us know if there is an arrangement on your end to accept service, or alternately please put us in contact this evening with whomever does have that authority.  Otherwise, we will serve these on the respective agents for service of process tomorrow.

We also never heard back from you on whether the e-vendors consent to their redacted proposals being filed on the bankruptcy court docket. We would like to avoid the cost, expense and potential delay of a motion to seal redacted documents that should not require that treatment.

Please make sure to include my assistant Leslie on your responses.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

# UNITED STATES BANKRUPTCY COURT

District of ___Delaware___

In re ___AKOUSTIS TECHNOLOGIES, INC., et al.___
_____
Debtor

Case No. ___24-12796 (LSS)___

_(Complete if issued in an adversary proceeding)_

Chapter ___11___

_____
Plaintiff

v.

Adv. Proc. No. _____

_____
Defendant

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: ___Stroz Friedberg LLC, Attn: Officer, Director, Managing Agent, or other Person(s) authorized to testify on its behalf___
_(Name of person to whom the subpoena is directed)_

☒ _Testimony_: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: See Attachment A.

| PLACE Alston & Bird LLP<br>90 Park Avenue, 15th Floor, New York, NY 10016 | DATE AND TIME<br>December 30, 2024 at 10:00 a.m. ET |
|---|---|

The deposition will be recorded by this method:
Before a court reporter or other person authorized to administer oaths, and recorded stenographically or videographically.

☐ _Production_: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: ___December 23, 2024___

CLERK OF COURT

_____                OR           _____
Signature of Clerk or Deputy Clerk                              _Attorney's signature_

The name, address, email address, and telephone number of the attorney representing _(name of party)_
___Quorvo, Inc.___ , who issues or requests this subpoena, are:
Leib M. Lerner, 350 S. Grand Ave., Ste. 5100, Los Angeles, CA 90071, leib.lerner@alston.com, (213) 576-1000

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**Attachment A**

**TOPICS**

1. The general description of your anticipated work for the Debtor to assist with the identification, collection and removal of any Qorvo confidential information pursuant to the permanent injunction issued by the Delaware District Court on October 15, 2024 in the matter of Qorvo, Inc. v. Akoustis Technologies and Akoustis, Inc. (Case No. 1:21-cv-01417) (the "Permanent Injunction") [Dist. Ct. Dkt. 710].

2. The general description of the data sources that you will inspect in connection with your work for Akoustis in connection with the Permanent Injunction, and the volume and/or quantity of such data sources.

3. The general description of the assistance that you will provide Akoustis to remove from its possession and quarantine all materials required to be removed pursuant to the Permanent Injunction.

4. The estimated time that it will take you to perform your services for Akoustis relating to the Permanent Injunction.

5. The anticipated cost to Akoustis for your services.

# UNITED STATES BANKRUPTCY COURT

District of **Delaware**

In re **AKOUSTIS TECHNOLOGIES, INC., et al.**

Debtor

*(Complete if issued in an adversary proceeding)*

Case No. **24-12796 (LSS)**

Chapter **11**

_____
Plaintiff

v.

_____
Defendant

Adv. Proc. No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: **Technology Concepts & Design, Inc., Attn: Officer, Director, Managing Agent, or other Person(s) authorized to testify on its behalf**

*(Name of person to whom the subpoena is directed)*

☒ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: **See Attachment A.**

| PLACE **Alston & Bird LLP**<br>**555 Fayetteville Street, Suite 600, Raleigh, NC 27601** | DATE AND TIME<br>December 30, 2024 at 1:00 p.m. ET |
|---|---|

The deposition will be recorded by this method:
Before a court reporter or other person authorized to administer oaths, and recorded stenographically or videographically.

☐ *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: **December 23, 2024**

CLERK OF COURT

OR

_____
Signature of Clerk or Deputy Clerk

_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
**Quorvo, Inc.** , who issues or requests this subpoena, are:
Leib M. Lerner, 350 S. Grand Ave., Ste. 5100, Los Angeles, CA 90071, leib.lerner@alston.com, (213) 576-1000

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by <u>Fed. R. Civ. P. 45</u>.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
  (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
  *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
  *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
  *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**Attachment A**

**TOPICS**

1. The general description of your anticipated work for the Debtor to assist with the identification, collection and removal of any Qorvo confidential information pursuant to the permanent injunction issued by the Delaware District Court on October 15, 2024 in the matter of Qorvo, Inc. v. Akoustis Technologies and Akoustis, Inc. (Case No. 1:21-cv-01417) (the "Permanent Injunction") [Dist. Ct. Dkt. 710].

2. The general description of the data sources that you will inspect in connection with your work for Akoustis in connection with the Permanent Injunction, and the volume and/or quantity of such data sources.

3. The general description of the assistance that you will provide Akoustis to remove from its possession and quarantine all materials required to be removed pursuant to the Permanent Injunction.

4. The estimated time that it will take you to perform your services for Akoustis relating to the Permanent Injunction.

5. The anticipated cost to Akoustis for your services.

| | |
|---|---|
| **From:** | Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com> |
| **Sent:** | Tuesday, December 24, 2024 1:26 PM |
| **To:** | Lerner, Leib; Westbrook, Margaret |
| **Cc:** | Blank, Stephen; Hernandez, Leslie; Cotter, John J. |
| **Subject:** | RE: Akoustis Sale Procedures Depositions (Stroz and TCDI) |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**EXTERNAL SENDER – Proceed with caution**

---

Leib,

To answer some of your specific questions: we have confirmed that we can accept service of process for TCDI and Stroz; by waiving service of process, however, neither Stroz nor TCDI waives any other objections they may have. We have no objection to conducting the depositions over Zoom. Both Stroz and TCDI have agreed that their redacted proposals can be filed on the bankruptcy court docket.

Unfortunately, however, the earliest we can schedule the depositions would be on January 3. We recognize that this is the same as the deadline for any objections Qorvo may file, and in light of your observance of the Sabbath, will agree to an extension of the objection deadline through 5:00 p.m. EST on Sunday, January 5 so long as we also receive an extension of time to file our reply through 5:00 p.m. EST on Tuesday, January 7.

Please copy my colleague John Cotter (copied here) on all correspondence relating to the e-discovery work in general, and these depositions in particular. I will now be off line until the 26th.

Regards,

Jeff Kucera
305-539-3322

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Monday, December 23, 2024 5:23 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Hernandez, Leslie <Leslie.Hernandez@alston.com>
**Subject:** Akoustis Sale Procedures Depositions (Stroz and TCDI)

Jeff and Margaret,
Attached are two Subpoenas, one each for Stroz and TCDI, with depositions set for next Monday at 10am ET and 1pm ET, respectively. We set them for within 100 miles of each of their locations, but as discussed, would strongly prefer to organize the depositions to be taken over Zoom.  Please let us know if there is an arrangement on your end to accept

service, or alternately please put us in contact this evening with whomever does have that authority. Otherwise, we will serve these on the respective agents for service of process tomorrow.

We also never heard back from you on whether the e-vendors consent to their redacted proposals being filed on the bankruptcy court docket. We would like to avoid the cost, expense and potential delay of a motion to seal redacted documents that should not require that treatment.

Please make sure to include my assistant Leslie on your responses.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

---

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Friday, December 27, 2024 12:28 PM |
| **To:** | Kucera, Jeffrey T.; Westbrook, Margaret |
| **Cc:** | Blank, Stephen; Cotter, John J.; David B. Stratton; Harris, Douglas |
| **Subject:** | RE: Akoustis Sale Procedures Depositions (Stroz and TCDI) |
| **Attachments:** | 2024.12.27 - Subpoena - Stroz (Final).pdf; 2024.12.27 - Subpoena - TCDI (Final).pdf |

Jeff,

We have carefully considered your proposal. First, we do not appreciate the Debtors' and E-Vendors' failure to accommodate depositions earlier than 1/3. We reached out to you very quickly after the last hearing and proposed 12/26, 12/27, 12/30 and 12/31 as possible deposition dates, and had subsequently thought that Debtors had agreed to 12/30 when we first issued the subpoenas. Those dates were both well before the hearing and well before the Court's 1/3 objection deadline. Only making witnesses available on 1/3, the Friday before the hearing and on the same day as the Court's objection deadline, does not seem like a reasonable accommodation.

Nonetheless, we intend to move forward with the depositions on 1/3 via Zoom, and have attached amended subpoenas for you to accept service on behalf of Stroz Friedberg and TCDI, with revised deposition dates and the Zoom information. Note that we have slightly revised topics 1-4 to include reference to the Permanent Injunction Order (and not just the Permanent Injunction), because the former is what is referenced in the Stroz Friedberg proposal rather than the Permanent Injunction itself. We also added an additional topic to specifically reference the Stroz Friedberg and TCDI proposals, given the Debtors' response that they will not agree to the proposals' admissibility. We believe that this topic would be incorporated within the other five topics, but want to make sure everything is as clear as possible for the Court to consider should any dispute arise.

As for your proposal to change the deadlines for Qorvo's response deadline from Friday, 1/3 to Sunday, 1/5 and to change Akoustis' reply deadline from Monday, 1/6 to Tuesday, 1/7, we do not agree to change the original deadlines. The Court will need time to reflect on our papers, and we will need time to reflect on your reply, prior to the hearing. Pushing out the original deadlines will make this difficult, and be prejudicial to Qorvo.

The bottom line is that we will take the depositions on 1/3, which we need and will utilize for the hearing. We will file our opposition papers on 1/3 as well, and do not agree to any delayed briefing schedule proposed by the Debtors.

If you have any questions regarding the above, I am available on my cell at 323-683-6644 until 5pm ET today, and any time on Sunday or Monday at your earliest convenience.

Leib

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Thursday, December 26, 2024 3:11 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

Thank you for the response. Given that it is already evening on the East Coast during this holiday season and almost time to light Chanukah candles out here, we will need to confer internally about your response first thing tomorrow and get back to you thereafter.
Leib

**From:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Sent:** Thursday, December 26, 2024 3:02 PM
**To:** Lerner, Leib <Leib.Lerner@alston.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

**EXTERNAL SENDER – Proceed with caution**

Leib, no worries – I've been called much worse.

The Debtors are in agreement that Qorvo can file the proposals on the docket. The Debtors will also stipulate to authenticity but not to admissibility.

Please advise when you have a response on our timing proposal.

Regards,

Jeff Kucera
305-539-3322

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Thursday, December 26, 2024 5:48 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

Jeff – Just following up here.  Leib

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Thursday, December 26, 2024 9:18 AM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

Jeff,
Resending this to correctly address to you.  My apologies, and I look forward to your response.

Jeff,

Thank you for your response. First, can you please clarify that the Debtors are in agreement that the redacted Stroz and TCDI proposals can be filed by Qorvo on the public Bankruptcy Court docket?  Your email below, and prior email, seems to imply that the confidentiality is held by the E-Vendors. That does not seem to be accurate, given that the E-Vendors supplied the documents to the Debtors, which is where it appears to us that any right of confidentiality lies (see attached).  Please also confirm that the Debtors stipulate to the authenticity and admissibility of these two documents for the 1/8 hearing.

