# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AKOUSTIS TECHNOLOGIES, INC., *et al.*,[1]<br><br>　　　　　　Debtors. | Chapter 11<br><br>Bankr. Case No. 24-12796 (LSS)<br>(Jointly Administered) |
| QORVO, Inc.,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>Akoustis Technologies, Inc., *et al.*<br><br>　　　　　Debtors-Respondents. | C.A. No. 1:25-cv-00006 (GBW) |

## DEBTORS-RESPONDENTS' MEMORANDUM OF LAW IN OPPOSITION TO QORVO, INC.'S MOTION TO WITHDRAW THE REFERENCE WITH RESPECT TO THE BIDDING PROCEDURES AND SALE MOTION

Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
Joshua B. Brooks (No. 6765)
**LANDIS RATH & COBB LLP**
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400

Margaret R. Westbrook (*pro hac vice* forthcoming)
**K&L GATES LLP**
301 Hillsborough Street, Suite 1200
Raleigh, North Carolina 27603
Telephone:　(919) 743-7300

Jeffrey T. Kucera (*pro hac vice* forthcoming)
Carly S. Everhardt (*pro hac vice* forthcoming)
**K&L GATES LLP**
Southeast Financial Center, Suite 3900
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 539-3300

Jonathan Edel (*pro hac vice* forthcoming)
**K&L GATES LLP**
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202
Telephone:　(704) 331-7445

*Counsel to the Debtors and Debtors in Possession*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Akoustis Technologies, Inc. (9046), Akoustis, Inc. (5617), Grinding and Dicing Services, Inc. (7929), and RFM Integrated Device Inc. (1138). The Debtors' corporate headquarters is located at 9805 Northcross Center Court, Suite A, Huntersville, NC 28078.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND ........................................................................................................... 3

    A.    General Background ............................................................................ 3

    B.    Qorvo Litigation and Permanent Injunction ...................................... 3

    C.    Proposed Sale Process.......................................................................... 5

    D.    The Cleanse Process ............................................................................ 5

ARGUMENT ................................................................................................................ 8

    A.    Qorvo Has Consented to the Bidding Procedures, Including the Cleanse
           Process and Bankruptcy Court Review Thereof ....................................... 9

    B.    The Bidding Procedures and Sale Motion Do Not Warrant Mandatory
           Withdrawal of the Reference .................................................................. 9

    C.    The Bidding Procedures and Sale Motion Do Not Warrant Permissive
           Withdrawal of the Reference ................................................................ 14

          1.    Efficiency and Judicial Economy Require Adjudication by the
                  Bankruptcy Court.................................................................... 15

          2.    Withdrawal of Reference Undermines the Uniform Administration
                  of the Bankruptcy Cases ........................................................ 15

          3.    Withdrawal of Reference Will Slow Down the Bankruptcy Process
                  and Is Purposely Designed to Do So........................................ 16

          4.    The Debtors Are Not Forum Shopping via the Chapter 11 Cases ........... 19

          5.    The Bankruptcy Court has Jurisdiction to Adjudicate the Claims at
                  Issue ...................................................................................... 20

    CONCLUSION ................................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*,
No. 6:09-CV-226, 2009 U.S. Dist. LEXIS 115854 (N.D.N.Y. Dec. 10, 2009).......................18

*Am. Classic Voyages v. Westaff (USA), Inc. (In re Am. Classic Voyages Co.)*,
337 B.R. 509 (D. Del. 2006).................................................................................17

*In re Amfesco Indus., Inc.*,
No. 88-CV-2662 (ERK), 1988 WL 134153 (E.D.N.Y. Nov. 14, 1988)...........................12, 13

*Barry v. Santander Bank, N.A. (In re Liberty State Benefits of Delaware, Inc.)*,
No. 11-12404-KG, 2015 WL 1137591 (D. Del. Mar. 12, 2015) .........................12, 13, 17, 22

*Energy Development Corp. v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*,
134 B.R. 808 (D. Del. 1991)................................................................................11

*Weiss ex rel. Fibercore, Inc. v. OFS Fitel, LLC*,
361 B.R. 315 (D. Mass. 2007) .............................................................................14

*Hatzel & Beuhler, Inc. v. Cent. Hudson Gas & Elec. Corp.*,
106 B.R. 367 (D. Del. 1989)................................................................................16

*Hatzel & Buehler, Inc. v. Orange & Rockland Utilities, Inc.*
107 B.R 34 (D. Del. 1989)..............................................................................11, 17

*Holland America Ins. Co. v. Succession of Roy*,
777 F.2d 992 (5th Cir. 1985) .........................................................................17

*IRS v. CM Holdings, Inc. (In re CM Holdings, Inc.)*,
221 B.R. 715 (D. Del. 1998)...........................................................................11, 12

*JCF AFFM Debt Holdings, L.P. v. Affirmative Ins. Holdings, Inc. (In re Affirmative Ins. Holdings, Inc.)*,
565 B.R. 566 (Bankr. D. Del. 2017) ...................................................................19, 22

*Michaelson v. Golden Gate Private Equity, Inc. (In re Appleseed's Intermediate Holdings, LLC)*, No. 11-807(JEI/KM), 2011 WL 6293251 (D. Del. Dec. 15, 2011) ........................................................................................................20

*NDEP Corp. v. Handl-It Inc. (In re NDEP Corp.)*,
203 B.R. 905 (D. Del. 1996)................................................................................20

*Pension Benefit Guarantee Corp. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines*),
138 B.R. 442 (D. Del. 1992) ................................................................10, 11, 14

*Pension Benefit Guaranty Corp. v. Smith Corona Corp.* (*In re Smith Corona Corp.*),
205 B.R 712 (D. Del. 1996) .....................................................................11

*In re Pruitt*,
910 F.2 1160, 1168 (3d Cir. 1990) ...........................................................17, 18, 23