We are conferring internally regarding your proposal concerning the depositions and response deadlines.  If you could respond to the above with Debtors' position regarding the documents (hopefully, affirmatively) that would be helpful.  If you think a call would be productive, I'm available today at your convenience.

Leib

---

**EXTERNAL SENDER – Proceed with caution**

---

Leib,

To answer some of your specific questions: we have confirmed that we can accept service of process for TCDI and Stroz; by waiving service of process, however, neither Stroz nor TCDI waives any other objections they may have. We have no objection to conducting the depositions over Zoom. Both Stroz and TCDI have agreed that their redacted proposals can be filed on the bankruptcy court docket.

Unfortunately, however, the earliest we can schedule the depositions would be on January 3. We recognize that this is the same as the deadline for any objections Qorvo may file, and in light of your observance of the Sabbath, will agree to an extension of the objection deadline through 5:00 p.m. EST on Sunday, January 5 so long as we also receive an extension of time to file our reply through 5:00 p.m. EST on Tuesday, January 7.

Please copy my colleague John Cotter (copied here) on all correspondence relating to the e-discovery work in general, and these depositions in particular. I will now be off line until the 26th.

Regards,

Jeff Kucera
305-539-3322

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Monday, December 23, 2024 5:23 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Hernandez, Leslie <Leslie.Hernandez@alston.com>
**Subject:** Akoustis Sale Procedures Depositions (Stroz and TCDI)

Jeff and Margaret,
Attached are two Subpoenas, one each for Stroz and TCDI, with depositions set for next Monday at 10am ET and 1pm ET, respectively. We set them for within 100 miles of each of their locations, but as discussed, would strongly prefer to organize the depositions to be taken over Zoom.  Please let us know if there is an arrangement on your end to accept service, or alternately please put us in contact this evening with whomever does have that authority.  Otherwise, we will serve these on the respective agents for service of process tomorrow.

We also never heard back from you on whether the e-vendors consent to their redacted proposals being filed on the bankruptcy court docket. We would like to avoid the cost, expense and potential delay of a motion to seal redacted documents that should not require that treatment.

Please make sure to include my assistant Leslie on your responses.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

---

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

# UNITED STATES BANKRUPTCY COURT

District of **Delaware**

In re **AKOUSTIS TECHNOLOGIES, INC., et al.**

Debtor

*(Complete if issued in an adversary proceeding)*

_____
Plaintiff

v.

_____
Defendant

Case No. **24-12796 (LSS)**

Chapter **11**

Adv. Proc. No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: **Stroz Friedberg LLC, Attn: Officer, Director, Managing Agent, or other Person(s) authorized to testify on its behalf**

*(Name of person to whom the subpoena is directed)*

[X] *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: **See Attachment A.**

| PLACE Via Zoom: https://us02web.zoom.us/j/84006293398?<br>pwd=gZDAcFJK3tbawatqvcDwh92mUtaoF3.1 | DATE AND TIME<br>January 3, 2025 at 9:00 a.m. ET |
|---|---|

The deposition will be recorded by this method:
Before a court reporter or other person authorized to administer oaths, and recorded stenographically or videographically.

[ ] *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: **December 27, 2024**

CLERK OF COURT

_____
Signature of Clerk or Deputy Clerk

OR

_____
*Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
**Quorvo, Inc.** , who issues or requests this subpoena, are:
Leib M. Lerner, 350 S. Grand Ave., Ste. 5100, Los Angeles, CA 90071, leib.lerner@alston.com, (213) 576-1000

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by <u>Fed. R. Civ. P. 45</u>.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
  (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
  *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
  *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
  *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**Attachment A**

**TOPICS**

1.  The general description of your anticipated work for Akoustis Technologies, Inc., Akoustis, Inc. and any of their affiliates, managers, employees or agents (collectively, "Akoustis"), to assist with the identification, collection and removal of any Qorvo Trade Secret Information and/or confidential Qorvo information pursuant to the Order Granting in Part and Denying in Part Plaintiff's Motion for Permanent Injunctive Relief (the "Permanent Injunction Order") [DE Dkt. No. 709] entered on October 11, 2024 in the United States District Court for the District of Delaware ("District Court"), Case No. Case No. 1:21-cv-01417-JPM, or the Permanent Injunction (the "Permanent Injunction") [DE Dkt. No. 710] entered by the District Court on October 15, 2024.

2.  The general description of the data sources that you will inspect in connection with your work for Akoustis in connection with the Permanent Injunction Order and Permanent Injunction, and the volume and/or quantity of such data sources.

3.  The general description of the assistance that you will provide Akoustis to remove from its possession and quarantine all materials required to be removed pursuant to the Permanent Injunction Order and Permanent Injunction.

4.  The estimated time that it will take you to perform your services for Akoustis relating to the Permanent Injunction Order and Permanent Injunction.

5.  The anticipated cost to Akoustis for your services.

6.  The consideration, development, preparation and submission of the Stroz Friedburg, LLC proposal and TCDI eDiscovery Services Proposal, both attached hereto (as redacted).



# K&L Gates: Akoustis Technologies Inc.

*Privileged and Confidential | Prepared at the Direction of Counsel*

November 7, 2024

Updated November 30, 2024

# Introduction

Stroz Friedberg, LLC ("Stroz Friedberg") is pleased to provide this proposal to assist Akoustis Technologies, Inc. ("Akoustis") in complying with the court's injunction Order (DI 709).  Stroz Friedberg will assist with the identification, collection, and removal of:

    a.  "Qorvo Trade Secret Information" (as defined in trial exhibits cited by the court), and

    b.  "All other documents that contain confidential Qorvo information (either indicated as [i] Qorvo-confidential by the information itself or [ii] otherwise known to be Qorvo-confidential by Akoustis) obtained or received without Qorvo's authorization or in violation of any obligation to maintain the confidentiality of that information".

Stroz Friedberg is uniquely suited to serve in this role because our practice combines significant expertise in forensics, expert witness work, and litigation. Our team consists of a deep bench of forensic experts, network specialists, and former practicing attorneys who combine deep technical knowledge, expert witness experience, and strong litigation awareness, with an ability to communicate sophisticated technical principles to a wide range of audiences.

This proposal outlines, at a high level, how Stroz Friedberg would approach assisting Akoustis in this matter, a preliminary proposed budget for each phase, and Stroz Friedberg's relevant qualifications and experience.

# About Stroz Friedberg

Stroz Friedberg is a global risk management firm and recognized leader in cybersecurity, digital forensics, and investigations with over 500 employees across multiple offices in North America, Europe, and Asia.

Our team of specialized professionals includes digital forensic examiners, cybersecurity analysts and consultants, and former government prosecutors and special agents.  We have a particular focus on cybersecurity risk services and have extensive experience designing and implementing technical and procedural protocols to address both U.S. government and state-level enforcement and regulatory directives.  Our technical expertise derives from both the education and experience of our consultants and engagement managers, who have graduated from leading technical programs and have often provided technical analysis in the adversarial context of litigation.  Our engagement managers, many of whom have experience as federal prosecutors, draw upon their legal training to guide our technical teams.  Our technical analysis has had to withstand the scrutiny of

adverse parties with enormous incentives to uncover mistakes, and over many years we have established a reputation that our work withstands that heavily motivated scrutiny.

- Stroz Friedberg maintains an unquestionable reputation for neutrality, independence, and ethical conduct, and the Parties can be assured that Stroz Friedberg possesses the necessary technical and analytical skills to perform the work described herein.  Stroz Friedberg is built around seeking truth, providing assurance to all parties, maintaining neutrality, and adhering to the highest standards of business ethics.  Now into its third decade in business, Stroz Friedberg has worked for public and private companies and other entities, as well as for multiple government agencies.

# Preservation Approach and Proposed Budget

Stroz Friedberg will assist Akoustis in preserving all relevant data sources, locating any potential trade secrets, and permanently removing them from Akoustis' possession.  Stroz Friedberg will take a practical but prudent approach to this work and would begin by gaining a detailed understanding of all the data sources to be preserved.  We understand the relevant data sources to include:

1. Any database, document management system, or other shared storage in use at Akoustis;

2. The mailboxes contained in Akoustis' corporate email servers for all Akoustis employees, and—upon documented and disclosed probable cause to believe that employees' personal email accounts were used to transmit, download, or upload Qorvo trade secrets—those email accounts; and

3. Akoustis computers, laptops, hard drives, and other storage media (including USB drives and network-based storage drives) belonging to all Akoustis employees.

Stroz Friedberg would use this understanding of Akoustis' data sources to develop a detailed plan that lays out a pragmatic approach for preserving all relevant data sources.  This plan will define the relevant requirements and outline our proposed approach for preservation with each data source.  Stroz Friedberg's preservation plan will include a mix of remote and on-site preservation to provide the most efficient means possible to preserve the relevant data.

Stroz Friedberg anticipates fees of approximately ██████████████ to preserve all relevant data sources that have been previously identified and newly identified data sources.

# Analysis Approach and Proposed Budget

Stroz Friedberg will conduct a targeted forensic analysis of computers to determine if any additional data sources should be preserved and analyzed for trade secrets. This analysis will be conducted to determine if any external storage devices were used by Akoustis that have not been produced for inspection. A list of any external storage devices found to have been used will be provided to Akoustis and the devices requested for inspection. Stroz Friedberg will utilize its custom and proprietary triage and analysis tool for this analysis.

Stroz Friedberg anticipates fees of approximately ███████████ to analyze specific data sources for potential additional sources of trade secrets.

# Identification of Trade Secrets Approach and Proposed Budget

Stroz Friedberg divested its e-Discovery group in 2022 to Technology Concepts and Design Inc. ("TCDI"). Stroz Friedberg continues to partner with TCDI when e-Discovery work is necessary and proposes partnering with TCDI to locate all trade secrets in the data sources collected.

Stroz Friedberg anticipates TCDI fees of approximately ███████████ to identify all potential trade secrets to develop a remediation library. See attached TCDI proposal for details on the detailed approach and proposed budget.

# Remediation Approach and Proposed Budget

Stroz Friedberg will work closely with TCDI to assemble a remediation library of data that potentially contains trade secrets, with the goal of permanently deleting that data and therefore removing it from Akoustis' possession.

Once a remediation library is established, Stroz Friedberg will develop a plan to efficiently and permanently delete the data from Akoustis' systems, based on the most effective means available. These means may include custom scripts, commercial tools, and manual deletion of data and will be identified once Stroz Friedberg understands the volume and type of data to be deleted.

Based on the limited information available to it today and past experiences, Stroz Friedberg anticipates fees of approximately ███████████ to remediate all potential trade secrets identified. This estimate may increase or decrease based on the volume of files contained within the remediation library and the number of data sources on which those files reside.