*Qorvo Inc. v. Akoustis Technologies, Inc.*,
No. 1:21-cv-01417-JPM (D. Del.) ..............................................................1, 3, 4

*SNMP Research Int'l, Inc. v. Nortel Networks, Inc.* (*In re Nortel Networks, Inc.*),
539 B.R 704 (D. Del. 2015) ............................................................10, 13, 15, 16

*The Singer Co. B.V. v. Groz-Beckert KG* (*In re The Singer Co., N.V.*),
No. 01 Civ. 0165 (WHP), 2002 WL 243779 (S.D.N.Y. Feb. 20, 2002) ................13

*United States Gypsum Co. v. Nat'l Gypsum Co.* (*In re Nat'l Gypsum Co.*),
145 B.R 539 (N.D. Tex. 1992) ..................................................................14

**Statutes**

11 U.S.C. § 541 .................................................................................18, 19, 22

11 U.S.C. §§ 1107(a) and 1108 ....................................................................3

11 U.S.C. § 1121 (b)-(d) ..........................................................................19

28 U.S.C. § 157(a) .................................................................................9

28 U.S.C. § 157(b)(2)(A) ..........................................................................18

28 U.S.C. § 157(c)(1) ..............................................................................20

28 U.S.C. § 157(d) ..........................................................................9, 10, 11

28 U.S.C. § 1334(a) ................................................................................9

35 U.S.C. § 271(a) .................................................................................15

**Other Authorities**

D. Del. LR 7.1.2(b) ................................................................................19

The above-captioned respondents, as debtors and debtors-in-possession (collectively, the "Respondents" or the "Debtors") by and through their proposed undersigned counsel, hereby submit this memorandum of law in opposition (the "Opposition") to (i) the *Motion of Qorvo, Inc. for Withdrawal of the Reference* [Bankr. D.I. 97] (the "Motion to Withdraw")[2] filed by Qorvo, Inc. ("Qorvo" or the "Movant") and (ii) *Qorvo, Inc.'s Opening Brief Motion to Withdraw the Reference with Respect to the Bidding Procedures and Sale Motion* filed contemporaneously with and attached to the Motion to Withdraw (the "Opening Brief").   In support of the Opposition, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT[3]

Experiencing financial distress from a variety of factors, the Debtors filed for relief under Chapter 11 of the United States Bankruptcy Code on December 16, 2024. Through the Bidding Procedures Motion, the Debtors sought to implement a time-sensitive process to pursue a sale of substantially all of their assets (and none of Qorvo's).  Such a sale needs to occur by May 2, 2025, or the Debtors will not have the liquidity to continue operations.  In that context, although Qorvo objected to the Bidding Procedures Motion, the Debtors and Qorvo subsequently negotiated and ***agreed*** upon a schedule for the Debtors to cleanse their assets, to meet and confer regarding any disputes relating to the ownership of those assets, to present any unresolved disputes to Judge Silverstein in the Bankruptcy Court, and to pursue a sale of the Cleansed Assets pursuant to the following schedule:

- January 17, 2025 – Deadline to exchange data and search terms
- March 14, 2025 – Deadline to exchange reports from review

---

[2] As used herein, references to "[Bankr. D.I. [●]]" shall refer to the Chapter 11 Cases' administratively consolidated docket before the Bankruptcy Court.  References to "[Dist. D.I. [●]]" shall refer to the Qorvo Litigation's docket before the District Court.

[3] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them throughout the Opposition.

- March 14-21, 2025 – Parties to meet and confer regarding forensic reports
- March 21, 2025 – Deadline for Qorvo to object to inclusion of Enjoined Information in assets proposed to be sold
- March 31, 2025 at 10:00 a.m. – Hearing date to consider Qorvo's objection (if any)
- April 11, 2025 – Deadline to submit bids and object to the sale/cure payments
- April 14, 2025 at 11:00 a.m. – Auction
- April 16, 2025 – Supplemental sale and adequate assurance objection deadline
- April 17, 2025 at 10:00 a.m. – Sale hearing
- April 22, 2025 – Deadline to consummate sale transaction(s)

Not only does this process comport with the Permanent Injunction, but the Debtors allowed Qorvo additional relief by consenting to Qorvo's request to conduct its own cleanse in a parallel process. As a result of this agreement, any timing concerns raised by Qorvo in the Motion to Withdraw are now moot. The process and timeline have been agreed upon, and the Bankruptcy Court is poised to make a timely ruling on any disputes.

Aside from Qorvo's consent, there are not, and never have been, any "meaningful considerations" of non-bankruptcy law necessitating mandatory withdrawal of the reference. The legal issues surrounding the Permanent Injunction were resolved by the District Court; all that remains is for the Bankruptcy Court to consider the terms of, and ensure compliance with, the Permanent Injunction. The parties have now agreed upon a process to achieve that result.

Finally, as the Bankruptcy Court determined in approving the Bidding Procedures Motion and, relatedly, denying Qorvo's Motion to Stay, there exists no basis for permissive withdrawal. The Debtors have a good faith basis for filing the Chapter 11 Cases—namely, the creation of a process to sell their assets in compliance with the Permanent Injunction in a timely manner before they run out of funds. Of paramount importance to the Bankruptcy Court's denial of the Motion to Stay was the need for speed and efficiency as well as the fact that the District Court did not intend for the Permanent Injunction to be a "death sentence" for the Debtors. *See* A00291-A00292 (Tr. of Bidding Procedures Hr'g, at 108:9–11; 109:2–5 (Jan. 9, 2025) [hereinafter, the "Jan. 9

Transcript"]) (Court: "Yes, but the judge, Judge McCalla, did not shut them down, did not say they couldn't conduct business…. [H]e recognizes the debtors' ability to exist, the public interest in competition, which would be facilitated by a sale of non-infringing product, he recognizes that."). Bankruptcy courts are uniquely positioned to balance the issues at present in these cases— including accommodating the reality of the Debtors' financial positions and scheduling hearings accordingly—and, therefore, withdrawal of reference is improper.