# Preparation of Report and Proposed Budget

Stroz Friedberg will prepare a report detailing all preservation, identification of trade secrets, analysis, and remediation. Stroz Friedberg anticipates fees of approximately ███████████████ to prepare this report.

# Select Relevant Experience

Stroz Friedberg has been engaged in numerous contested matters to serve as a forensic expert, neutral, or special master. Stroz Friedberg has provided a variety of services, including drafting protocols related to the preservation, collection, review, and product of key documents; forensically preserving and harvesting data on workstations, laptops, serves, home computers, USB drives, and other media; testing and running keyword searches to harvest the most complete and critical set of data relevant to the litigation; reviewing and analyzing key data; and providing assurance to all parties and the Court that sensitive data will be handled discreetly and appropriately. Select engagements include:

- Stroz Friedberg recently concluded a large-scale remediation effort. This remediation effort included laptops, mobile phones, cloud file storage, email, and backups for over 30 users, both current and former with the goal of accomplishing permanent, unrecoverable deletion of targeted documents while maintaining business functionality for the client. Stroz Friedberg leveraged a combination of proprietary and open-source tooling, and manual processes where applicable to most efficiently and effectively conduct the deletion effort. Depending on the data source being remediated from, Stroz Friedberg leveraged their expertise, research and testing, and even escalating to third-party support where necessary to ensure complete, accurate, and expeditious deletion.

- Stroz Friedberg was recently retained to serve as a forensic expert in connection with a motion for a preliminary injunction and temporary restraining order in a matter alleging theft of trade secrets and violations of restrictive covenants. Stroz Friedberg conducted forensic analysis of multiple devices and cloud-storage repositories, authored two declarations, and testified at a preliminary injunction hearing, in which our client prevailed.

- Stroz Friedberg has been retained to serve as a forensic expert in numerous other matters involving contest intellectual property and trade secrets, and these matters have included data preservation, identification, and deletion, drafting of expert reports, and oral testimony in deposition, evidentiary hearings, and trial.

Stroz Friedberg is also routinely asked to undertake sensitive data-related investigations outside of the litigation context. Some highlights of other work related to data investigation and remediation include:

- Stroz Friedberg was retained to conduct an independent investigation into the alleged theft of trade secrets by certain former employees of Google who joined Uber and an entity it acquired. Stroz Friedberg forensically preserved and analyzed data from over two dozen devices and cloud-storage repositories, interviewed multiple employees, and drafted a detailed report for use in litigation.

- Stroz Friedberg has served as a Third-Party Monitor and Third-Party Cybersecurity & Network Auditor in connection with National Security Agreements issued by the Committee on Foreign Investment in the United States, with a focus on monitoring Chinese access to U.S. protected data.

Stroz Friedberg served as an independent, neutral consultant providing digital forensic work for the Depart of Justice's Deepwater Horizon Task Force in connection with the investigation into the Deepwater Horizon disaster. In 2011, the Task Force requested that British Petroleum ("BP") produce various computers and electronic devices as part of the Task Force's investigation. Stroz Friedberg was selected to serve as the independent forensic consultant under an agreement whereby BP selected an independent firm to search and analyze data on computers and electronic devices that might be subject to BP's attorney-client privilege. Drawing upon our expertise in digital forensics, we were able to recover many deleted text messages and metadata that proved crucial as evidence. Although engaged and paid by BP, Stroz Friedberg operated as an independent, neutral consultant sitting between BP and the Government.

# Stroz Friedberg Team

The matter would be led by Brian Lichter, a former practicing attorney and federal prosecutor, and Mike Perry, an experienced forensic expert witness. Stroz Friedberg will supplement its team with other forensic examiners and consultants as appropriate.

Brian Lichter is Vice President in the Washington, D.C. office of Stroz Friedberg. His practice focuses on advising clients on high-impact incident response matters, complex regulatory investigation, executive and Board-level advisory work, and litigation consulting. Mr. Lichter has led investigations into cyber attacks by nation-state actors, hacktivists, and ransomware groups, and has significant experience investigating thefts of intellectual property. Mr. Lichter also regularly leads litigation-related engagements and has testified as an expert witness in multiple arbitration matters related to data breaches. He co-leads Stroz Friedberg's CFIUS

practice and is currently serving as the Third-Party Cybersecurity & Network Auditor under a National Security Agreement.

Before joining Stroz Friedberg, Mr. Lichter served as Cybersecurity Counsel and Senior Director for Global Investigations at Cognizant Technology Solutions, an attorney in the White-Collar Defense & Investigations and Complex Commercial Litigation practices at Latham & Watkins LLP, and as a federal corruption prosecutor with the Public Integrity Section of the U.S. Department of Justice,. Mr. Lichter began his legal career as a law clerk to the Chief Judge Diane S. Sykes of the U.S. Court of Appeals for the Seventh Circuit. He received his J.D. from Northwestern University Pritzker School of Law, and his undergraduate degree *magna cum laude* from Washington University in St. Louis.

Michael Perry is a Vice President in Stroz Friedberg's Boston office, where he leads and supports complex digital forensic and incident response engagements involving intellectual property and data theft, business email compromise, internal employee misconduct, and digital data preservation with anticipation of litigation. Mr. Perry has testified dozens of times as an expert in trials, depositions, and hearings.

Prior to joining Stroz Friedberg, Mr. Perry was a Deputy Sheriff and Digital Evidence Forensic Examiner for the Plymouth County Sheriff's Department's Bureau of Criminal Investigation (BCI), where he preserved and analyzed data and conducted investigations in criminal matters. Mr. Perry holds a B.A. in Information Technology from Boston College. He holds the industry certificates GIAC Certified Forensic Analyst (GCFA) and GIAC Advanced Smartphone Forensics Certification (GASF).



eDiscovery Services
# PROPOSAL

Prepared For:



Prepared By:
Greg Michalek, J.D., CIPP/US
Senior Director
336-232-5826
g_michalek@tcdi.com



## Qorvo v Akoustis Trade Secret Identification & Analysis- Overview of Technology Solutions and Budget

PREPARED AT THE DIRECTION OF MIKE PERRY, VICE PRESIDENT AT STROZ FRIEDBERG

The following provides an overview of technology solutions, processes, and document review services that TCDI could provide to support Stroz Friedberg's identification obligations. Please note this is our best effort to identify the technology and service options and associated budget estimates for the project. This is not intended to be a final project design/workflow plan – those details would continue to be refined in close collaboration with Stroz Friedberg, the client, and its counsel via a project design-build process.

The technology solutions proposed below are suggested because, in our experience, they are well-suited to identify the excludable content, will utilize automated or semi-autonomous processes where possible, integrate well with other tools, and can be refined to meet evolving needs and requirements.

### Base Assumptions

- The previous work performed by FTI will not be re-used, but details on the work done and work product utilized will be needed, including all search terms and parameters.
- Every document that can safely be identified, en masse, as being incredibly unlikely to contain trade secrets or confidential business material will be immediately set aside from identification processes. (If new information impacts those assumptions, such documents can easily be returned to the workflow queues.)
- We will leverage duplicate analysis to identify documents where effectively the same document has already received a designation for trade secret or business confidential and use propagation to reduce overall volumes in Review (items will appear on final deletion log)
- We will design and leverage new trade secret and business confidential search term strings and domain analyses after learning more about the product(s) at issue and case at large.
- Gen AI tools and analytics will be used to the fullest extent possible where such tools can be validated to deliver timely, high-quality results at efficient pricing.

### General Project Approach and Timeline

TCDI proposes to utilize a small team of our top technology and professional service experts that would pair with client/counsel to ensure efficiency and avoid any duplication of efforts.

To maximize efficiencies, we propose the majority of the efforts should be completed over a four-month period (approx. December 2024 through March 2025) with an additional two-month period (approx. April 2025 through May 2025) for clean-up, final validation, and documentation, etc. This would target a project completion date of approx. May 2025 and allow Stroz Friedberg the time to complete the project within their 8-12 month timeline.

Based on experience with similar projects, meeting project objectives and deadlines while maintaining cost efficiencies are dependent on a variety of factors including:

- the nature of the data to be analyzed (consistency of data across custodians and sources, variety of sources and file types, presence of encryption, amenability to search, etc.)



- maintaining timely and collaborative communication pathways to ensure continuous alignment on direction and strategy;
- Flexibility regarding workflows and technologies so that those strategies and technologies that generate efficient, high-quality results are utilized, while other data sets may require iterative strategies before settling on the appropriate tech and workflow; and
- Minimal changes to scope of search after project initiation – significant mid-project directional changes to the scope and nature of the search that necessitate re-work against the same data sets can have a significant impact on the timing and efficiency of the overall project delivery.

## Strategy

- Identification of Trade Secret and Business Confidential using Reveal's Brainspace tool [https://www.revealdata.com/] to design, deploy, and evaluate specialized active learning classifiers based on inputs from client/counsel
- This process would also leverage domain analysis tools and traditional search term queries wherever it would be advantageous.
- We would create a list of trade secret and business confidential terms and suggested additional concepts by Brainspace
- Managed Document Review via TCDI MSMR Document Review Team [https://www.tcdi.com/legal-services/managed-document-review/military-spouse-program/]
- MSMR document review services in support of tool and process validation, support for search term development, etc.
- We would use Relativity for review, validation, and counsel queries - -this serves as the validation and feedback loop to ensure accurate coding
- We would use Relativity Analytics to reduce noise and prioritize for review
- Identify small and large files for manual validation
- Identify non-reviewable file types
- Streamline known Trade secret files (already discovered or known senders/receivers)
- Extract all text
- Send Review population to Altumatim for Gen AI processing or utilize Air for Review
- MSMR prompt creation with client/counsel to identify trade secret and business confidential documents
- MSMR to analyze small sample of results and update prompt criteria accordingly (iterate to best results) - -this serves as the validation and feedback loop to ensure accurate coding
- Run prompts across batches of documents (depending on total size) and MSMR team validate results
- MSMR team to use search terms and analytics to find more documents containing trade secret or confidential business material

### Analysis and Review of Data Not Processed

TCDI will perform data cleanup steps across data populations not sent through analytics processes and utilize additional tools and methodologies, as needed. These steps may include:

- Analysis of file size and removal of small byte or large files
- Analysis of file types and removal of non-reviewable files
- Identification of Foreign Language documents
- Identification of image-based files and use of Gen AI tools, such as TackleAI to aid in the potential identification and review of files not successful in text-based processes


## Final Deliverables

- Summary Report documenting processes used (please note that this would not rise to the level of description and detail found in a traditional litigation testifying expert report, but such a report could be prepared on request)
- Narrative of overall process
- Tools and services used and any accompanying detailed outcomes data
- Search terms/Concepts/TAR/prompts employed against data
- Data reduction/document removal techniques and outcomes data
- Log of files to be deleted
- Log of Exceptions/Issues
- Final Daily Status report
- Final Query Log (aggregation of all)

# Pricing Estimates

## Processing and Data Analytics Estimate

Brainspace analytics: used to find various types of trade secret documents through search terms, suggested concept terms, concept wheel analysis, communication analysis, TAR Modeling and other analytics. This will result in large populations of documents that will be over-inclusive and need to be pared down through review.