## **BACKGROUND**

### A.    **General Background**

On December 16, 2024 (the "Petition Date"), each of the Respondents filed voluntary petitions under title 11 of chapter 11 of the United States Code (the "Bankruptcy Code"), commencing the cases before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), captioned as *In re Akoustis Technologies, Inc.*, No. 24-12796 (LSS) (Bankr. D. Del. Dec. 16, 2024) [hereinafter, the "Chapter 11 Cases"]. The United States Trustee filed a notice of appointment of a committee of unsecured creditors on December 30, 2024 [Bankr. D.I. 93].

Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of Mark D. Podgainy in Support of Chapter 11 Petitions and First Day Motions* [Bankr. D.I. 2] (the "First Day Declaration").

### B.    **Qorvo Litigation and Permanent Injunction**

On October 4, 2021, Debtor Akoustis, Inc. was sued by Qorvo, Inc. ("Qorvo") in the United States District Court for the District of Delaware (the "District Court"), in a case captioned *Qorvo Inc. v. Akoustis Technologies, Inc.*, No. 1:21-cv-01417-JPM (D. Del.) [hereinafter, the "Qorvo

Litigation"], alleging, among other things, patent infringement, false advertising, false patent marketing, and unfair competition. *See* Dist. D.I. 1.

On May 17, 2024, the jury returned a verdict in favor of Qorvo for misappropriation of certain trade secrets and patent infringement, including an award of damages in the amount of $38.6 million (the "Jury Award"). *See* Dist. D.I. 601. On November 22, 2024, after the resolution of the parties' post-trial motions, the Court entered an Amended Final Judgment that compiled all of the District Court's findings and rulings into a single judgment. *See* Dist. D.I. 717.

The Court also granted Qorvo a permanent injunction (*see* Dist. D.I. 710, the "Permanent Injunction") that enjoined the Debtors and related parties from (a) possessing, reviewing, using, or disclosing the Qorvo Trade Secret Information,[4] which remain under seal; (b) offering, selling, or distributing products that were made using the Qorvo Trade Secret Information; or (c) advertising, promoting, or offering services utilizing the Qorvo Trade Secret Information. *See id.* at ¶ 1. To implement the Permanent Injunction, the District Court also ordered the Debtors to conduct a search of their databases in order to identify and purge any information regarding the Enjoined Information,[5] and granted Qorvo the right to audit the Respondents' systems and files to ensure compliance with the Permanent Injunction for two years. *See id.* at ¶¶ 2–3. Finally, the District Court also permanently enjoined the Debtors from making, using, selling, or otherwise offering to sell in the United States certain products the jury found infringed on two of Qorvo's patents. *See id.* at ¶ 4.

The Debtors filed a notice of appeal of the Damages Award and the Permanent Injunction on November 29, 2024. *See* Dist. D.I. 719.

---

[4] As such term is defined in the Permanent Injunction.

[5] As used herein, the term "Enjoined Information" refers to any confidential Qorvo information as set forth in ¶ 2(a)(iii) of the Permanent Injunction, including any Qorvo Trade Secret Information, as defined therein.

### C.    Proposed Sale Process

In June 2024, the Debtors engaged Getzler Henrich & Associates LLC to assist in exploring and assessing strategic options with the Debtors and understanding the Debtors' overall financial condition.  *See* First Day Declaration, at ¶ 35.  In August 2024, the Debtors also retained Raymond James & Associates, Inc. ("RJA") to serve as investment banker to assist in the assessment of and solicitation of third-party interest in such options.  *See id.*

The Debtors and their advisors ultimately determined that a sale process as part of a chapter 11 case was the most viable option (the "Sale Process").  *See* Bankr. D.I. 15, at ¶ 14 (the "Pokrassa Bidding Procedures Declaration").  The prepetition marketing process resulted in the Debtors selecting Gordon Brothers Commercial & Industrial, LLC (the "Stalking Horse Bidder") as stalking horse bidder, to acquire only a subset of the Debtors' assets on a liquidation basis to ensure they implicated no Enjoined Information (the "Stalking Horse Bid").  *See id.* at ¶ 15.

Though no other bidder has made a firm offer, multiple parties have expressed interest in acquiring the Debtors' assets with an intention of continuing the business as a going concern.  *See id.*  A going-concern sale remains the Debtors' ultimate goal and, in the Debtors' opinion, would generate the highest amount of proceeds for distribution to stakeholders and would prevent further layoffs of employees.   Interested purchasers, however, have indicated they would only consummate a going-concern transaction to the extent the Qorvo Litigation will not implicate their future operations.  *See id.*

### D.    The Cleanse Process

To comply with the Permanent Injunction, provide comfort to bidders, and obtain the highest possible price for the Debtors' assets, the Debtors are engaging in a "cleanse" of any assets necessary for a sale as a going concern to ensure that no assets being sold contain any Enjoined Information.  To do so, on the Petition Date, the Debtors filed the *Motion of the Debtors for Entry*

*of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Bankr. D.I. 14] (the "Bidding Procedures Motion"). As part of the Bidding Procedures Motion, the Debtors sought approval of the bidding procedures (as amended, the "Bidding Procedures").[6] *See* Bidding Procedures Motion, at p. 1–2.