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Data Processing (Blended Rate) | | | | | | | | | | |
| Brainspace Analytics | | | | | | | | | | |

## AI For Data Reduction & Identification

AI For Data Reduction and Identification will run Brainspace selected populations through an LLM model and this phase will involve MSMR team members creating prompts, validating results, re-engineering prompts, re-validating results until precision and recall numbers show good results in finding the required trade secret documents. The model will then be run across all selected documents and the MSMR team will validate results and remediate issues (over and under inclusive coding).

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Altumatim - SAR | | | | | | | | | | |
| TackleAI – Image Based AI | | | | | | | | | | |



## Data Hosting

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| User Fees (User/Month) | | | | | | | | | | |
| Review Hosting (OUT) (GB) (EMAIL/SERVER) | | | | | | | | | | |
| IN Hosting (GB) | | | | | | | | | | |

## AI Exclusion Document Review

AI Exclusion Review phase is for the work done in Brainspace as well as review of non-AI accessible docs (images, schematics, photos, large files, etc) to find trade secret documents.

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Review (Outside SAR) | | | | | | | | | | |
| Review Management | | | | | | | | | | |
| Review Consultant | | | | | | | | | | |

## Professional Services

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Project Management | | | | | | | | | | |
| TAR/AI Consulting | | | | | | | | | | |
| Technical Time | | | | | | | | | | |
| Expert Consulting | | | | | | | | | | |

## Overall Estimate

| Phase | Low Total | High Total |
|---|---|---|
| Processing and Data Analytics | | |
| AI For Data Reduction & Identification | | |
| Data Hosting | | |
| AI Exclusion Review | | |
| Professional Services | | |
| **Total** | | |
| **Monthly Estimate** | | |

*Project estimates are an approximation based on information and requirements provided and are not guaranteed. Actual costs and terms may change once the project starts and we will notify you as soon as we can of any substantial changes. Data Processing and AI for Data Reduction & Identification are one-time fees.*

# UNITED STATES BANKRUPTCY COURT

District of **Delaware**

In re **AKOUSTIS TECHNOLOGIES, INC., et al.**

_____

Debtor

*(Complete if issued in an adversary proceeding)*

_____

Plaintiff

v.

_____

Defendant

Case No. **24-12796 (LSS)**

Chapter **11**

Adv. Proc. No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: **Technology Concepts & Design, Inc., Attn: Officer, Director, Managing Agent, or other Person(s) authorized to testify on its behalf**

*(Name of person to whom the subpoena is directed)*

[X] *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: **See Attachment A.**

| PLACE Via Zoom: https://us02web.zoom.us/j/84006293398?pwd=gZDAcFJK3tbawatqvcDwh92mUtaoF3.1 | DATE AND TIME January 3, 2025 at 11:00 a.m. ET |
|---|---|

The deposition will be recorded by this method:
Before a court reporter or other person authorized to administer oaths, and recorded stenographically or videographically.

[ ] *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: **December 27, 2024**
_____

CLERK OF COURT

_____ OR _____

Signature of Clerk or Deputy Clerk          *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
**Quorvo, Inc.**_____ , who issues or requests this subpoena, are:
**Leib M. Lerner, 350 S. Grand Ave., Ste. 5100, Los Angeles, CA 90071, leib.lerner@alston.com, (213) 576-1000**

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by <u>Fed. R. Civ. P. 45</u>.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

## Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
### (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
      (i) is a party or a party's officer; or
      (ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
    (A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    (B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
    *(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    *(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
    *(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      (i) fails to allow a reasonable time to comply;
      (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
      (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      (iv) subjects a person to undue burden.
    *(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
      (i) disclosing a trade secret or other confidential research, development, or commercial information; or

      (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    *(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
    *(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    *(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    *(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    *(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
    *(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      (i) expressly make the claim; and
      (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    *(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**Attachment A**

**TOPICS**

1. The general description of your anticipated work for Akoustis Technologies, Inc., Akoustis, Inc. and any of their affiliates, managers, employees or agents (collectively, "Akoustis"), to assist with the identification, collection and removal of any Qorvo Trade Secret Information and/or confidential Qorvo information pursuant to the Order Granting in Part and Denying in Part Plaintiff's Motion for Permanent Injunctive Relief (the "Permanent Injunction Order") [DE Dkt. No. 709] entered on October 11, 2024 in the United States District Court for the District of Delaware ("District Court"), Case No. Case No. 1:21-cv-01417-JPM, or the Permanent Injunction (the "Permanent Injunction") [DE Dkt. No. 710] entered by the District Court on October 15, 2024.

2. The general description of the data sources that you will inspect in connection with your work for Akoustis in connection with the Permanent Injunction Order and Permanent Injunction, and the volume and/or quantity of such data sources.

3. The general description of the assistance that you will provide Akoustis to remove from its possession and quarantine all materials required to be removed pursuant to the Permanent Injunction Order and Permanent Injunction.

4. The estimated time that it will take you to perform your services for Akoustis relating to the Permanent Injunction Order and Permanent Injunction.

5. The anticipated cost to Akoustis for your services.

6. The consideration, development, preparation and submission of the Stroz Friedburg, LLC proposal and TCDI eDiscovery Services Proposal, both attached hereto (as redacted).



# K&L Gates: Akoustis Technologies Inc.

*Privileged and Confidential | Prepared at the Direction of Counsel*

November 7, 2024

Updated November 30, 2024

# Introduction

Stroz Friedberg, LLC ("Stroz Friedberg") is pleased to provide this proposal to assist Akoustis Technologies, Inc. ("Akoustis") in complying with the court's injunction Order (DI 709). Stroz Friedberg will assist with the identification, collection, and removal of:

a. "Qorvo Trade Secret Information" (as defined in trial exhibits cited by the court), and

b. "All other documents that contain confidential Qorvo information (either indicated as [i] Qorvo-confidential by the information itself or [ii] otherwise known to be Qorvo-confidential by Akoustis) obtained or received without Qorvo's authorization or in violation of any obligation to maintain the confidentiality of that information".

Stroz Friedberg is uniquely suited to serve in this role because our practice combines significant expertise in forensics, expert witness work, and litigation. Our team consists of a deep bench of forensic experts, network specialists, and former practicing attorneys who combine deep technical knowledge, expert witness experience, and strong litigation awareness, with an ability to communicate sophisticated technical principles to a wide range of audiences.

This proposal outlines, at a high level, how Stroz Friedberg would approach assisting Akoustis in this matter, a preliminary proposed budget for each phase, and Stroz Friedberg's relevant qualifications and experience.

# About Stroz Friedberg

Stroz Friedberg is a global risk management firm and recognized leader in cybersecurity, digital forensics, and investigations with over 500 employees across multiple offices in North America, Europe, and Asia.

Our team of specialized professionals includes digital forensic examiners, cybersecurity analysts and consultants, and former government prosecutors and special agents. We have a particular focus on cybersecurity risk services and have extensive experience designing and implementing technical and procedural protocols to address both U.S. government and state-level enforcement and regulatory directives. Our technical expertise derives from both the education and experience of our consultants and engagement managers, who have graduated from leading technical programs and have often provided technical analysis in the adversarial context of litigation. Our engagement managers, many of whom have experience as federal prosecutors, draw upon their legal training to guide our technical teams. Our technical analysis has had to withstand the scrutiny of

adverse parties with enormous incentives to uncover mistakes, and over many years we have established a reputation that our work withstands that heavily motivated scrutiny.

- Stroz Friedberg maintains an unquestionable reputation for neutrality, independence, and ethical conduct, and the Parties can be assured that Stroz Friedberg possesses the necessary technical and analytical skills to perform the work described herein.  Stroz Friedberg is built around seeking truth, providing assurance to all parties, maintaining neutrality, and adhering to the highest standards of business ethics.  Now into its third decade in business, Stroz Friedberg has worked for public and private companies and other entities, as well as for multiple government agencies.

# Preservation Approach and Proposed Budget

Stroz Friedberg will assist Akoustis in preserving all relevant data sources, locating any potential trade secrets, and permanently removing them from Akoustis' possession.  Stroz Friedberg will take a practical but prudent approach to this work and would begin by gaining a detailed understanding of all the data sources to be preserved.  We understand the relevant data sources to include:

1. Any database, document management system, or other shared storage in use at Akoustis;

2. The mailboxes contained in Akoustis' corporate email servers for all Akoustis employees, and—upon documented and disclosed probable cause to believe that employees' personal email accounts were used to transmit, download, or upload Qorvo trade secrets—those email accounts; and

3. Akoustis computers, laptops, hard drives, and other storage media (including USB drives and network-based storage drives) belonging to all Akoustis employees.

Stroz Friedberg would use this understanding of Akoustis' data sources to develop a detailed plan that lays out a pragmatic approach for preserving all relevant data sources.  This plan will define the relevant requirements and outline our proposed approach for preservation with each data source.  Stroz Friedberg's preservation plan will include a mix of remote and on-site preservation to provide the most efficient means possible to preserve the relevant data.

Stroz Friedberg anticipates fees of approximately ██████████████████ to preserve all relevant data sources that have been previously identified and newly identified data sources.

# Analysis Approach and Proposed Budget

Stroz Friedberg will conduct a targeted forensic analysis of computers to determine if any additional data sources should be preserved and analyzed for trade secrets. This analysis will be conducted to determine if any external storage devices were used by Akoustis that have not been produced for inspection. A list of any external storage devices found to have been used will be provided to Akoustis and the devices requested for inspection. Stroz Friedberg will utilize its custom and proprietary triage and analysis tool for this analysis.

Stroz Friedberg anticipates fees of approximately ███████████ to analyze specific data sources for potential additional sources of trade secrets.

# Identification of Trade Secrets Approach and Proposed Budget

Stroz Friedberg divested its e-Discovery group in 2022 to Technology Concepts and Design Inc. ("TCDI"). Stroz Friedberg continues to partner with TCDI when e-Discovery work is necessary and proposes partnering with TCDI to locate all trade secrets in the data sources collected.

Stroz Friedberg anticipates TCDI fees of approximately ███████████ to identify all potential trade secrets to develop a remediation library. See attached TCDI proposal for details on the detailed approach and proposed budget.

# Remediation Approach and Proposed Budget

Stroz Friedberg will work closely with TCDI to assemble a remediation library of data that potentially contains trade secrets, with the goal of permanently deleting that data and therefore removing it from Akoustis' possession.