On January 8 and 9, the Bankruptcy Court conducted a two-day hearing on the Bidding Procedures Motion (along with other critical operational motions). The Debtors established through testimony and documentary evidence that the Sale Process must be completed by May 2, 2025. After the close of evidence, the Debtors and Qorvo negotiated and agreed to—and the Bankruptcy Court approved—a process to ensure the cleansing of the Enjoined Information and to resolve any disputes within the required timeline. *See* A00345-A00348 (Jan. 9 Transcript, at 162:18–165:7 (Jan. 9, 2025)). The parties designed this consensual framework to ensure the assets the Debtors propose to sell (the "Proposed Cleansed Assets") will be devoid of all Enjoined Information (the "Cleansed Assets"). Rather than merely allowing for an audit of the Debtors' work, the Debtors agreed to provide Qorvo with a full copy of the data and information comprising

---

[6] As used herein, the "Bidding Procedures" refers to the amended form of bidding procedures approved as part of the *Order (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into the Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief* [Bankr. D.I. 176] (the "Bidding Procedures Order"), entered on January 13, 2025.

and relating to the Proposed Cleansed Assets. *See* Bidding Procedures Order, at ¶ 17. To coordinate their work, the parties will exchange search terms to identify any Enjoined Information by no later than January 17, 2025. *See id.* at ¶ 17. Thereafter, the parties will have approximately two months to review and search the data before exchanging forensic reports on March 14, 2025. Thereafter, the parties have one week to confer to the extent there is any disagreement over the existence or inclusion of Enjoined Information therein. *See id.* at ¶ 19. If the parties cannot reach an agreement, Qorvo may file an objection with the Bankruptcy Court on or before March 21, 2025, and the Bankruptcy Court will hear the objection on March 31, 2025. *See id.* at ¶¶ 21–22. Further, the Debtors agreed to, and the Bankruptcy Court approved, a mechanism for Qorvo to receive reimbursement for a substantial amount of costs associated with this process, up to $400,000.00. *See id.* at ¶ 18.

As noted above, the Bankruptcy Court indicated that the Bidding Procedures had been proposed in good faith, the Debtors were attempting to comply with the Permanent Injunction, and the Permanent Injunction anticipated the Debtors' continued operations and the cleansing process. *See* A00328 (Jan. 9 Transcript, at 145:9–15) (Court: "I don't think this was proposed in bad faith. I think it's an attempt to understand if there is, in fact, a violation because - - and I think it's been said a thousand times now, if there's something remaining, it will be removed. The debtors are not seeking to sell anything that enjoins. And I know nobody's wanting to buy anything that has been enjoined and found to be infringing."); A00291 (Jan. 9 Transcript, at 108:9–11) (Court: "Yes, but the judge, Judge McCalla, did not shut them down, did not say they couldn't conduct business…."). Qorvo and the Debtors engaged in extensive negotiations over the terms of the cleansing process to ensure compliance with the terms of the Permanent Injunction. *See* A00339

(Jan. 9 Transcript, at 156:22–23) (identifying a recess to negotiate terms of the Bidding Procedures from 2:05 p.m. through 3:59 p.m.).

Qorvo has agreed to the entry of the Bidding Procedures Order, pursuant to which the Bankruptcy Court has jurisdiction over the Bidding Procedures and disputes relating to the Enjoined Information. This framework ensures compliance with the terms of the Permanent Injunction. *See* A00346 (Jan. 9 Transcript, at 163:2–4) (Qorvo Counsel: "[W]e've agreed as well in order to get this done is that, under the [I]njunction, Qorvo has a right to 50 percent of its cost reimbursement …."); A00347 (Jan. 9 Transcript, at 164:16–19) (Qorvo Counsel: "The way that we got to yes here, Your Honor, is by being able - - is by Qorvo being able to know that it's now going to have to do a significant amount of work."); A00348 (Jan. 9 Transcript, at 165:5–7) (Qorvo Counsel: "I'm only authorized by Qorvo to agree, provided that we're assured certainty and we're not litigating over $400,000.").

## **ARGUMENT**

District courts have "original but not exclusive jurisdiction over all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(a). Pursuant to authority granted in 28 U.S.C. § 157(a), this Court has referred all cases arising under title 11 to the Bankruptcy Court. *See Amended Standing Order of Reference*, dated February 29, 2012 (C.J. Sleet). Nevertheless, Congress specified that in certain circumstances district courts are authorized to withdraw the reference to the bankruptcy courts and adjudicate disputes directly. *See* 28 U.S.C. § 157(d).

In particular, section 157(d) provides:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires

> consideration of both title 11 and other laws of the United States
> regulating organizations or activities affecting interstate
> commerce.

28 U.S.C. § 157(d).  Section 157(d) provides two avenues for withdrawing the reference—

permissive withdrawal and mandatory withdrawal—depending on the specific facts of the dispute.

As discussed below neither is justified in this context.

**A.      Qorvo Has Consented to the Bidding Procedures, Including the Cleanse Process and Bankruptcy Court Review Thereof**

Prior to discussing whether the there is any legal basis for this Court to withdraw the

reference, the Debtors emphasize that Qorvo has ***consented to the entry of the Bidding Procedures***

***Order***, rendering the Motion to Withdraw moot.  The Bidding Procedures in their current form

were negotiated by the Debtors and Qorvo, to ensure that Qorvo was comfortable with the

proposed process to cleanse the Enjoined Information from the Proposed Cleansed Assets.  *See*

A00355 (Jan. 9 Transcript, at 172:2–4) (Court: "I'm prepared to enter an order consistent with the

discussion on the record[] of the resolution that's been reached with Qorvo ….")).  At this point,

the Debtors submit it is improper for Qorvo to continue litigating either (i) that the Bankruptcy

Court lacks the jurisdiction or the capacity to apply the terms of the Permanent Injunction to a sale

under section 363 of the Bankruptcy Code, or (ii) that the timeline or cleanse process in the Bidding

Procedures Order in some way violates the Permanent Injunction.