Once a remediation library is established, Stroz Friedberg will develop a plan to efficiently and permanently delete the data from Akoustis' systems, based on the most effective means available. These means may include custom scripts, commercial tools, and manual deletion of data and will be identified once Stroz Friedberg understands the volume and type of data to be deleted.

Based on the limited information available to it today and past experiences, Stroz Friedberg anticipates fees of approximately ███████████ to remediate all potential trade secrets identified. This estimate may increase or decrease based on the volume of files contained within the remediation library and the number of data sources on which those files reside.

# Preparation of Report and Proposed Budget

Stroz Friedberg will prepare a report detailing all preservation, identification of trade secrets, analysis, and remediation.  Stroz Friedberg anticipates fees of approximately ███████████ to prepare this report.

# Select Relevant Experience

Stroz Friedberg has been engaged in numerous contested matters to serve as a forensic expert, neutral, or special master.  Stroz Friedberg has provided a variety of services, including drafting protocols related to the preservation, collection, review, and product of key documents; forensically preserving and harvesting data on workstations, laptops, serves, home computers, USB drives, and other media; testing and running keyword searches to harvest the most complete and critical set of data relevant to the litigation; reviewing and analyzing key data; and providing assurance to all parties and the Court that sensitive data will be handled discreetly and appropriately.  Select engagements include:

- Stroz Friedberg recently concluded a large-scale remediation effort.  This remediation effort included laptops, mobile phones, cloud file storage, email, and backups for over 30 users, both current and former with the goal of accomplishing permanent, unrecoverable deletion of targeted documents while maintaining business functionality for the client.  Stroz Friedberg leveraged a combination of proprietary and open-source tooling, and manual processes where applicable to most efficiently and effectively conduct the deletion effort. Depending on the data source being remediated from, Stroz Friedberg leveraged their expertise, research and testing, and even escalating to third-party support where necessary to ensure complete, accurate, and expeditious deletion.

- Stroz Friedberg was recently retained to serve as a forensic expert in connection with a motion for a preliminary injunction and temporary restraining order in a matter alleging theft of trade secrets and violations of restrictive covenants.  Stroz Friedberg conducted forensic analysis of multiple devices and cloud-storage repositories, authored two declarations, and testified at a preliminary injunction hearing, in which our client prevailed.

- Stroz Friedberg has been retained to serve as a forensic expert in numerous other matters involving contest intellectual property and trade secrets, and these matters have included data preservation, identification, and deletion, drafting of expert reports, and oral testimony in deposition, evidentiary hearings, and trial.

Stroz Friedberg is also routinely asked to undertake sensitive data-related investigations outside of the litigation context. Some highlights of other work related to data investigation and remediation include:

- Stroz Friedberg was retained to conduct an independent investigation into the alleged theft of trade secrets by certain former employees of Google who joined Uber and an entity it acquired. Stroz Friedberg forensically preserved and analyzed data from over two dozen devices and cloud-storage repositories, interviewed multiple employees, and drafted a detailed report for use in litigation.

- Stroz Friedberg has served as a Third-Party Monitor and Third-Party Cybersecurity & Network Auditor in connection with National Security Agreements issued by the Committee on Foreign Investment in the United States, with a focus on monitoring Chinese access to U.S. protected data.

Stroz Friedberg served as an independent, neutral consultant providing digital forensic work for the Depart of Justice's Deepwater Horizon Task Force in connection with the investigation into the Deepwater Horizon disaster. In 2011, the Task Force requested that British Petroleum ("BP") produce various computers and electronic devices as part of the Task Force's investigation. Stroz Friedberg was selected to serve as the independent forensic consultant under an agreement whereby BP selected an independent firm to search and analyze data on computers and electronic devices that might be subject to BP's attorney-client privilege. Drawing upon our expertise in digital forensics, we were able to recover many deleted text messages and metadata that proved crucial as evidence. Although engaged and paid by BP, Stroz Friedberg operated as an independent, neutral consultant sitting between BP and the Government.

# Stroz Friedberg Team

The matter would be led by Brian Lichter, a former practicing attorney and federal prosecutor, and Mike Perry, an experienced forensic expert witness. Stroz Friedberg will supplement its team with other forensic examiners and consultants as appropriate.

Brian Lichter is Vice President in the Washington, D.C. office of Stroz Friedberg. His practice focuses on advising clients on high-impact incident response matters, complex regulatory investigation, executive and Board-level advisory work, and litigation consulting. Mr. Lichter has led investigations into cyber attacks by nation-state actors, hacktivists, and ransomware groups, and has significant experience investigating thefts of intellectual property. Mr. Lichter also regularly leads litigation-related engagements and has testified as an expert witness in multiple arbitration matters related to data breaches. He co-leads Stroz Friedberg's CFIUS

practice and is currently serving as the Third-Party Cybersecurity & Network Auditor under a National Security Agreement.

Before joining Stroz Friedberg, Mr. Lichter served as Cybersecurity Counsel and Senior Director for Global Investigations at Cognizant Technology Solutions, an attorney in the White-Collar Defense & Investigations and Complex Commercial Litigation practices at Latham & Watkins LLP, and as a federal corruption prosecutor with the Public Integrity Section of the U.S. Department of Justice,. Mr. Lichter began his legal career as a law clerk to the Chief Judge Diane S. Sykes of the U.S. Court of Appeals for the Seventh Circuit. He received his J.D. from Northwestern University Pritzker School of Law, and his undergraduate degree *magna cum laude* from Washington University in St. Louis.

Michael Perry is a Vice President in Stroz Friedberg's Boston office, where he leads and supports complex digital forensic and incident response engagements involving intellectual property and data theft, business email compromise, internal employee misconduct, and digital data preservation with anticipation of litigation. Mr. Perry has testified dozens of times as an expert in trials, depositions, and hearings.

Prior to joining Stroz Friedberg, Mr. Perry was a Deputy Sheriff and Digital Evidence Forensic Examiner for the Plymouth County Sheriff's Department's Bureau of Criminal Investigation (BCI), where he preserved and analyzed data and conducted investigations in criminal matters. Mr. Perry holds a B.A. in Information Technology from Boston College. He holds the industry certificates GIAC Certified Forensic Analyst (GCFA) and GIAC Advanced Smartphone Forensics Certification (GASF).



# eDiscovery Services
# PROPOSAL

Prepared For:



Prepared By:
Greg Michalek, J.D., CIPP/US
Senior Director
336-232-5826
g_michalek@tcdi.com


**Qorvo v Akoustis Trade Secret Identification & Analysis- Overview of Technology Solutions and Budget**

PREPARED AT THE DIRECTION OF MIKE PERRY, VICE PRESIDENT AT STROZ FRIEDBERG

The following provides an overview of technology solutions, processes, and document review services that TCDI could provide to support Stroz Friedberg's identification obligations. Please note this is our best effort to identify the technology and service options and associated budget estimates for the project. This is not intended to be a final project design/workflow plan – those details would continue to be refined in close collaboration with Stroz Friedberg, the client, and its counsel via a project design-build process.

The technology solutions proposed below are suggested because, in our experience, they are well-suited to identify the excludable content, will utilize automated or semi-autonomous processes where possible, integrate well with other tools, and can be refined to meet evolving needs and requirements.

## Base Assumptions

- The previous work performed by FTI will not be re-used, but details on the work done and work product utilized will be needed, including all search terms and parameters.
- Every document that can safely be identified, en masse, as being incredibly unlikely to contain trade secrets or confidential business material will be immediately set aside from identification processes. (If new information impacts those assumptions, such documents can easily be returned to the workflow queues.)
- We will leverage duplicate analysis to identify documents where effectively the same document has already received a designation for trade secret or business confidential and use propagation to reduce overall volumes in Review (items will appear on final deletion log)
- We will design and leverage new trade secret and business confidential search term strings and domain analyses after learning more about the product(s) at issue and case at large.
- Gen AI tools and analytics will be used to the fullest extent possible where such tools can be validated to deliver timely, high-quality results at efficient pricing.

## General Project Approach and Timeline

TCDI proposes to utilize a small team of our top technology and professional service experts that would pair with client/counsel to ensure efficiency and avoid any duplication of efforts.

To maximize efficiencies, we propose the majority of the efforts should be completed over a four-month period (approx. December 2024 through March 2025) with an additional two-month period (approx. April 2025 through May 2025) for clean-up, final validation, and documentation, etc. This would target a project completion date of approx. May 2025 and allow Stroz Friedberg the time to complete the project within their 8-12 month timeline.

Based on experience with similar projects, meeting project objectives and deadlines while maintaining cost efficiencies are dependent on a variety of factors including:

- the nature of the data to be analyzed (consistency of data across custodians and sources, variety of sources and file types, presence of encryption, amenability to search, etc.)



- maintaining timely and collaborative communication pathways to ensure continuous alignment on direction and strategy;
- Flexibility regarding workflows and technologies so that those strategies and technologies that generate efficient, high-quality results are utilized, while other data sets may require iterative strategies before settling on the appropriate tech and workflow; and
- Minimal changes to scope of search after project initiation – significant mid-project directional changes to the scope and nature of the search that necessitate re-work against the same data sets can have a significant impact on the timing and efficiency of the overall project delivery.

## Strategy

- Identification of Trade Secret and Business Confidential using Reveal's Brainspace tool [https://www.revealdata.com/] to design, deploy, and evaluate specialized active learning classifiers based on inputs from client/counsel
- This process would also leverage domain analysis tools and traditional search term queries wherever it would be advantageous.
- We would create a list of trade secret and business confidential terms and suggested additional concepts by Brainspace
- Managed Document Review via TCDI MSMR Document Review Team [https://www.tcdi.com/legal-services/managed-document-review/military-spouse-program/]
- MSMR document review services in support of tool and process validation, support for search term development, etc.
- We would use Relativity for review, validation, and counsel queries - -this serves as the validation and feedback loop to ensure accurate coding
- We would use Relativity Analytics to reduce noise and prioritize for review
- Identify small and large files for manual validation
- Identify non-reviewable file types
- Streamline known Trade secret files (already discovered or known senders/receivers)
- Extract all text
- Send Review population to Altumatim for Gen AI processing or utilize Air for Review
- MSMR prompt creation with client/counsel to identify trade secret and business confidential documents
- MSMR to analyze small sample of results and update prompt criteria accordingly (iterate to best results) - -this serves as the validation and feedback loop to ensure accurate coding
- Run prompts across batches of documents (depending on total size) and MSMR team validate results
- MSMR team to use search terms and analytics to find more documents containing trade secret or confidential business material

### Analysis and Review of Data Not Processed

TCDI will perform data cleanup steps across data populations not sent through analytics processes and utilize additional tools and methodologies, as needed. These steps may include:
- Analysis of file size and removal of small byte or large files
- Analysis of file types and removal of non-reviewable files
- Identification of Foreign Language documents
- Identification of image-based files and use of Gen AI tools, such as TackleAI to aid in the potential identification and review of files not successful in text-based processes



## Final Deliverables

- Summary Report documenting processes used (please note that this would not rise to the level of description and detail found in a traditional litigation testifying expert report, but such a report could be prepared on request)
- Narrative of overall process
- Tools and services used and any accompanying detailed outcomes data
- Search terms/Concepts/TAR/prompts employed against data
- Data reduction/document removal techniques and outcomes data
- Log of files to be deleted
- Log of Exceptions/Issues
- Final Daily Status report
- Final Query Log (aggregation of all)

## Pricing Estimates

### Processing and Data Analytics Estimate

Brainspace analytics: used to find various types of trade secret documents through search terms, suggested concept terms, concept wheel analysis, communication analysis, TAR Modeling and other analytics. This will result in large populations of documents that will be over-inclusive and need to be pared down through review.