**B.      The Bidding Procedures and Sale Motion Do Not Warrant Mandatory Withdrawal of the Reference**

"In the District of Delaware, withdrawal is deemed mandatory when (1) consideration of

law outside of Title 11 … is necessary for the resolution of the case or proceeding; and

(2) the consideration of federal law outside the Bankruptcy Code necessary to resolve the

proceeding is substantial and material."  *See Pension Benefit Guarantee Corp. v. Cont'l Airlines,*

*Inc.* (*In re Cont'l Airlines*), 138 B.R. 442, 444–45 (D. Del. 1992).  Not every contested matter that

"alleges a violation of federal non-bankruptcy law necessarily requires substantial and material consideration of that law." *SNMP Research Int'l, Inc. v. Nortel Networks, Inc.* (*In re Nortel Networks, Inc.*), 539 B.R 704, 708 (D. Del. 2015) (citing *Hatzel & Buehler, Inc. v. Orange & Rockland Utilities, Inc.* 107 B.R 34, 38 (D. Del. 1989). Mandatory withdrawal of reference is only warranted where the movant demonstrates that "substantial and material consideration of nonbankruptcy law is necessary to resolve the case." *See Cont'l Airlines*, 138 B.R. at 445.

Courts around the country (including in this district) have circumscribed the seemingly broad reach of section 157(d), noting that "a literal interpretation of this provision could result in an 'escape hatch' through which most bankruptcy matters could routinely be removed to the district court." *Pension Benefit Guaranty Corp. v. Smith Corona Corp.* (*In re Smith Corona Corp.*), 205 B.R 712, 714 (D. Del. 1996). Such an outcome clearly not being Congress's intention (particularly for *mandatory* withdrawal of reference), courts have placed a heavy burden on a movant to establish that the matter would require a "meaningful consideration" of non-bankruptcy law, rather than a "mere application of well-settled law" for mandatory withdrawal to apply. *See IRS v. CM Holdings, Inc.* (*In re CM Holdings, Inc.*), 221 B.R. 715, 721 (D. Del. 1998) (internal citation omitted); *Energy Development Corp. v. Columbia Gas Sys., Inc.* (*In re Columbia Gas Sys., Inc.*), 134 B.R. 808, 811 (D. Del. 1991) ("These guidelines help to distinguish a required 'consideration' of federal law outside the Bankruptcy Code from its 'simple application.' In the latter case, withdrawal of reference is not mandatory."); *see also Cont'l Airlines*, 138 B.R. at 445 ("As the party seeking withdrawal of the reference, [movant] bears the burden of demonstrating that a substantial and material consideration of nonbankruptcy law is necessary to resolve the case.").

Such "meaningful considerations" generally require issues of first impression or cases in which an aspect of the applicable federal non-bankruptcy law is unsettled. *See Cont'l Airlines,*

*Inc.*, 138 B.R. at 447 (denying mandatory withdrawal of reference, noting there is no issue of first impression under non-bankruptcy law or actual conflict between such law and the Bankruptcy Code); *CM Holdings*, 221 B.R. at 722 (finding the existence of substantial and material consideration of non-bankruptcy law, noting "this area of the law is unsettled … [and] it is undeniable that this case represents an issue of first impression in this circuit").  Indeed, district courts often deny a request for mandatory withdrawal of the reference when resolution of the matter would require only the "straightforward application of a federal statute to a particular set of facts."  *In re Amfesco Indus., Inc.*, No. 88-CV-2662 (ERK), 1988 WL 134153, at *2 (E.D.N.Y. Nov. 14, 1988); *Barry v. Santander Bank, N.A.* (*In re Liberty State Benefits of Delaware, Inc.*), No. 11-12404-KG, 2015 WL 1137591, at *3 (D. Del. Mar. 12, 2015).

Here, Qorvo argues mandatory withdrawal is required, but it has articulated no dispute that requires a meaningful consideration of non-bankruptcy law.  Indeed, Qorvo's argument essentially amounts to a claim that the Bidding Procedures and Sale Process represent an attempt by the Debtors to bypass the Permanent Injunction.[7]  *See* Motion to Withdraw, at ¶ 27.  In an attempt to tie this argument to a question of non-bankruptcy law, Qorvo claims "the [Bidding Procedures] Motion … requires substantial and material consideration of non-Bankruptcy Code laws – namely whether the Debtors' assets continue to infringe on Qorvo's trade secrets and patents (they do and will unless and until Debtors' assets are cleansed) …."  *See id.* at ¶ 28.  As such, it appears this "substantial and material" consideration of non-bankruptcy law relates solely to the digestion and application of the Permanent Injunction and its terms.  *See id.* at ¶ 27.

---

[7] Qorvo also argues that the timeline proposed in the Bidding Procedures is too truncated (*see* Motion to Withdraw, at ¶ 27); however, the Motion to Withdraw does not expound upon this assertion.  Nevertheless, the proposed timeline for a sale process in no way implicates any federal law other than bankruptcy law, so this argument is similarly unavailing.

Notwithstanding Qorvo's conclusory statements, it has identified no "substantial and material" issue of non-bankruptcy law that is implicated by the Bidding Procedures, Bidding Procedures Motion, or the Sale Process.  The reason for this is simple: there is none.  Even before the Bankruptcy Court's entry of the Bidding Procedures Order, no such issue existed, and now that the Bidding Procedures have been approved, all that remains is compliance with that process. Qorvo has not met the first prong of the analysis requiring an application of non-bankruptcy law.

The Debtors here are not asking the Bankruptcy Court to make any determination in the first instance with respect to the Permanent Injunction or Enjoined Information, as the District Court has already conducted such analysis when it issued the Permanent Injunction.

Here, though the Permanent Injunction necessarily stands upon non-bankruptcy intellectual property law, the application of the Permanent Injunction to the Bidding Procedures does not present any novel questions of intellectual property law.  The Permanent Injunction is clear in its scope and the actions it enjoins.  Like the settlement agreement in *Continental Airlines*, the Bankruptcy Court is fully capable of comprehending the terms of the Permanent Injunction and ensuring the Debtors remain in compliance therewith as part of the Sale Process.