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Data Processing (Blended Rate) | | | | | | | | | | |
| Brainspace Analytics | | | | | | | | | | |

### AI For Data Reduction & Identification

AI For Data Reduction and Identification will run Brainspace selected populations through an LLM model and this phase will involve MSMR team members creating prompts, validating results, re-engineering prompts, re-validating results until precision and recall numbers show good results in finding the required trade secret documents. The model will then be run across all selected documents and the MSMR team will validate results and remediate issues (over and under inclusive coding).

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Altumatim - SAR | | | | | | | | | | |
| TackleAI – Image Based AI | | | | | | | | | | |



## Data Hosting

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| User Fees (User/Month) | | | | | | | | | | |
| Review Hosting (OUT) (GB) (EMAIL/SERVER) | | | | | | | | | | |
| IN Hosting (GB) | | | | | | | | | | |

## AI Exclusion Document Review

AI Exclusion Review phase is for the work done in Brainspace as well as review of non-AI accessible docs (images, schematics, photos, large files, etc) to find trade secret documents.

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Review (Outside SAR) | | | | | | | | | | |
| Review Management | | | | | | | | | | |
| Review Consultant | | | | | | | | | | |

## Professional Services

| Description | Low Volume | High Volume | Price | Unit | Charge | Months | Low Per Month | High Per Month | Low Total | High Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Project Management | | | | | | | | | | |
| TAR/AI Consulting | | | | | | | | | | |
| Technical Time | | | | | | | | | | |
| Expert Consulting | | | | | | | | | | |

## Overall Estimate

| Phase | Low Total | High Total |
|---|---|---|
| Processing and Data Analytics | | |
| AI For Data Reduction & Identification | | |
| Data Hosting | | |
| AI Exclusion Review | | |
| Professional Services | | |
| **Total** | | |
| **Monthly Estimate** | | |

*Project estimates are an approximation based on information and requirements provided and are not guaranteed. Actual costs and terms may change once the project starts and we will notify you as soon as we can of any substantial changes. Data Processing and AI for Data Reduction & Identification are one-time fees.*

**Lerner, Leib**

---

| | |
|---|---|
| **From:** | Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com> |
| **Sent:** | Friday, December 27, 2024 1:13 PM |
| **To:** | Lerner, Leib; Westbrook, Margaret |
| **Cc:** | Blank, Stephen; Cotter, John J.; David B. Stratton; Harris, Douglas |
| **Subject:** | RE: Akoustis Sale Procedures Depositions (Stroz and TCDI) |

**EXTERNAL SENDER – Proceed with caution**

---

Leib – received. We're reviewing the subpoenas and will advise if we think any discussion is needed. We are fine with keeping the schedule as-is. I disagree with your characterization of events, but since we are all ultimately on the same page it is not worth any back and forth. If we don't speak, have a nice weekend.

Regards,

Jeff Kucera
305-539-3322

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Friday, December 27, 2024 3:28 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>; David B. Stratton <dstratton@pashmanstein.com>; Harris, Douglas <Douglas.Harris@alston.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

Jeff,

We have carefully considered your proposal.  First, we do not appreciate the Debtors' and E-Vendors' failure to accommodate depositions earlier than 1/3.  We reached out to you very quickly after the last hearing and proposed 12/26, 12/27, 12/30 and 12/31 as possible deposition dates, and had subsequently thought that Debtors had agreed to 12/30 when we first issued the subpoenas.  Those dates were both well before the hearing and well before the Court's 1/3 objection deadline.  Only making witnesses available on 1/3, the Friday before the hearing and on the same day as the Court's objection deadline, does not seem like a reasonable accommodation.

Nonetheless, we intend to move forward with the depositions on 1/3 via Zoom, and have attached amended subpoenas for you to accept service on behalf of Stroz Friedberg and TCDI, with revised deposition dates and the Zoom information. Note that we have slightly revised topics 1-4 to include reference to the Permanent Injunction Order (and not just the Permanent Injunction), because the former is what is referenced in the Stroz Friedberg proposal rather than the Permanent Injunction itself. We also added an additional topic to specifically reference the Stroz Friedberg and TCDI proposals, given the Debtors' response that they will not agree to the proposals' admissibility. We believe that this topic would be incorporated within the other five topics, but want to make sure everything is as clear as possible for the Court to consider should any dispute arise.

As for your proposal to change the deadlines for Qorvo's response deadline from Friday, 1/3 to Sunday, 1/5 and to change Akoustis' reply deadline from Monday, 1/6 to Tuesday, 1/7, we do not agree to change the original

deadlines.  The Court will need time to reflect on our papers, and we will need time to reflect on your reply, prior to the hearing.  Pushing out the original deadlines will make this difficult, and be prejudicial to Qorvo.

The bottom line is that we will take the depositions on 1/3, which we need and will utilize for the hearing.  We will file our opposition papers on 1/3 as well, and do not agree to any delayed briefing schedule proposed by the Debtors.

If you have any questions regarding the above, I am available on my cell at 323-683-6644 until 5pm ET today, and any time on Sunday or Monday at your earliest convenience.

Leib

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Thursday, December 26, 2024 3:11 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

Thank you for the response. Given that it is already evening on the East Coast during this holiday season and almost time to light Chanukah candles out here, we will need to confer internally about your response first thing tomorrow and get back to you thereafter.
Leib

---

**From:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Sent:** Thursday, December 26, 2024 3:02 PM
**To:** Lerner, Leib <Leib.Lerner@alston.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

**EXTERNAL SENDER – Proceed with caution**

Leib, no worries – I've been called much worse.

The Debtors are in agreement that Qorvo can file the proposals on the docket. The Debtors will also stipulate to authenticity but not to admissibility.

Please advise when you have a response on our timing proposal.

Regards,

Jeff Kucera
305-539-3322

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Thursday, December 26, 2024 5:48 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

Jeff – Just following up here.  Leib

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Thursday, December 26, 2024 9:18 AM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

Jeff,
Resending this to correctly address to you. My apologies, and I look forward to your response.

Jeff,

Thank you for your response. First, can you please clarify that the Debtors are in agreement that the redacted Stroz and TCDI proposals can be filed by Qorvo on the public Bankruptcy Court docket? Your email below, and prior email, seems to imply that the confidentiality is held by the E-Vendors. That does not seem to be accurate, given that the E-Vendors supplied the documents to the Debtors, which is where it appears to us that any right of confidentiality lies (see attached). Please also confirm that the Debtors stipulate to the authenticity and admissibility of these two documents for the 1/8 hearing.

We are conferring internally regarding your proposal concerning the depositions and response deadlines. If you could respond to the above with Debtors' position regarding the documents (hopefully, affirmatively) that would be helpful. If you think a call would be productive, I'm available today at your convenience.

Leib

**From:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Sent:** Tuesday, December 24, 2024 1:26 PM
**To:** Lerner, Leib <Leib.Lerner@alston.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Hernandez, Leslie <Leslie.Hernandez@alston.com>; Cotter, John J. <John.Cotter@klgates.com>
**Subject:** RE: Akoustis Sale Procedures Depositions (Stroz and TCDI)

**EXTERNAL SENDER – Proceed with caution**

Leib,

To answer some of your specific questions: we have confirmed that we can accept service of process for TCDI and Stroz; by waiving service of process, however, neither Stroz nor TCDI waives any other objections they may have. We have no objection to conducting the depositions over Zoom. Both Stroz and TCDI have agreed that their redacted proposals can be filed on the bankruptcy court docket.

Unfortunately, however, the earliest we can schedule the depositions would be on January 3. We recognize that this is the same as the deadline for any objections Qorvo may file, and in light of your observance of the Sabbath, will agree to an extension of the objection deadline through 5:00 p.m. EST on Sunday, January 5 so long as we also receive an extension of time to file our reply through 5:00 p.m. EST on Tuesday, January 7.

Please copy my colleague John Cotter (copied here) on all correspondence relating to the e-discovery work in general, and these depositions in particular. I will now be off line until the 26th.

Regards,

Jeff Kucera
305-539-3322

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Monday, December 23, 2024 5:23 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Hernandez, Leslie <Leslie.Hernandez@alston.com>
**Subject:** Akoustis Sale Procedures Depositions (Stroz and TCDI)

Jeff and Margaret,
Attached are two Subpoenas, one each for Stroz and TCDI, with depositions set for next Monday at 10am ET and 1pm ET, respectively. We set them for within 100 miles of each of their locations, but as discussed, would strongly prefer to organize the depositions to be taken over Zoom. Please let us know if there is an arrangement on your end to accept service, or alternately please put us in contact this evening with whomever does have that authority. Otherwise, we will serve these on the respective agents for service of process tomorrow.
We also never heard back from you on whether the e-vendors consent to their redacted proposals being filed on the bankruptcy court docket. We would like to avoid the cost, expense and potential delay of a motion to seal redacted documents that should not require that treatment.
Please make sure to include my assistant Leslie on your responses.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

---

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only. If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Monday, December 30, 2024 3:59 PM |
| **To:** | Kucera, Jeffrey T. |
| **Cc:** | Westbrook, Margaret; Cotter, John J.; Blank, Stephen; Harris, Douglas; Matt McGuire; Matthew Pierce; Edel, Jon N. |
| **Subject:** | RE: 24-12796-LSS Akoustis |

Okay.

**From:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Sent:** Monday, December 30, 2024 3:58 PM
**To:** Lerner, Leib <Leib.Lerner@alston.com>
**Cc:** Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Cotter, John J. <John.Cotter@klgates.com>; Blank, Stephen <Stephen.Blank@alston.com>; Harris, Douglas <Douglas.Harris@alston.com>; Matt McGuire <mcguire@lrclaw.com>; Matthew Pierce <pierce@lrclaw.com>; Edel, Jon N. <Jon.Edel@klgates.com>
**Subject:** RE: 24-12796-LSS Akoustis

**EXTERNAL SENDER – Proceed with caution**

Thanks for the clarification. I assume you will also be filing the motion to withdraw the reference at the same time; please correct me if I'm wrong. If you file the motions tomorrow, we would not oppose having the hearing on the motion to stay on Jan 8th with our objection deadline being Jan 7th.