Even considering other cases where "complex" intellectual property issues are at bar,[8] courts in this jurisdiction routinely find that Bankruptcy Courts are well within their powers to apply such law as part of the bankruptcy cases before them.  For example, in *SNMP Research Int'l, Inc. v. Nortel Networks, Inc.*, the movant initiated an adversary proceeding alleging violations

---

[8] Here, it is important to note that any arguments related to the patent infringement is a "red herring," which Qorvo included simply with the intention of creating the illusion of additional (or, potentially, any) complexity.  By the Sale Process, the Debtors are **_not_** proposing to sell any **_products_** that may infringe upon the patents included in the Permanent Injunction as part of the Sale Process; they are proposing to sell a subset of their assets used in the manufacture of their products.  Patents only cover the production, use, sale, or offering for use/sale of infringing products—not the equipment used for such production.  *See* 35 U.S.C. § 271(a) ("[W]hoever without authority **_makes, uses, offers to sell, or sells any patented invention_**, within the United States … during the term of the patent therefor, infringes the patent.") (emphasis added).

under the Copyright Act.  *See* 539 B.R. 704, 706 (D. Del. 2015).  Much like here, the movants in *Nortel Networks* asserted that the issues before the bankruptcy court included "complex issues" of federal intellectual property law.  *See id.* at 708.  According to the movants, such issues would require the bankruptcy court to answer "[w]hat code is owned by SNMP Research and [analyze] whether a work is derivative work and whether that derivative work is itself infringing."  *See id.* (citing movants brief) (alterations in original).  Moreover, the movant alleged that the case would require the bankruptcy court to apply a "complex method for calculating damages" with "a variety of damages theories."  *Id.*  Nevertheless, the *Nortel Networks* court declined to find mandatory withdrawal was warranted, noting "this [dispute] merely requires deciding how the law applies to the facts of the case rather than deciphering or interpreting the law," but it was devoid of any allegation that such analysis "will require meaningful (i.e., 'substantial and material') consideration of federal non-bankruptcy law."  *See id.* at 708–09.

Even when a bankruptcy court has faced "complex" intellectual property disputes, Delaware District Courts do not consider withdrawal of reference mandatory.  This was even true in *Nortel Networks*, where the bankruptcy court was required to determine infringement in the first instance.  So long as such application is "settled" law, mandatory withdrawal of the reference is inappropriate.  Here, the determination of whether infringement has occurred is not at issue; the District Court has issued the Permanent Injunction, and the Bankruptcy Court is capable of ensuring the Debtors remain in compliance with its unambiguous terms.

In short, Qorvo has articulated no novel interpretation of non-bankruptcy law that is at issue in this case.  As of today, the Debtors only seek to have the Bankruptcy Court determine that the Sale Process as contemplated in the Bidding Procedures is reasonable in light of the circumstances, including remaining within the bounds of the Permanent Injunction.  The

Bankruptcy Court and Qorvo already agreed that it does, and this question is squarely within the mandate of the Bankruptcy Court in allowing the Debtors to manage the affairs of the estate and dispose of property of the estate in accordance with the Bankruptcy Code. Accordingly, mandatory withdrawal of the reference is inappropriate.

## C.  The Bidding Procedures and Sale Motion Do Not Warrant Permissive Withdrawal of the Reference

Permissive withdrawal of reference is limited to circumstances "for cause shown." When interpreting the "for cause" aspect of permissive withdrawal, there is a presumption that Congress intended for bankruptcy proceedings to be adjudicated by a bankruptcy court. *See Hatzel & Beuhler, Inc. v. Cent. Hudson Gas & Elec. Corp.*, 106 B.R. 367, 371 (D. Del. 1989) (noting for cause requirement signals as "presumption that Congress intended to have bankruptcy proceeding adjudicated in bankruptcy court unless rebutted by contravening policy." (internal citations omitted)). It is Qorvo's burden to prove cause exists. *See Liberty State*, 2015 WL 1137591 at *2 ("As the moving party, [movant] has the burden to prove that cause exists to withdraw the reference." (citation omitted)).

When contemplating whether to withdraw the reference, the Court may consider the following five factors: "the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process." *In re Pruitt*, 910 F.2 1160, 1168 (3d Cir. 1990) (citing *Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 999 (5th Cir. 1985)). The Court should also consider "whether the action sought to be withdrawn is 'core' or 'non-core,'" *see Hatzel & Beuhler, Inc. v. Orange & Rockland Utils., Inc.,* 107 B.R. 34, 39 (D. Del. 1989), and the "timing of the request for withdrawal." *See Am. Classic Voyages v. Westaff* (*USA*),

*Inc.,* (*In re Am. Classic Voyages Co.*), 337 B.R. 509, 511 (D. Del. 2006). All of the factors favor denial of the Motion to Withdraw.

      1.     *Efficiency and Judicial Economy Require Adjudication by the Bankruptcy Court*

First, allowing the Bankruptcy Court to continue overseeing this case promotes the efficient resolution this matter. While Qorvo imagines it is the only creditor at issue in this matter, the Debtors have thousands of creditors. *See* Voluntary Petitions for Non-Individuals Filing for Bankruptcy in *In re Akoustis Technologies, Inc.*, Case No. 24-12796 (D. Del. 2024) [Bankr. D.I. 1]; *In re Akoustis, Inc.*, Case No. 24-12797 (D. Del. 2024) [Bankr. D.I. 1]; *In re Grinding and Dicing Services, Inc.*, Case No. 24-12798 (D. Del. 2024) [Bankr. D.I. 1]; and *In re RFM Integrated Device Inc.*, Case No. 24-12799 (D. Del. 2024) [Bankr. D.I. 1]. It is fairer to all the parties to have one court adjudicate the disputes taking into consideration all parties' interests and not merely Qorvo's. Furthermore, it is more efficient to have the Bankruptcy Court decide a core bankruptcy issue than it is for this Court to decide that same issue, particularly when all that remains is ensuring compliance with the Bidding Procedures. *See Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*, No. 6:09-CV-226, 2009 U.S. Dist. LEXIS 115854 (N.D.N.Y. Dec. 10, 2009), *4 ("Thus, the fact that the claim is a core bankruptcy matter weights in favor of leaving the matter in the Bankruptcy Court."). The factors of efficiency and judicial economy support denial of the Motion to Withdraw.