Regards,

Jeff Kucera
305-539-3322

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Monday, December 30, 2024 6:36 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Cc:** Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Cotter, John J. <John.Cotter@klgates.com>; Blank, Stephen <Stephen.Blank@alston.com>; Harris, Douglas <Douglas.Harris@alston.com>; Matt McGuire <mcguire@lrclaw.com>; Matthew Pierce <pierce@lrclaw.com>; Edel, Jon N. <Jon.Edel@klgates.com>
**Subject:** RE: 24-12796-LSS Akoustis

Jeff,
We will be filing the motion for hearing on shortened time tomorrow, and ask the Court for a hearing at its earliest convenience.
Leib
323-683-6644

**From:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Sent:** Monday, December 30, 2024 3:33 PM

**To:** Lerner, Leib <Leib.Lerner@alston.com>
**Cc:** Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Cotter, John J. <John.Cotter@klgates.com>; Blank, Stephen <Stephen.Blank@alston.com>; Harris, Douglas <Douglas.Harris@alston.com>; Matt McGuire <mcguire@lrclaw.com>; Matthew Pierce <pierce@lrclaw.com>; Edel, Jon N. <Jon.Edel@klgates.com>
**Subject:** RE: 24-12796-LSS Akoustis

**EXTERNAL SENDER – Proceed with caution**

Leib – Confirmed as to points (1). As to point (2), the Debtors will not consent to any stay of the bid procedures motion. As to point (3), although we did not discuss it, I was under the impression you were going to file the motion immediately; when do you intend to file it and when will you ask for a hearing?

Regards,

Jeff Kucera
305-539-3322

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Monday, December 30, 2024 6:00 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Cc:** Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Cotter, John J. <John.Cotter@klgates.com>; Blank, Stephen <Stephen.Blank@alston.com>; Harris, Douglas <Douglas.Harris@alston.com>
**Subject:** 24-12796-LSS Akoustis

Jeff,

This is to follow up on the call between you, me and Steve earlier today.  We discussed that (1) the Debtors will not consent to Qorvo's withdrawing the reference on the Bidding Procedures and Sale Motion, (2) the Debtors will not consent to a stay of the hearing on the Bidding Procedures or to the Sale Motion progressing past the hearing pending a decision by the District Court on Qorvo's to be filed motion to withdraw the reference, but (3) Debtors do consent to the Bankruptcy Court hearing on shortened notice Qorvo's to be filed motion to stay proceedings.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified

that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.

**EXHIBIT 6**

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Friday, December 20, 2024 8:32 AM |
| **To:** | paige.tinkham@blankrome.com |
| **Cc:** | Blank, Stephen; Kucera, Jeffrey T.; Westbrook, Margaret |
| **Subject:** | Akoustis Sale |

Paige,

Alston & Bird represents Qorvo, Inc, which is the largest unsecured creditor of Akoustis. There is a sale procedures motion set for January 8, with an objection deadline of January 3.  Jeff Kucera let us know that you are representing Gordon Brothers, the stalking horse on the sale.  Qorvo would like to take a short deposition of your client's 30(b)(6) witness regarding the proposed sale. We are coordinating other depositions as well. We understand that this smack in the middle of the holidays.  Nonetheless, given the time frame on the motion, we are hoping that we could arrange for a 2-hour deposition via Zoom for December 26 (preferably) or 27. Could you please let us know if this would work?  Time is of the essence, and we appreciate and look forward to your quick response.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Friday, December 20, 2024 12:00 PM |
| **To:** | Tinkham, Paige B. |
| **Cc:** | Blank, Stephen; Kucera, Jeffrey T.; Westbrook, Margaret |
| **Subject:** | RE: Akoustis Sale |
| **Attachments:** | Gordon Subpoena Attachment A.docx |

Paige,
Thanks for getting back to us. The topics are attached and we will circulate a Zoom invite for 4pm CT.  Jeff and Margaret, you are welcome to join.
Leib

---

**From:** Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Sent:** Friday, December 20, 2024 10:43 AM
**To:** Lerner, Leib <Leib.Lerner@alston.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Subject:** RE: Akoustis Sale

**<span style="color:red">EXTERNAL SENDER – Proceed with caution</span>**

---

Leib,

Can you please send me the list of topics?  I am struggling to see how a deposition of Gordon Brothers is relevant to the sale procedures hearing.  Once I see the topics, let's discuss.  I'm tied up with meetings until about 4 p.m. CT today, but can chat thereafter if you can send the list to assist in our discussion.

Paige

**Paige Barr Tinkham** | BLANK**ROME**
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2514 (*forwarded to cellphone*) | F: 312.264.2443 | paige.tinkham@blankrome.com

---

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Friday, December 20, 2024 10:32 AM
**To:** Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Subject:** Akoustis Sale

You don't often get email from leib.lerner@alston.com. Learn why this is important

Paige,

Alston & Bird represents Qorvo, Inc, which is the largest unsecured creditor of Akoustis. There is a sale procedures motion set for January 8, with an objection deadline of January 3.  Jeff Kucera let us know that you are representing Gordon Brothers, the stalking horse on the sale.  Qorvo would like to take a short deposition of your client's 30(b)(6) witness regarding the proposed sale. We are coordinating other depositions as well. We understand that this smack in the middle of the holidays.  Nonetheless, given the time frame on the motion, we are hoping that we could arrange for a 2-hour deposition via Zoom for December 26 (preferably) or 27. Could you please let us know if this would work?  Time is of the essence, and we appreciate and look forward to your quick response.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# ATTACHMENT A

## Attachment A

## TOPICS

1.     The assets and liabilities proposed to be purchased (and those intended to be excluded) by Gordon Brothers Commercial & Industrial, LLC ("Purchaser"), pursuant to the Asset Purchase Agreement ("APA") filed on December 16, 2024 in the chapter 11 case of Akoustis Technologies, Inc., et al., USBC Del. Case No. 24-12796 [Doc. 14-3].

2.     The terms and conditions of the APA, including but not limited to Conditions Precedent (Article 8), Termination (Article 9), the Purchase and Sale; Closing (Article 2), Schedule 2.1(a) (Akoustis Transferred Assets), Schedule 2.1(b) (GDSI Transferred Assets), Schedule 2.1(c) (RFMI Transferred Assets), Schedule 2.2, Article 5 (Bankruptcy Court Matters), Section 6.3 (Efforts to Consummate), Section 6.4 (Notices and Consents), Schedule 6.4 (Third-Party Consents).

3.     The definitions in the APA including "Purchase Price," "Intellectual Property," "Owned Intellectual Property," and "Work-Around."

4.     Assets under consideration for purchase by Purchaser subject to Debtors' compliance with the permanent injunction issued by the Delaware District Court on October 15, 2024 in the case styled *Qorvo, Inc. v. Akoustis Technologies and Akoustis, Inc.* (Case No. 1:21-cv-01417).

5.     The anticipated timing and mechanics for the marketing and resale of the Transferred Assets, estimates for the Sellers' Shared Proceeds (as defined in the APA), and development of Annex A to the APA.

6.     Communications with Debtors and Debtors' insiders regarding the potential purchase or exclusion from purchase of the "Transferred Assets" and "Excluded Assets" as defined in the APA.

# Lerner, Leib

| | |
|---|---|
| **From:** | Tinkham, Paige B. <paige.tinkham@blankrome.com> |
| **Sent:** | Monday, December 23, 2024 7:09 PM |
| **To:** | Lerner, Leib |
| **Cc:** | Blank, Stephen; Hernandez, Leslie; Jeffrey T. Kucera; Margaret Westbrook; Ottaviano, Ken |
| **Subject:** | Re: Akoustis Sale Procedures Depositions (GBCI) |

**EXTERNAL SENDER – Proceed with caution**

Leib,

I will accept service. However, Gordon Brother's representative is unavailable on the 30th. In addition, we anticipate a motion to quash will be filed.

Paige

**Paige Barr Tinkham** | BLANKROME
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2514 (*forwarded to cellphone*) | F: 312.264.2443 | paige.tinkham@blankrome.com

On Dec 23, 2024, at 5:23 PM, Lerner, Leib <Leib.Lerner@alston.com> wrote:

Paige,
Attached is a subpoena for Gordon Brothers Commercial & Industrial, LLC, with the deposition set for next Monday December 30 at 3pm ET. While we set the deposition for within 100 miles of your client's location, we would strongly prefer to organize the deposition to be taken over Zoom, as we previously discussed. Please let us know if you are authorized to accept service. Otherwise, we will serve this directly tomorrow.
Please make sure to include my assistant Leslie on your responses.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.
<2024.12.23 - Subpoena - GBCI (Final).pdf>

**********************************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.

**********************************************************************************************

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Monday, December 23, 2024 2:23 PM |
| **To:** | Paige Barr Tinkham (paige.tinkham@blankrome.com) |
| **Cc:** | Blank, Stephen; Hernandez, Leslie; Kucera, Jeffrey T.; Westbrook, Margaret |
| **Subject:** | Akoustis Sale Procedures Depositions (GBCI) |
| **Attachments:** | 2024.12.23 - Subpoena - GBCI (Final).pdf |

Paige,

Attached is a subpoena for Gordon Brothers Commercial & Industrial, LLC, with the deposition set for next Monday December 30 at 3pm ET. While we set the deposition for within 100 miles of your client's location, we would strongly prefer to organize the deposition to be taken over Zoom, as we previously discussed. Please let us know if you are authorized to accept service. Otherwise, we will serve this directly tomorrow.

Please make sure to include my assistant Leslie on your responses.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

# UNITED STATES BANKRUPTCY COURT

District of _Delaware_

In re _AKOUSTIS TECHNOLOGIES, INC., et al._

Debtor

*(Complete if issued in an adversary proceeding)*

Case No. _24-12796 (LSS)_

Chapter _11_

_____

Plaintiff

v.

_____

Defendant

Adv. Proc. No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To: _Gordon Brothers Commercial & Industrial, LLC, Attn: Officer, Director, Managing Agent, or other Person(s) authorized to testify on its behalf_

*(Name of person to whom the subpoena is directed)*

[X] *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding). If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: See Attachment A.

| PLACE | DATE AND TIME |
|---|---|
| 101 Arch Street Suite 650 \| Boston, MA 02110 | December 30, 2024 at 3:00 p.m. ET |

The deposition will be recorded by this method:
Before a court reporter or other person authorized to administer oaths, and recorded stenographically or videographically.