      2.     *Withdrawal of Reference Undermines the Uniform Administration of the Bankruptcy Cases*

Similarly, the uniformity inquiry requires consideration of whether uniformity will be achieved ***within the bankruptcy case*** and must be analyzed in tandem with considerations of judicial efficiency. *See Pruitt*, 910 F.2d at 1168. Although Qorvo attempts to couch the sale as a potential violation of the Permanent Injunction, the sale is just a determination of what is and is

not property of the Debtors to be determined under Section 541 of the Bankruptcy Code so as to comport with the Permanent Injunction. Additionally, there are no other bidders for the Debtors' assets, and the Stalking Horse APA clearly does not violate the Permanent Injunction since it contemplates selling only "factory reset" property.

Any issues implicating non-bankruptcy law have been resolved by the District Court's issuance of the Permanent Injunction and Permanent Injunction Order (as defined in the Lerner Declaration[9]). At this point, the only remaining issues for the Bankruptcy Court relate to matters squarely within its jurisdiction and expertise—including, determining the "core" matter of what may constitute "property of the estate" under section 541 of the Bankruptcy Code and overseeing the proposed Sale Process included in the Bidding Procedures. *See* 28 U.S.C. § 157(b)(2)(A); *see also JCF AFFM Debt Holdings, L.P. v. Affirmative Ins. Holdings, Inc.* (*In re Affirmative Ins. Holdings, Inc.*), 565 B.R. 566, 583 (Bankr. D. Del. 2017) ("[V]arious courts have concluded that matters requiring a declaration of whether a certain asset comes within the definition of property of the estate, as set forth in section 541 of the Bankruptcy Code, are core proceedings."). Additionally, the resolution of this issue will affect the sale, plan, and generally how this case moves forward. Therefore, efficiency and judicial economy support the Bidding Procedures Motion being decided by the Bankruptcy Court. Despite attempts to argue to the contrary, this factor favors denial of the Motion to Withdraw.

> 3.    *Withdrawal of Reference Will Slow Down the Bankruptcy Process and Is Purposely Designed to Do So*

The bankruptcy process is designed to be efficient and to operate on a strict timeline to avoid the "melting" of the proverbial ice cube. For example, a debtor only has 120 days to file a

---

[9] The "Lerner Declaration" refers to the *Declaration of Leib M. Lerner in Support of Qorvo, Inc.'s Motion to Withdraw the Reference with Respect to the Bidding Procedures and Sale Motion* attached to the Motion to Withdraw.

Plan and 180 days to have it confirmed absent the Court granting an extension for cause. *See* 11 U.S.C. § 1121 (b)-(d). Moreover, in these Chapter 11 Cases, the Stalking Horse APA includes certain milestones which must be met. In other words: time is of the essence.

The filing of the Motion to Withdraw will delay the case at least 21 days to allow for briefing pursuant to Local Rule 7.1.2(b). Further, Qorvo's argument that its Motion to Withdraw would expedite the proceedings is belied by its *Motion to Stay the Bidding Procedures and Sale Motion Pending the Disposition of the Motion to Withdraw the Reference* [Bankr. D.I. 98] (the "Motion to Stay")—demonstrating Qorvo's true intent—to slow the bankruptcy process down for its own benefit and obliterate the value provided by the Stalking Horse Bid. Indeed, the Bankruptcy Court did not grant the Motion to Stay for just this reason—it noted that time is of the essence and any delay in the process will doom the Chapter 11 Cases. *See* A00289 (Jan. 9 Transcript, at 106:9–22) (Court: "So why would I stop the process from running? If anything, over the last two days, what questioning by both parties has shown me is that this process needs to start, it needs to start because the debtors think it will take until March 7th, I guess now, you think it will take longer. The process needs to start…. [I]f this process is going to take longer, as Qorvo suggests, why wouldn't I start it now?"). Not only do the Debtors run out of cash May 2, 2025, but the Stalking Horse Bid expires on April 22, 2025, meaning the Stalking Horse Bidder may walk away from the sale, in which case, there will be ***no return*** to creditors.

Under the consensual terms of the Bidding Procedures, the proposed sale transaction must close by no later than ***April 22, 2025***. In the interim, there are ***nine*** other deadlines and hearings scheduled as well as an auction, including those requiring that (a) Qorvo and the Debtors exchange information by no later than ***January 17, 2025***; (b) they must exchange reports with respect to the data and information by no later than ***March 14, 2025***; (c) Qorvo file any objection to the proposed

sale by no later than ___*March 21, 2025*___; (d) any objections are to be heard by the Bankruptcy Court at a hearing already scheduled for ___*10:00 a.m. on Monday, March 31, 2025*___; (e) interested parties file objections to the sale by no later than ___*April 11, 2025*___, and (f) the Bankruptcy Court hold the sale hearing on at ___*10:00 a.m. on April 17, 2025*___.  It is imperative this schedule remains in place, as any deviation could spell disaster for the Debtors' and their estates, given their financial constraints and given the terms of the Stalking Horse Bid. *See* A00289 (Jan. 9 Transcript, at 106:9–22).