[ ] *Production*: You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

_____

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _December 23, 2024_

CLERK OF COURT

_____     OR     _____
Signature of Clerk or Deputy Clerk                    *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
_Quorvo, Inc._ , who issues or requests this subpoena, are:
Leib M. Lerner, 350 S. Grand Ave., Ste. 5100, Los Angeles, CA 90071, leib.lerner@alston.com, (213) 576-1000

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by <u>Fed. R. Civ. P. 45</u>.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
　(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
　(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
　　(i) is a party or a party's officer; or
　　(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
　(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
　(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
　*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
　*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
　　(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
　　(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
　*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
　　(i) fails to allow a reasonable time to comply;
　　(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
　　(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
　　(iv) subjects a person to undue burden.
　*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
　　(i) disclosing a trade secret or other confidential research, development, or commercial information; or

　　(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
　*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
　　(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
　　(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
　*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
　*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
　*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
　*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
　*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
　　(i) expressly make the claim; and
　　(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
　*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**Attachment A**

**TOPICS**

1.      The assets and liabilities proposed to be purchased (and those intended to be excluded) by Gordon Brothers Commercial & Industrial, LLC ("Purchaser"), pursuant to the Asset Purchase Agreement ("APA") filed on December 16, 2024 in the chapter 11 case of Akoustis Technologies, Inc., et al., USBC Del. Case No. 24-12796 [Doc. 14-3].

2.      The terms and conditions of the APA, including but not limited to Conditions Precedent (Article 8), Termination (Article 9), the Purchase and Sale; Closing (Article 2), Schedule 2.1(a) (Akoustis Transferred Assets), Schedule 2.1(b) (GDSI Transferred Assets), Schedule 2.1(c) (RFMI Transferred Assets), Schedule 2.2, Article 5 (Bankruptcy Court Matters), Section 6.3 (Efforts to Consummate), Section 6.4 (Notices and Consents), Schedule 6.4 (Third-Party Consents).

3.      The definitions in the APA including "Purchase Price," "Intellectual Property," "Owned Intellectual Property," and "Work-Around."

4.      Assets under consideration for purchase by Purchaser subject to Debtors' compliance with the permanent injunction issued by the Delaware District Court on October 15, 2024 in the case styled *Qorvo, Inc. v. Akoustis Technologies and Akoustis, Inc.* (Case No. 1:21-cv-01417).

5.      The anticipated timing and mechanics for the marketing and resale of the Transferred Assets, estimates for the Sellers' Shared Proceeds (as defined in the APA), and development of Annex A to the APA.

6.      Communications with Debtors and Debtors' insiders regarding the potential purchase or exclusion from purchase of the "Transferred Assets" and "Excluded Assets" as defined in the APA.

| | |
|---|---|
| **From:** | Tinkham, Paige B. <paige.tinkham@blankrome.com> |
| **Sent:** | Monday, December 23, 2024 9:03 AM |
| **To:** | Lerner, Leib; Kucera, Jeffrey T.; Westbrook, Margaret |
| **Cc:** | Blank, Stephen |
| **Subject:** | RE: Akoustis - Qorvo Depositions |

**EXTERNAL SENDER – Proceed with caution**

Leib,

I confirm that Gordon Brothers is not buying the IP and has no intention of doing so.

I disagree that there are any bases for a deposition of Gordon Brothers.  If you have caselaw you are relying on, please share it.

Paige

**Paige Barr Tinkham** | BLANK**ROME**
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2514 (*forwarded to cellphone*) | F: 312.264.2443 | paige.tinkham@blankrome.com

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Sunday, December 22, 2024 3:17 PM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** RE: Akoustis - Qorvo Depositions

All,

We appreciate Jeff's email. Can you (or Paige) further confirm whether Gordon Brothers is committing that its bid will not change to later include IP or any additional assets other than the equipment on the exhibit attached to the currently filed APA.

In addition, while we certainly appreciate the clarification, isolating the intellectual property from the Gordon Brothers bid still does not resolve the questions and concerns that we discussed and were listed as topics on the draft subpoena that we sent on Friday. As Jeff argued at the hearing, the expedited timing is being driven by Gordon Brothers, which is also seeking stalking horse protections. As such, Qorvo needs to understand the reason for the proposed speed of the transaction. Further, Qorvo is entitled to understand the proposed value of the stalking horse bid and bid protections, which is relevant to the 1/8 hearing when those procedures are proposed for approval.  We imagine that any soon-to-be-appointed Committee will have similar questions.

The bottom line is that we think that it remains appropriate to take Gordon Brothers' deposition, as well as the depositions of both e-vendors.  We would like to confirm all three for the 30th (if at all possible) so that we can ensure that a transcript is then available for Qorvo's objection to be filed on 1/3.  We look forward to your response.

Leib

**From:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>
**Sent:** Sunday, December 22, 2024 9:01 AM
**To:** Lerner, Leib <Leib.Lerner@alston.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>; Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** RE: Akoustis - Qorvo Depositions

**EXTERNAL SENDER – Proceed with caution**

Leib,

We have spoken with Gordon Brothers. The parties have agreed to add "Intellectual Property" to the list of Excluded Assets in the APA. The debtors and Gordon Brothers believe this should satisfy Qorvo's questions about what assets are included in the APA. We will file the amended APA with the court (if not today, then tomorrow). We do not believe that any of Qorvo's remaining issues regarding the Gordon Brothers bid present factual questions that are relevant for a hearing on bid procedures, and therefore we do not believe that a deposition of Gordon Brothers is necessary.

As for the e-vendors, we are still working to confirm dates. We understand that neither the 26th or the 27th work, but are trying to coordinate times for the 30th and, if needed, the 31st.

Regards,

Jeff Kucera
305-539-3322

**From:** Lerner, Leib <Leib.Lerner@alston.com>
**Sent:** Sunday, December 22, 2024 9:21 AM
**To:** Kucera, Jeffrey T. <Jeffrey.Kucera@klgates.com>; Westbrook, Margaret <Margaret.Westbrook@klgates.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>
**Subject:** Akoustis - Qorvo Depositions

Jeff and Margaret,
We never heard back from you as to whether the parties can consensually facilitate the e-vendor depositions for this week via Zoom. We are trying once more today by reaching out to you again. We also note that Gordon Brothers has not responded to us either after our Friday call. You can call my cell today at 323-683-6644 to discuss.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.

This electronic message contains information from the law firm of K&L Gates LLP. The contents may be privileged and confidential and are intended for the use of the intended addressee(s) only.  If you are not an intended addressee, note that any disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this e-mail in error, please contact me at Jeffrey.Kucera@klgates.com.


*********************************************************************************************************

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.


*********************************************************************************************************

| | |
|---|---|
| **From:** | Lerner, Leib |
| **Sent:** | Tuesday, December 24, 2024 10:50 AM |
| **To:** | Tinkham, Paige B. |
| **Cc:** | Blank, Stephen; Ottaviano, Ken |
| **Subject:** | RE: Akoustis Sale Procedures Depositions (GBCI) |

Paige,
Thank you for accepting service. Do you have a proposed schedule for GB to file the motion to quash? We would like to have the motion heard on 1/8 and would stipulate to shortened time.
Leib

**From:** Tinkham, Paige B. <paige.tinkham@blankrome.com>
**Sent:** Monday, December 23, 2024 7:09 PM
**To:** Lerner, Leib <Leib.Lerner@alston.com>
**Cc:** Blank, Stephen <Stephen.Blank@alston.com>; Hernandez, Leslie <Leslie.Hernandez@alston.com>; Jeffrey T. Kucera <Jeffrey.Kucera@klgates.com>; Margaret Westbrook <Margaret.Westbrook@klgates.com>; Ottaviano, Ken <ken.ottaviano@blankrome.com>
**Subject:** Re: Akoustis Sale Procedures Depositions (GBCI)

**EXTERNAL SENDER – Proceed with caution**

Leib,

I will accept service. However, Gordon Brother's representative is unavailable on the 30th. In addition, we anticipate a motion to quash will be filed.

Paige

**Paige Barr Tinkham** | BLANKROME
444 West Lake Street | Suite 1650 | Chicago, IL 60606
O: 312.776.2514 (*forwarded to cellphone*) | F: 312.264.2443 | paige.tinkham@blankrome.com

> On Dec 23, 2024, at 5:23 PM, Lerner, Leib <Leib.Lerner@alston.com> wrote:
>
>
> Paige,
> Attached is a subpoena for Gordon Brothers Commercial & Industrial, LLC, with the deposition set for next Monday December 30 at 3pm ET. While we set the deposition for within 100 miles of your client's location, we would strongly prefer to organize the deposition to be taken over Zoom, as we previously discussed.  Please let us know if you are authorized to accept service.  Otherwise, we will serve this directly tomorrow.
> Please make sure to include my assistant Leslie on your responses.

Leib M. Lerner
Partner
**ALSTON & BIRD**
350 South Grand Avenue
Suite 5100
Los Angeles, CA 90071
+1 213 576 1193 (O)
Leib.Lerner@alston.com
*Please note our new mailing address*

NOTICE: This e-mail message and all attachments may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that you may not read, copy, distribute or otherwise use this message or its attachments. If you have received this message in error, please notify the sender by email and delete all copies of the message immediately.
<2024.12.23 - Subpoena - GBCI (Final).pdf>


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the Blank Rome LLP or Blank Rome Government Relations LLC sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*\*\*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AKOUSTIS TECHNOLOGIES, INC.,[1]<br><br>Debtors. | § Chapter 11<br>§<br>§ Case No. 24-12796-LSS<br>§ (Jointly Administered)<br>§<br>§ **Proposed Hearing Date: January 8, 2025 at 2:30 p.m. ET**<br>§ **Proposed Obj. Deadline: January 7, 2025 at 4 p.m. ET**<br>§<br>§ **Re. Bankr. D.I. 14** |

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that, on December 31, 2024, Qorvo, Inc. ("Qorvo") filed (i) *Qorvo, Inc.'s Motion to Stay the Bidding Procedures and Sale Motion Pending the Disposition of the Motion to Withdraw the Reference* (the "Motion") was filed with the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that an objection, if any, to the Motion must be in writing, filed with the Court, 824 N. Market Street, 3rd Floor, Wilmington, Delaware 19801, and served upon the undersigned counsel, so that it is received on or before January 7, 2025 at 4:00 p.m. (Eastern Time).

**PLEASE TAKE FURTHER NOTICE THAT A HEARING ON THE MOTION, IF NECESSARY, WILL BE HELD ON JANUARY 8, 2025 AT 2:30 P.M. (EASTERN TIME) BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN, UNITED STATES BANKRUPTCY JUDGE, UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 6TH FLOOR, COURTROOM NO. 6, WILMINGTON, DELAWARE 19801.**

**PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED BY MOTION WITHOUT FURTHER NOTICE OR HEARING.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929), and RFM Integrated Device Inc. (1138). The Debtors' corporate headquarters is located at 9805 Northcross Center Court, Suite A, Huntersville, NC 28078.

Dated:  December 31, 2024
      Wilmington, Delaware

Respectfully submitted,

**PASHMAN STEIN WALDER HAYDEN, P.C**

By: /s/ *David B. Stratton*
David B. Stratton (Del. I.D. No. 960)
824 North Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 592-6496
Email: dstratton@pashmanstein.com

*Attorneys for Qorvo, Inc.*