Nevertheless, Qorvo argues that not withdrawing the reference would require duplication of efforts, because (a) the parties would have to submit findings of facts and conclusions of law, (b) the District Court has more institutional experience with these cases, and (c) proceeding in District Court may cut out a round of appeals.  First, Qorvo is incorrect in its assertion that the parties would have to submit findings of fact and conclusions of law—that is only required for non-core proceedings.  28 U.S.C. § 157(c)(1).  As discussed above, the sale of estate property and what constitutes estate property is core matter under the Bankruptcy Code.  Thus, the cases Qorvo relies upon, *NDEP Corp. v. Handl-It. Inc.* (*In re NDEP Corp.*), 203 B.R. 905, 913 (D. Del. 1996) and *Michaelson v. Golden Gate Private Equity, Inc.* (*In re Appleseed's Intermediate Holdings, LLC*), No. 11-807(JEI/KM), 2011 WL 6293251 (D. Del. Dec. 15, 2011), are both inapplicable because they involve non-core proceedings.  Second, Qorvo ignores the fact the District Court only has familiarity with two of the Debtors and their property while the Bidding Procedures Motion contemplates the potential sale of assets of all four Debtors and their combined property. The assets of the other two Debtors are not subject to the Permanent Injunction.  Moreover, due to their "core" nature, District Courts do not routinely conduct bankruptcy sales.  Finally, cutting out a round of appeals alone is not enough to justify the permissive removal of a bankruptcy case.

In reality, the only party delaying the bankruptcy process is Qorvo.  Such a strategy makes little sense for a traditional creditor.  Qorvo, however, is not any ordinary creditor.  Qorvo and the Debtors are competitors and will remain so unless and until one or the other stops operating.  To an extent, that outcome is likely because the Debtors are seeking a sale of their assets and/or operations.  That victory is not enough for Qorvo.  Instead, Qorvo also seeks to end any competition in the marketplace from the technologies developed by the Debtors—including those that were *not* subject to the Permanent Injunction.  Therefore, withdrawal would not expedite the bankruptcy process and, thus, this factor supports denial of the Motion to Withdraw.

### 4.    The Debtors Are Not Forum Shopping via the Chapter 11 Cases

Notwithstanding Qorvo's arguments to the contrary, the Debtors have not engaged in forum shopping by filing the Bidding Procedures Motion and pursuing the Sale Process.  As explained throughout this Opposition—and, indeed, throughout the Bankruptcy Case in general—the Debtors are not seeking to relitigate the Permanent Injunction.  *See* A00328 (Jan. 9 Transcript, at 145:13–15) (Court: "The debtors are not seeking to sell anything that enjoins.  And I know nobody's wanting to buy anything that has been enjoined and found to be infringing.").  Upon the conclusion of the Qorvo Litigation, the Debtors have faced mounting financial and operational challenges, including the Damages Award, the Permanent Injunction, potential defaults under their prepetition notes as a result thereof, and an imminent need for working capital.  *See First Day Declaration*, at ¶ 22 (noting the Qorvo Litigation having "rendered the Debtors' financial situation unsustainable"); *See* A00290 (Jan. 9 Transcript, at 107:12–13) (Court: "I think [the debtors] have monetary constraints.").  There are myriad good faith reasons for the Debtors to have commenced these Chapter 11 Cases, none of which Qorvo appears to dispute and which the Bankruptcy Court acknowledged.  *See* A00328 (Jan. 9 Transcript, at 145:9–12) (Court: "I don't think this was proposed in bad faith.  I think it's an attempt to understand if there is, in fact, a violation because

- - and I think it's been said a thousand times now, if there's something remaining, it will be removed."). And as the Chapter 11 Cases have resulted in this "forum," it would make no sense for the Debtors to pursue a sale of its assets outside of the confines of these cases. Thus, the Debtors have not engaged in forum shopping.

5.    *The Bankruptcy Court has Jurisdiction to Adjudicate the Claims at Issue*

As discussed above in section B.2 of the Argument, all matters of non-bankruptcy law have been resolved by the District Court's issuance of the Injunction and Permanent Injunction Order. The only remaining issues for the Bankruptcy Court relate to matters squarely within its jurisdiction—namely, determining the "core" matters of what may constitute "property of the estate" under section 541 of the Bankruptcy Code and overseeing the proposed Sale process including the Bidding Procedures, which now include terms to which Qorvo has agreed. *See JCF AFFM Debt Holdings, L.P. v. Affirmative Ins. Holdings, Inc.* (*In re Affirmative Ins. Holdings, Inc.*), 565 B.R. 566, 583 (Bankr. D. Del. 2017) ("[V]arious courts have concluded that matters requiring a declaration of whether a certain asset comes within the definition of property of the estate, as set forth in section 541 of the Bankruptcy Code, are core proceedings.").

Even assuming *arguendo* the Bidding Procedures Motion is a non-core proceeding, it would still be improper to withdraw reference for the sole reason it was not a core proceeding. *Liberty State Benefits,* 2015 WL 1137591 at *3 ("Proceedings should not be withdrawn for the sole reason they are non-core."). Thus, this factor weighs in favor of denying the Motion to Withdraw.

## CONCLUSION

Qorvo has not met its burden of showing the Bidding Procedures Motion should be withdrawn to District Court under either the mandatory or permissive standards, especially now that the parties have consented to the Bankruptcy Court's process.

Dated:  January 14, 2025
    Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew R. Pierce*
Matthew B. McGuire (No. 4366)
Matthew R. Pierce (No. 5946)
Joshua B. Brooks (No. 6765)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Email:  mcguire@lrclaw.com
     pierce@lrclaw.com
     brooks@lrclaw.com

- and -

**K&L GATES LLP**
Jeffrey T. Kucera
Carly S. Everhardt
Southeast Financial Center, Suite 3900
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 539-3300
Email:  jeffrey.kucera@klgates.com
     carly.everhardt@klgates.com

- and –

Margaret R. Westbrook
301 Hillsborough Street, Suite 1200
Raleigh, North Carolina 27603
Telephone: (919) 743-7300
Email:  margaret.westbrook@klgates.com

-and-

Jonathan Edel
300 South Tryon Street, Suite 1000
Charlotte, North Carolina 28202
Telephone: (704) 331-7445
Email:  jon.edel@klgates.com

*Counsel to the Debtors*
*and Debtors in Possession*